# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., AMPRO PRODUCTS, INC. n/k/a CROSSROADS PROPERTIES B, INC., GEORGIA FEED PRODUCTS COMPANY, L.L.C. n/k/a CROSSROADS PROPERTIES C, LLC, | ) ) ) ) ) ) ) ) | C.A. No. __2:22-CV-091-RWS__ |
| Plaintiffs, | ) ) | **TRIAL BY JURY DEMANDED** |
| v. | ) ) | |
| RIVER VALLEY INGREDIENTS, LLC, TYSON POULTRY, INC., and TYSON FARMS, INC., | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## COMPLAINT

Cynthia G. Burnside
Matthew T. Covell
**HOLLAND & KNIGHT LLP**
Regions Plaza, Suite 1800
1180 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone:  (404) 817-8500
Facsimile:  (404) 881-0470
cynthia.burnside@hklaw.com
matthew.covell@hklaw.com

*Counsel for Plaintiffs*

OF COUNSEL:

Kenneth L. Racowski
**HOLLAND & KNIGHT LLP**
2929 Arch Street, Suite 800
Philadelphia, Pennsylvania 19104
Telephone:  (215) 252-9600
Facsimile:  (215) 867-6070
kenneth.racowski@hklaw.com

Caitlin Saladrigas
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida 33401
Telephone:  (561) 833-2000
Facsimile:  (561) 650-8399
caitlin.saladrigas@hklaw.com

Plaintiffs American Proteins, Inc. n/k/a Crossroads Properties A, Inc. ("American Proteins"), AMPRO Products, Inc. n/k/a Crossroads Properties B, Inc. ("AMPRO") and Georgia Feed Products Company, L.L.C. n/k/a Crossroads Properties C, LLC ("Georgia Feed") (collectively, "Plaintiffs" or the "API Entities") bring these claims against Defendants, Tyson Poultry, Inc. ("Tyson Poultry"), Tyson Farms, Inc. ("Tyson Farms"), and River Valley Ingredients, LLC ("River Valley") (collectively, "Defendants" or the "Tyson Entities"), and state as follows.

## NATURE OF THE CASE

1.      Beginning at a time unknown to Plaintiffs, but well known to Defendants, Defendants Tyson Poultry, Tyson Farms, and River Valley, by, through, and in concert with their officers and executives, including Roy Slaughter, Scott Peters, Shane Parks and Doug Ramsey, orchestrated an anticompetitive scheme in collusion with their competitors to drive Plaintiffs, American Proteins, AMPRO, and Georgia Feed, from the poultry rendering market in Georgia, Alabama, north Florida, and south Tennessee (the "Market").

2.      The Tyson Entities' scheme was intended to, and did, give the Tyson Entities monopolistic and monopsonistic control in the Market, which allowed the Tyson Entities to abuse their market power to harm consumers and competition.

3

3.      The Tyson Entities' scheme gave them access to highly confidential, competitively sensitive information for purposes of furthering and enforcing the conspiracy with their competitors.

4.      The Tyson Entities' conduct violates federal antitrust laws, and entitles Plaintiffs to compensatory, treble, and punitive damages, equitable relief, and recovery of fees and expenses.

5.      To carry out their scheme, the Tyson Entities colluded with two of the API Entities' largest supplier-customers, Wayne Farms, LLC ("Wayne Farms"), and Koch Foods, Inc. ("Koch Foods"),[1] to boycott the API Entities and withhold critical raw material inputs for purposes of forcing a below fair market value sale of the API Entities to the Tyson Entities.   Together with the Tyson Entities, the co-conspirator supplier-customers accounted for the majority of the API Entities' raw material inputs.

6.      Upon information and belief, the Tyson Entities' agreements with Wayne Farms and Koch Foods were at anticompetitive prices, far below the Tyson Entities' average variable costs.

---

[1] Wayne Farms and Koch Foods are poultry processors who historically sold raw material outputs from their poultry processing operations for use as inputs in the API Entities' poultry rendering operations and who also purchased feed products manufactured from those raw materials from the API Entities, all as described in greater detail, *infra*.

4

7.     The Tyson Entities then approached the API Entities and falsely represented that they had irrevocably locked up these supplier-customers to exclusive ten-year contracts, and that the Tyson Entities either would purchase the API Entities' operating assets (the "Transferred Assets")  or would ruin the API Entities' business by depriving them of the raw materials necessary to operate.

8.     Unbeknownst to and concealed from the API Entities, the Tyson Entities had negotiated a contractual "out" with Wayne Farms and Koch Foods that allowed the Tyson Entities to back out of the agreements if they were unsuccessful in forcing the divestiture of the Transferred Assets by the API Entities.  At the time, the Tyson Entities did not have any rendering plants operating in the Market that could service Wayne Farms and Koch Foods, showing that the purpose of the contracts was specifically to deprive the API Entities of raw materials in order to pressure them into a sale.

9.     The Tyson Entities then made a proposal for the purchase of the Transferred Assets at a price approximately one-half the amount at which the Tyson Entities internally had valued the Transferred Assets.  Facing the perceived destruction of their business, the API Entities reluctantly agreed to sell the Transferred Assets at a depressed price below fair market value through an Asset

#157521097_v1

Purchase Agreement ("APA"), thereby shutting down their long-time family business.

10.    The proposed transaction was submitted for Hart-Scott-Rodino Act ("HSR") review by the United States Department of Justice ("DOJ").  However, the Tyson Entities failed to disclose a number of anticompetitive purposes and effects of the acquisition, then unknown to the API Entities, including without limitation and upon information and belief: (1) that the Tyson Entities were able to sign up Wayne Farms and Koch Foods at anticompetitive rates by having their internal rendering divisions overcharge their captive internal processing operations in the first step of a predatory pricing scheme; (2) that the Tyson Entities would seek through their acquired monopoly and monopsony power as a vertically integrated operator in the Market to recoup losses on the Wayne Farms and Koch Foods contracts by price-gouging other customers after the acquisition, including competitor poultry processors, in the second step of the predatory pricing scheme; (3) that the Tyson Entities sought through the acquisition to gain access to sensitive competitive information, including among others, kill systems, bird sizes, deboning techniques, number of production days, equipment and process innovations, changes in customer specifications, whether competitors are entering or exiting certain markets, and scarcity of materials, which the Tyson Entities can now access in

6

connection with "rendering audits" of competitor poultry processing plants in the Market; and (4) that the Tyson Entities sought leverage over competitor processors through the ability to threaten to deprive those processors of rendering capacity in the Market, which is an essential waste management process, without which a poultry processing operation would be crippled.

11.    The Tyson Entities' actions to collude with their competitors and boycott the API Entities to force the divestiture of the Transferred Assets, and to use the monopoly and monopsony power thereby acquired as a vertically integrated operator in the Market to injure consumers and competition and to restrain trade, is simply the latest in a long line of bad faith, anticompetitive, and commercially repugnant conduct by the Tyson Entities and their affiliates.

## **PARTIES**

### **Plaintiffs**

12.    Plaintiff American Proteins is a privately held Georgia corporation, with its principal place of business in Cumming, Georgia.  On August 23, 2018, American Proteins changed its name to Crossroads Properties A, Inc.

13.    Plaintiff AMPRO is wholly owned by American Proteins and is incorporated in and has its principal place of business in Cumming, Georgia.  On August 23, 2018, AMPRO changed its name to Crossroads Properties B, Inc.

7

14.     Plaintiff Georgia Feed, whose sole member is American Proteins, is a Georgia limited liability company with its principal place of business in Cumming, Georgia.   On August 23, 2018, Georgia Feed changed its name to Crossroads Properties C, LLC.

**Defendants**

15.     Defendant Tyson Poultry is a Delaware corporation with its principal place of business in Springdale, Arkansas.   Tyson Poultry is a wholly owned subsidiary of Tyson Foods, Inc., which is a publicly traded Delaware corporation that is also headquartered in Springdale, Arkansas.

16.     Defendant Tyson Farms is a North Carolina corporation with its principal place of business in Springdale, Arkansas.   Tyson Farms is also a wholly owned subsidiary of Tyson Foods, Inc.

17.     Defendant River Valley is a Delaware limited liability company with its principal place of business in Springdale, Arkansas.   River Valley is a wholly owned subsidiary of Tyson Poultry, Inc.

**Co-Conspirators**

18.     Although not named as a defendant herein, Wayne Farms participated as a co-conspirator with Defendants and performed acts in furtherance of the

conspiracy to boycott Plaintiffs, drive Plaintiffs from the Market, and force Plaintiffs to sell to Defendants.

19.    Wayne Farms is a Delaware corporation with its principal place of business in Oakwood, Georgia.  Wayne Farms is a poultry processor and a direct competitor of Defendants.

20.    Although not named as a defendant herein, Koch Foods participated as a co-conspirator with Defendants and performed acts in furtherance of the conspiracy to boycott Plaintiffs, drive Plaintiffs from the Market, and force Plaintiffs to sell to Defendants.

21.    Koch Foods is a privately held Delaware corporation with its principal place of business in Park Ridge, Illinois.  Koch Foods is a poultry processor and a direct competitor of Defendants.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 4 which vests United States district courts "with jurisdiction to prevent and restrain violations" of the antitrust laws of the United States.

23.    This Court has personal jurisdiction over Defendants because they are registered to do business in the State of Georgia.  The Court also has personal jurisdiction over Defendants because Defendants transact business within this state

9

as contemplated by O.C.G.A. § 9-10-91(1), committed tortious acts or omissions within this state as contemplated by O.C.G.A. § 9-10-91(2), own, use or possess real property situated within this state as contemplated by O.C.G.A § 9-10-91(4), and Plaintiffs' claims arise from such acts, omissions, ownership, or use.

24.    Venue is proper in this district, because this is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated, including without limitation the negotiation and execution of the subject Asset Purchase Agreement, and the transfer of ownership of the former API facilities at Cumming, Georgia and Cuthbert, Georgia.  28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### Overview of the Poultry Rendering Industry

25.    American Proteins was a private, family-owned Georgia company founded in 1949 by Leland Bagwell, whose son, Tommy, took over the family business in 1972.  At the time it was acquired by Tyson, American Proteins had grown into the largest poultry renderer in the Southeast.

26.    Rendering is essentially a recycling and waste disposal process involving animal parts used to manufacture various animal feed products.  Rendering contributes to sustainability in the poultry industry and ensures that the greatest

10

possible use is made of non-edible (for human consumption) animal parts generated by the slaughter of poultry for human consumption.

27.    Poultry renderers acquire raw materials from so-called poultry processors:  the companies, like the Tyson Entities, Wayne Farms, and Koch Foods, that slaughter poultry and process the meat for human consumption.  After poultry is processed for human consumption, parts of the carcass and other leftovers are sold to poultry renderers who render these products into meal products for farmed animals and also for pets.

28.    The rendering industry is unique in that many poultry processors are both "suppliers" and "customers" in the sense that they sell raw materials (output from processing plants) to renderers like American Proteins and then buy back finished feed products from the same renderer at the end of the rendering process. Thus, the API Entities' contracts with many of their supplier-customers accounted for both:  (a) the purchase of raw materials by the API Entities from the processor, as well as, (b) the sale of finished feed products by the API Entities back to the processor.

**The Southeast Poultry Rendering Market**

29.    The API Entities provided poultry rendering services to processors located in Georgia, Alabama, north Florida, and south Tennessee (the "Market").

11

30.     Prior to the APA transaction, the API Entities controlled greater than an estimated 90% of the market share for poultry rendering within the Market.

31.     Within the territories of Alabama and Georgia, the API Entities' market share was greater than approximately 90%.  The Tyson Entities, and a small number of independent rendering operations, including Darling Ingredients, Inc., Fieldale Farms Corp., and Birmingham Hide & Tallow, Co., Inc. (also known as BHT ReSources) handled the remaining market share in Alabama and Georgia.  Upon information and belief, the independent operators were operating at or near capacity, and accordingly did not represent viable competition for the API Entities' services within those states.

32.     In north Florida, the API Entities serviced the single operating poultry processor (Pilgrim's Pride Corporation) and therefore controlled 100% of available market share.

33.     In Tennessee, the API Entities serviced two of five operating poultry processing plants, with the remaining three poultry processing plants being serviced by the Tyson Entities and/or their affiliates.

34.     Although the Tyson Entities, prior to the APA transaction, did not have any rendering plants within the Market, the Tyson Entities were a competitor for rendering services in Tennessee and areas adjacent to Georgia and Alabama.

#157521097_v1

35.     The geographic location of a poultry rendering operation is significant because poultry processors are only able to send raw materials out to a radius of approximately 125 miles of their poultry processing plants before the material becomes rancid and no longer can be used.  Thus, a poultry renderer must strategically locate within a viable radius of a sufficient concentration of the poultry processors it intends to service.  Poultry renderers located more than 125 miles away from a poultry processing plant are not realistic options for the processor and do not compete with closer renderers for the processor's business.

36.     The supply of available raw material inputs is effectively fixed and is dictated by the number of poultry processing operations and their output volume within the viable radius.  Without entry of a new poultry processing operation, the supply of raw material inputs for poultry rendering will not increase.  The supply of raw material inputs, however, could decrease depending on a host of factors.

37.     The API Entities had four poultry rendering plants.  API's Cumming Plant was located at 4990 Leland Drive, Cumming, Georgia.  API's Hanceville Plant was located at 1170 County Road 508, Hanceville, Alabama.  API's Alma Plant was located at 1255 US Highway 1 South, Alma, Georgia.  Georgia Feed's Cuthbert Plant was located at 82 Georgia Feed Drive, Cuthbert, Georgia.

38.    Attached as **Exhibit A** hereto is a map that shows four concentric circles of 125 miles around each of the API Entities' rendering facilities as they operated in 2018 prior to the APA transaction.  Within each of those four concentric circles of 125 miles, API's competitors in the poultry rendering industry (BHT Resources, Darling Ingredients, Fieldale Farms and Valley Proteins) are noted in green.  The map also shows the poultry processing plants operating in 2018 within the four concentric circles.  Accordingly, **Exhibit A** provides a visual representation of the location of all participants - suppliers, customers, and competitors - in the Market in which the API Entities operated prior to the APA transaction.  Each of the poultry processors in the Market faced the 125-mile limit on the transport of material to be rendered and could rely for rendering services only on the renderers identified in **Exhibit A**.  Accordingly, the area comprised of the four concentric circles in **Exhibit A** constitutes the "Southeast Poultry Rendering Market."

39.    The geographic component of the relevant antitrust market in which to evaluate the Defendants' conduct is the market for poultry rendering within the Southeast Poultry Rendering Market, as depicted in **Exhibit A**.

40.    The relevant antitrust market includes two distinct but related components.

14

41.     First, the Southeast Poultry Rendering Market includes the purchase of raw materials from poultry processors.  Processors slaughter poultry and process the meat for human consumption.  After this processing is complete, various parts of the animal remain that are not traditionally marketed and sold for human consumption.  The leftover parts of the poultry are the raw materials for rendering.  The poultry renderers purchase raw materials from poultry processors, which include feathers, bones, meat, entrails, and other non-human consumable parts of a poultry carcass or other leftovers.

42.     Second, the Southeast Poultry Rendering Market includes the sale of finished feed products back to poultry processors.  The poultry renderers boil, cook, and process the raw materials to create non-human consumable proteins that are sold as pet food, animal feed, or other purposes.  Once the rendering process is complete, the poultry renderer can sell the finished products back to the poultry processors from which it purchased the raw materials.

43.     Rendering is an essential service to poultry processors because it solves a significant waste management and disposal problem for the processors.  Without access to rendering, the processors would be responsible for disposal of all of the raw materials that otherwise are used as inputs in the rendering process.  The costs of disposing of the raw materials leftover from poultry processing, assuming that a

15

processor could even find access to a disposal site for the raw materials, would be crippling to the processor's ability to operate.  Without access to rendering, poultry processors would reduce the output of poultry processed for human consumption.  Accordingly, approximately 100% of the raw materials from processors within the Southeast Poultry Rendering Market were sold to renderers.

44.     Poultry renderers within the Southeast Poultry Rendering Market purchase raw materials from poultry processors, render the raw materials, and can sell the non-human consumable proteins back to the processors.  Because waste disposal (e.g., through landfilling) of the raw materials is not a commercially viable solution for poultry processors, there is no reasonable substitute for poultry processors for the services provided by renderers.

45.     Through the APA transaction, the Defendants acquired substantial market power in the Southeast Poultry Rendering Market.

46.     After the APA transaction, the Defendants have the ability to raise prices significantly above competitive levels profitably, without losing sales to capacity-constrained competing processors.  Moreover, Defendants have the ability to restrain trade and depress production by their direct competitor poultry processors by refusing access to the essential service of rendering within the Southeast Poultry Rendering Market.

16

**The Relevant Market Is Particularly Susceptible to Anticompetitive Conduct.**

47.    The Southeast Poultry Rendering Market is marked by several characteristics that facilitate the market's susceptibility to anticompetitive conduct and bolster Defendants' substantial market power.

48.    First, the poultry processors that supply raw materials for rendering in the Southeast Poultry Rendering Market have a long, deep history of collusion and anticompetitive conduct.

49.    Second, the Southeast Poultry Rendering Market is highly concentrated.  Following the APA transaction, Defendants possess over 90% of the market share for rendering within the market.

50.    Third, the Southeast Poultry Rendering Market has high barriers to entry.

51.    Fourth, the interrelated nature of the rendering and processing functions allows Defendants, as a vertically integrated processor and renderer, with market dominance in rendering in the Southeast Poultry Rendering Market, to benefit from access to non-public, highly confidential, and competitively sensitive information from processor competitors.  Specifically, Defendants as a renderer gain access to information from processor competitors, which, based on Defendants' control of rendering in the Market, have no choice but to rely on Defendants for rendering

17

services.  Defendants have the ability to use sensitive information they obtain about their competitor processors' production to form and enforce collusive agreements, to constrain their competitors' production by withholding rendering services, or to engage in other anticompetitive conduct that strengthens Defendants' market position in processing.

### **High Barriers to Entry**

52.    Because poultry rendering plants face large fixed costs and operating expenses, they need to operate at approximately 85% or more of total rendering capacity in order to be efficient.  This serves as a barrier to entry in the market because it means that a new entrant likely will not undertake the effort and significant expense associated with building a new rendering plant without a committed supply of raw materials.

53.    The Tyson Entities' internal documents state that building a rendering plant within the Southeast Poultry Rendering Market would cost an "estimated $200-250M over a minimum of 2 years."

54.    Significant additional barriers to entry exist in the poultry rendering industry due to environmental, regulatory, land-use, and permitting restrictions.

55.    The Tyson Entities' internal documents clearly recognize the non-monetary problems associated with building a new rendering plant, and state that

#157521097_v1

"[p]ermitting and other start-up issues will require management time, and distract from running daily business."

56.     The API Entities were required to obtain numerous permits relating to wastewater management, air emissions controls, and odor abatement, among others, from multiple agencies in order to operate in the Market.

57.     There is also strong and vocal community resistance to the construction of new poultry rendering facilities due to perceived risks of odors and other nuisances.

58.     The Tyson Entities' internal documents recognize the threat of community opposition and nuisance potential of seeking to build a new rendering plant within the Southeast Poultry Rendering Market as leading to "potentially negative press and pushback from locals."

59.     As a consequence of the extremely high barriers to entry, prior to the APA, there were no new rendering facilities built in the Southeast Poultry Rendering Market other than Plaintiffs' Cuthbert, Georgia plant in the last thirty-five (35) years.

**Defendants' History of Collusion and Other Anticompetitive Conduct**

60.     Defendants, their co-conspirators, and the poultry processors that supply raw materials for rendering in the Southeast Poultry Rendering Market have a long, deep history of collusion and anticompetitive conduct.

#157521097_v1

61.     Unparalleled access to highly guarded, non-public data about food production in the chicken, pork, and turkey industries has enabled anticompetitive price fixing to run rampant in recent years.  *See e.g.*, *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (N.D. Ill. 2017).

62.     Tyson itself was sued as a processor in these industries for using information accessed through a clearing house called Agri Stats, Inc. ("Agri Stats") to collude with and monitor competitors in violation of Section 1 of the Sherman Act.  *See id.*; *see also In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753 (D. Minn. 2020); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19 C 8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020).

63.     Agri Stats is "a company that provides 'secretive information exchange services' to companies in a variety of agricultural sectors . . . ."  *Olean*, 2020 WL 6134982 at *1 (citation omitted).  Agri Stats collects data from processors in these industries and provides those same processors with Agri Stats reports.  *In re Broiler Chicken*, 290 F. Supp. 3d at 781.

64.     Courts have held that access to information via a clearing house like Agri Stats could be used as "a mechanism to monitor" competitors in a manner that facilitates price fixing.  *Id.* at 798 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906–07 (6th Cir. 2009)) (an industry information clearing house could

be a tool for a price fixing conspiracy if it "could provide defendants with [the pertinent] information *before* defendants implemented their rate reductions")); *see also In re Pork*, 495 F. Supp. 3d at 766–67 (information exchanged via Agri Stats was "detailed, competitively sensitive, and closely guarded non-public information about prices, capacity, sales volume, and demand" that plaintiffs argued was used to "monitor" competitors' production in a manner that supported claims for a price fixing conspiracy in violation of Section 1 of the Sherman Act); *Olean*, 2020 WL 6134982 at *2 (Agri Stats reports in the chicken and turkey industries contained data on "the number of broilers placed, chick mortality by week and percentage, chick cost, days between flocks provided to contract farmers, feed conversion rates, and average daily weights" and access to this data enabled defendants in the turkey industry to "monitor industry-wide supply levels").

65.    In the broiler chicken industry, Agri Stats reports provide information about where processors buy their breeder stock and feed, the size of production facilities, and actual production numbers. *In re Broiler Chicken*, 290 F. Supp. 3d at 781. The reports also provide information regarding production capacity, including number of eggs, the size of breeder flocks, and other inventory numbers, as well as financial information about each company. *Id.*

66.    Agri Stats was used as a means of communication and monitoring by competitors in various agricultural sectors to support collusion and price fixing. *Id.* at 800.

67.    After the APA transaction, Defendants' control over rendering in the Market provides them a steady supply of real-time information about their competitor processors' production that is analogous - if not more robust - to market information shared by Agri Stats.  Poultry processors must render inedible poultry waste products and Defendants' dominance in rendering means that competitor processors in the Market cannot avoid working with Defendants and, voluntarily or involuntarily, sharing with Defendants information about their production.

68.    Poultry rendering plants provide the renderer with a significant amount of non-public, highly guarded information about poultry size, poultry type, production volume, kill schedules, and technology used.  In short, the Tyson Entities' poultry rendering plants provide the Tyson Entities with access to substantial amounts of real time data on their competitors in the Southeast region. Like in the Agri Stats cases where competitors were able to glean significant amounts of material information about one another to monitor production output and fix prices, the Tyson Entities are now able to collect information about their competitors with impunity, including through the use of rendering audits.  The Tyson

#157521097_v1

Entities are able to garner an unprecedented amount of information through poultry rendering plants, which their competitors have no choice but to use.

69.     Additionally, where (as here) barriers to entry are high and the market has experienced increased consolidation, the deleterious effect of information exchanges on competition in the market is particularly significant. *See Olean*, 2020 WL 6134982.

70.     The processor competitors that use the Tyson Entities' poultry rendering plants have no alternative poultry rendering plant and cannot survive without a poultry rendering plant.  As a result, the Tyson Entities are now perfectly positioned to garner information from their processor competitors by rendering competitors' inedible poultry waste product.  The Tyson Entities have a captive market, whose participants are unable to turn to another poultry renderer for their needs.

71.     As was the case with Agri Stats, where the exchange of information in a small, difficult to enter market was especially bad for competition, the nature of the poultry rendering industry gives the Tyson Entities an anticompetitive advantage.  The Tyson Entities' poultry rendering plants arguably provide the Tyson Entities with even more power than Agri Stats gave food processors.  The poultry rendering plants now owned by the Tyson Entities create a self-enforcing circle that

23

supports and enables the Tyson Entities' ability to dominate and abuse its market power in the Southeast Poultry Rendering Market.

### The Tyson Entities Targeted the API Entities with an Illegal Boycott

72.    In the summer of 2017, the Tyson Entities, through Roy Slaughter, the Senior Vice President, Operations of Tyson Foods, approached the API Entities in Georgia through Tommy Bagwell, then the chairman of the board of American Proteins and the majority shareholder of the API Entities, and Mark Ham, then the CEO of American Proteins, regarding the Tyson Entities' interest in acquiring the API Entities and/or the Transferred Assets.

73.    The Transferred Assets included API's four poultry rendering plants in Hanceville, Alabama, Cumming, Georgia, Alma, Georgia, and Cuthbert, Georgia.

74.    The Tyson Entities falsely represented through Slaughter, Scott Peters (Senior Vice President, Finance of Tyson Foods), Shane Parks (Senior Vice President, Tyson Foods) and others, to the API Entities and their representatives in Georgia that the Tyson Entities had signed up Wayne Farms and Koch Foods to ten-year exclusive contracts[2] that would deprive the API Entities of the majority of their raw material supply (when combined with the departure of Tyson and its newly

_____

[2] The Tyson Entities' internal documents state that typical rendering agreements for the supply of raw materials are "under 3-5 year contracts."

acquired Keystone operations).  If true, the API Entities would be functionally unable to continue operating because they would lack the ability to run their plants at the required minimum capacity.

75.   Wayne Farms and Koch Foods had been rendering customers of the API Entities for approximately 30 years.  When the API Entities learned of the agreements with the Tyson Entities, they immediately undertook efforts to retain their long-time customers.  The API Entities made attractive new contract offers to Wayne Farms and Koch Foods at prices below the parties' prior agreements and at market length for rendering agreements.  Their efforts were fruitless, as both Wayne Farms and Koch Foods refused to even consider the proposals and advised the API Entities that the agreements with the Tyson Entities were done from the start.

76.   While the Tyson Entities had in fact reached agreements with Wayne Farms and Koch Foods, the Tyson Entities misrepresented, omitted, and concealed that the Tyson Entities had retained a contractual "out" that would permit them to back out of the Wayne Farms and Koch Foods contracts if they were unable to induce the API Entities to sell them the Transferred Assets.

77.   Wayne Farms and Koch Foods also told the API Entities that the Tyson Entities had locked them up for ten years, but omitted or concealed that the Tyson

Entities had retained a contractual "out" in the agreements, in the event that Defendants' scheme failed.

78.    The Tyson Entities' intent to use the Wayne Farms and Koch Foods contracts as leverage to force the API Entities to sell is reflected in Tyson board materials, which state: "[T]he owner decided to engage in discussions . . . due to . . . Tyson securing raw material contracts with key suppliers (Koch & Wayne)."

79.    Prior to the Tyson Entities' overtures, the API Entities were not seeking to sell their assets or business, and they would not have agreed to the sale had they known the truth about the Wayne Farms and Koch Foods contracts.

80.    The Tyson Entities had a long history of collusion with Wayne Farms and Koch Foods that involved not only the poultry processing industry, but also the pork and beef processing industries.

81.    The Tyson Entities had entered collusive agreements with Wayne Farms and Koch Foods (as well as other processors) to fix prices, limit output, and exchange competitively sensitive information.

82.    Building upon this history of collusion, the Tyson Entities convinced Wayne Farms and Koch Foods to collusively agree to boycott the API Entities by withholding their collective raw materials from the API Entities, thereby depriving the API Entities of the volume necessary to maintain profitable rendering operations.

83.     Upon information and belief, the Tyson Entities offered Wayne Farms and Koch Foods pricing below their marginal costs of rendering, in exchange for one-sided, long-term contracts that provided the Tyson Entities with the ability to cancel the contracts, if the scheme to force the API Entities did not succeed.

84.     Wayne Farms and Koch Foods, already involved in various collusive agreements with the Tyson Entities, had incentives to go along with yet another invitation to collude with the Tyson Entities and participate in the scheme to drive the API Entities out of the Southeast Poultry Rendering Market.  The Tyson Entities offered Wayne Farms and Koch Foods long-term access to rendering services at below-market rates, along with the possibility that the Tyson Entities' control over rendering prices might impede entry by, or growth of, other processors.

85.     The Tyson Entities, along with their co-conspirators Wayne Farms and Koch Foods, formed their collusive agreement with the specific intent for the Tyson Entities to monopolize the Southeast Poultry Rendering Market.

86.     To ensure the success of their illegal boycott, the Tyson Entities put significant pressure on the API Entities.  At one point during an unrelated lunch meeting in Dallas, Texas, Roy Slaughter, then the Senior Vice President, Operations of Tyson Foods, attempted to physically intimidate Mark Ham, then the CEO of

American Proteins, regarding the potential sale of the API Entities to the Tyson Entities.

87.     During this lunch, Mr. Slaughter, who had become irate and began to lean over the table towards Mr. Ham, aggressively threatened that:  "we are either going to buy you or put you out of business!"  Mr. Ham understood Mr. Slaughter's plain meaning to be that the API Entities could either sell their business to the Tyson Entities or the Tyson Entities would drive the API Entities out of business entirely.

88.     Mr. Ham was shocked by Mr. Slaughter's conduct and comments, and conveyed the substance of the conversation with alarm to other senior executives of the API Entities the next day.

89.     The Tyson Entities' intention to acquire the API Entities was made clear throughout the Southeast Poultry Rendering Market.  A senior executive of Koch Foods, a long-standing primary supplier-customer of the API Entities, specifically told Mark Ham that the Tyson Entities were "coming after Tommy [Bagwell]," the owner of the API Entities, and were going to "force him to sell."

90.     Due to the illegal boycott, the API Entities justifiably concluded that they were faced with an existential threat to their continued ability to operate and therefore reluctantly agreed to discuss a sale of the Transferred Assets to the Tyson Entities.  As the API Entities saw it, if they did not sell to the Tyson Entities, their

business would be functionally destroyed, and the Transferred Assets would sit and rust.

91.     Thereafter, the Tyson Entities communicated to the API Entities a proposed purchase price range for the Transferred Assets between $800 to $850 million without any information relating to the historical financial performance of the API Entities.  The price of the proposed transaction was to be based on the Transferred Assets and their rendering capacity, which the Tyson Entities could value based on their knowledge and experience operating rendering facilities of their own.

92.     This proposed purchase price was approximately *half* of the Tyson Entities' internal valuation of the Transferred Assets, as reflected in internal Tyson board presentation materials, which was well below fair market value.

93.     On May 14, 2018, the Tyson Entities and the API Entities executed the subject APA, under which the Tyson Entities agreed to pay $825 million for the Transferred Assets.

94.     The APA transaction closed on August 20, 2018 ("Closing").  The Defendants' collusive boycott with Wayne Farms and Koch Foods succeeded.

95.     The APA transaction was both the culmination of Defendants' collusion with Wayne Farms and Koch Foods, and also the instrumentality and

29

means by which the Tyson Entities sought to carry out a plan to further injure consumers and competition in the Southeast Poultry Rendering Market.

**Harm to Consumers and Competition as a Result of the APA Transaction**

96.    Prior to the APA transaction, the API Entities were an independent rendering operation that depended entirely on third-party suppliers for its raw material inputs.  This reliance created significant incentives for the API Entities to keep prices and margins low and to act to benefit the API Entities' supplier-customers, even though the API Entities were a dominant firm in the Market.

97.    Prior to the APA transaction, the Tyson Entities were supplier-customers of the API Entities for rendering services in the Market.

98.    Unlike the API Entities, the Tyson Entities are part of a vertically integrated poultry operation, which owns and operates its own processing and rendering divisions, among others.  As such, the Tyson Entities have their own captive internal sources of raw material inputs for rendering (the outputs from their own processing divisions) and are not subject to the same incentives to keep prices and margins low with regard to third party supplier-customers, including in particular the supplier-customers who compete with the Tyson Entities and their affiliates in poultry processing.

99.   At the time of the APA transaction, the Tyson Entities lacked the rendering capacity necessary to service themselves and customers in the Market.  To obtain that capacity and the control over rendering needed to injure consumers and competition in the Southeast Poultry Rendering Market, the Tyson Entities had to drive the API Entities from the Market.  They did so by conspiring with Wayne Farms and Koch Foods with the specific intent to monopolize the Southeast Poultry Rendering Market.

100.   After acquiring the Transferred Assets, the Tyson Entities obtained monopoly and monopsony power within the Southeast Poultry Rendering Market. The Tyson Entities' market power, coupled with significant barriers to entry, give the Tyson Entities the power to reward, punish, and to discriminate between and among customers, including those that compete with the Tyson Entities in poultry processing and other market segments.

101.   For example, upon information and belief, the Tyson Entities have used their market power to raise prices on customers, including Pilgrim's Pride Corporation ("Pilgrim's"), which is the Tyson Entities' largest and most significant processor competitor and the largest supplier of raw materials for rendering in the Southeast Poultry Rendering Market.

102.   Pilgrim's was a longtime supplier and customer of the API Entities, who operated under short-term agreements and fair pricing.  But following the APA transaction, the Tyson Entities have, upon information and belief, sought to force Pilgrim's to accept an exclusively long-term supply contract awarding the Tyson Entities above-market prices.

103.   The Tyson Entities' anticompetitive use of its market power against its biggest competitor has forced Pilgrim's to explore the exceedingly difficult and expensive route of building its own rendering plant in the Southeast Poultry Rendering Market.

104.   Upon information and belief, Pilgrim's has failed to gain approval to build a rendering facility in at least three towns within the Southeast Poultry Rendering Market.

105.   Without access to rendering services, Pilgrim's business as a competitor processor of the Tyson Entities would be crippled.  Pilgrim's is faced with the choice of incurring tremendous expense and delay in building its own rendering plant or dealing with the Tyson Entities on discriminatory and highly unfavorable terms.  Either choice will harm Pilgrim's ability to compete with the Tyson Entities.  Moreover, as the largest and most significant competitor to the

Tyson Entities, prices will increase and output will decrease within the Southeast Poultry Rendering Market.

106.   Harming Pilgrim's ability to compete with the Tyson Entities was an explicit intent and factor driving the Tyson Entities' anticompetitive scheme. Specifically, Tyson's own internal documents show that Pilgrim's threat to the Tyson Entities was part of the "strategic rationale" for its collusion to force the API Entities from the Southeast Poultry Rendering Market.

107.   Among other things, the potential price increases to Pilgrim's, in the form of increased service fees for processing raw materials, are intended upon information and belief to recoup losses incurred in connection with the predatorily priced Wayne Farms and Koch Foods contracts that allowed the Tyson Entities to induce the sale.

108.   As a vertically integrated processor and renderer, the Tyson Entities' ability to increase prices to Pilgrim's and other customers is not checked by ordinary market forces.  Even if customers had alternatives for some of their rendering needs (which, based on the Tyson Entities' dominance in rendering, they do not), the Tyson Entities could withstand reduction in external raw material supply by increasing or reallocating captive internal raw material supply to allow their rendering facilities to continue to operate at efficient levels.

109.  Pilgrim's and other affected supplier-customers have no viable alternative rendering operation to which to send their raw material outputs in the Southeast Poultry Rendering Market.  Not rendering the materials is not an option because the poultry processors are otherwise obligated to dispose of the materials. Restrictions on landfilling as well as waste disposal costs and other regulations mean that the processors cannot simply discard the materials.  And because the Tyson Entities do not have a viable rendering competitor in the Market (having acquired the API Entities' more than 90% market share), and a new entrant is unlikely due to the high barriers to entry, Pilgrim's and related parties effectively have no choice but to continue using the Tyson Entities for poultry rendering in the Market, regardless of the Tyson Entities' pricing.  This further assures that the Tyson Entities' anticompetitive conduct is unlikely to be corrected by market forces unless and until a court intervenes.

110.   In particular, the Tyson Entities' dominant market position provides the Tyson Entities with significant leverage over the independent poultry processors (which do not have their own rendering operations) in the Southeast Poultry Rendering Market.  Those independent processors are vulnerable to their monopolist and monopsonist processing competitor, the Tyson Entities.   These independent

processors include Sanderson Farms, Mar-Jac Poultry, Golden Rod Broilers, and Peco Foods.  *See* **Exhibit A**.

111.   Based on their market dominance as a renderer controlling more than 90% market share in the Southeast Poultry Rendering Market, the Tyson Entities also hold substantial market power over their processor competitors within the Southeast Poultry Rendering Market, which have no choice but to supply highly confidential, commercially sensitive data to the Tyson Entities along with their raw materials.

112.   The Tyson Entities have replaced Agri Stats as the sole source of competitive market data within the Southeast Poultry Rendering Market and have access to real-time data that enables Defendants to "monitor industry-wide supply levels."  In doing so, the Tyson Entities have the ability to abuse their market power by colluding with other processor competitors to fix prices, reduce outputs, or otherwise harm competition and consumers, as they have done in numerous other instances within the last decade.

113.   As the Supreme Court long-ago held in *American Column & Lumber Co. v. United States*,[3] "[g]enuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals."

---

[3] *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921).

#157521097_v1

114.   Access to this highly confidential, competitively sensitive information from its competitors allows the Tyson Entities not only to form new collusive agreements, but to enforce, police and maintain the already existing collusive agreements between the Tyson Entities and their competitors.

115.   Rendering contracts provide a tool to keep competitor pricing in line because the information gained from rendering allows a vertically integrated processor and renderer to control market pricing.

116.   The Tyson Entities own and operate rendering plants outside of the Southeast Poultry Rendering Market that service some of the same processor competitors.  The Tyson Entities can also abuse their market power by tying pricing in other markets to their provision of rendering services within the Southeast Poultry Rendering Market.   By threatening to refuse to provide rendering services to processors within the Southeast Poultry Rendering Market, the Tyson Entities can charge above market prices in other markets to processors that have no alternative for their rendering services within the Southeast Poultry Rendering Market.

### Tyson's Prior Collusion with Koch Foods and Wayne Farms Paves the Way for the Current Collusion with Koch Foods and Wayne Farms

117.   Tyson was not alone in executing its scheme to push API out of the Southeast Poultry Rendering Market, thereby taking over API's dominant market share.  Defendants maneuvered with the help of their other co-conspirators, Wayne

Farms and Koch Foods, to bring their collusive scheme to life and obtain a dominant position in rendering in the Market and access to competitor processors' competitive data with the ability to form new conspiracies and enforce its ongoing conspiracies. The three co-conspirators did so with the specific intent to monopolize the Southeast Poultry Rendering Market.

118.   Koch Foods and Wayne Farms - both co-defendants with Tyson in *In re Broiler Chicken Antitrust Litigation* in the Northern District of Illinois - conspired with Tyson to effectuate the anticompetitive scheme.

119.   In fact, these three co-conspirators have a storied history of anticompetitive conduct. A simple search of the federal court dockets reveals 41 antitrust actions currently pending or filed against all three entities - Tyson, Koch, and Wayne - within the past two years alone.  That astounding number is without consideration of the companies' affiliates, and without consideration of Tyson's affiliate, Tyson Foods, Inc.

120.   Tyson Foods was served with a Department of Justice ("DOJ"), Antitrust Division grand jury subpoena on April 26, 2019, concerning a criminal investigation into anticompetitive conspiracy in the broiler chicken industry.  Tyson Foods self-reported violative conduct, avoiding prosecution by making a deal with the DOJ to cooperate with the investigation.  However, on October 6, 2020, multiple

37

Tyson executives were individually indicted.  Notably, Koch Foods, as well as several of its executives, were also indicted for conspiring to fix prices and rig bids for broiler chickens on July 28, 2021.[4]

121.   While Tyson's cooperation with the DOJ resulted in its avoidance of criminal charges, Tyson has paid a total of $179 million to date in settlement of consumer ($99 million) and wholesaler ($80 million) claims in the Northern District of Illinois Broiler Chicken Antitrust Litigation, alone.  As previously noted, all three of Tyson, Koch, and Wayne were implicated in that litigation.

122.   According to the District Court for the Northern District of Illinois, all three of Tyson, Koch, and Wayne were among entities that had received Antitrust Civil Investigative Demands from the office of the Florida Attorney General.  *See In re Broiler Chicken Antitrust Litigation*, 2017 WL 4417447 (N.D. Ill. Sept. 28, 2017).  Not only were all three entities implicated in anticompetitive conduct, all three entities were implicated in anticompetitive conduct within the confines of the Southeast Poultry Rendering Market  at issue here.

---

[4] While co-conspirator Wayne Farms and its executives were not, to API's knowledge, indicted in connection with the broiler chicken price fixing criminal investigation, Wayne Farms also has a track record of antitrust enforcement scrutiny. The announced merger of Wayne Farms with Sanderson Farms (as a joint venture between Cargill and Continental) is under antitrust investigation by the DOJ.

123.   In the same Northern District of Illinois litigation, the court found allegations about defendants' parallel conduct - explicitly including Tyson, Wayne Farms, and Koch Foods - to plausibly demonstrate that the parallel conduct (around price-fixing) was a product of conspiracy.

124.   It has been established throughout years of antitrust litigation in the poultry industry that Tyson, Koch Foods, and Wayne Farms have been in the same room together for many anticompetitive conversations.  In *Jien v. Perdue Farms Inc.*, No. 19-cv-2521, 2020 WL 5544183 (D. Md. Sept. 16, 2020), in fact, the District Court for the District of Maryland noted that a Tyson executive had made an important co-conspirator admission.  He testified that "off books" wage fixing discussions among processors - including Tyson, Koch Foods, and Wayne Farms - were so beyond the pale, that Tyson determined to withdraw from the discussions. The court found that, based on Tyson's admission, there "is no inferential leap required to find a wage fixing conspiracy plausible."

125.   Tyson, Wayne Farms and Koch Foods's collusion is explicit.  These three competitors entered into anticompetitive contracts aimed at monopolizing the Southeast Poultry Rendering Market and consolidating competitively sensitive competitor information within Tyson's control - providing Tyson with access to the information about poultry supply, bird size, kill schedules, and other data points

previously available only through Agri Stats.  That the conduct was collusive is clear:  Tyson, Wayne Farms and Koch Foods cannot have contracted as they did without explicit discussion and acknowledgement that they were seeking to put the API Entities out of business.  That purpose was, in fact, written into the contracts.

126.   As Tyson, Koch Foods and Wayne Farms, along with their competitors, came under criminal and civil fire for their anticompetitive monitoring of the poultry market through Agri Stats, monopsonizing (and monopolizing) the Southeast Poultry Rendering Market, aided by Koch Foods and Wayne Farms, presented Tyson with a new opportunity to aggregate the type of information it once obtained through its anti-competitive use of Agri Stats.

**<u>Fraudulent Concealment, Delayed Discovery, and Tolling</u>**

127.   The API Entities did not learn of the contractual "out" until sometime after the Closing of the APA transaction.

128.   Plaintiffs, through the exercise of reasonable diligence, could not have discovered Defendants' wrongful conduct or the resulting injury any sooner because Defendants fraudulently concealed and affirmatively misled Plaintiffs as to their conduct and the resulting impact, and specifically refused to show copies of the Wayne Farms and Koch Foods contracts to the API Entities' representatives, despite requests for same prior to Closing.

129.   By its very nature, the success of a conspiracy depends on the co-conspirators' concealment of its existence.   Upon information and belief, Defendants, along with their co-conspirators Wayne Farms and Koch Foods, planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings, agreed not to discuss or disclose details of their conspiracy or the terms of their agreements in furtherance of their conspiracy, and falsely represented to Plaintiffs the nature of the contracts whereby the conspirators boycotted the API Entities.

130.   Recognizing both the illegality of the conspiracy and the need to disguise its existence, Defendants, along with co-conspirators Wayne Farms and Koch Foods, took affirmative acts to conceal the key terms of the one-sided supply contracts that Defendants used to wrongfully force the API Entities from the Southeast Poultry Rendering Market.

131.   Plaintiffs only recently discovered limited information that belies Defendants' representations and reveals the true nature and scope of Defendants' conspiracy and boycott despite efforts by the Tyson Entities to conceal same.

132.   Defendants' fraudulent concealment caused Plaintiffs' delayed discovery of the facts underlying Plaintiffs' claims.   As a result, any applicable statute of limitations affecting the rights of Plaintiffs has been tolled.

## CAUSES OF ACTION

### COUNT I
**(Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1)**
**Against All Defendants**

133.   Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 132 as if fully set forth herein.

134.   The Defendants' conduct as alleged herein constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

135.   The Defendants entered into an agreement with direct horizontal processing competitors Wayne Farms and Koch Foods, and with as-yet unknown co-conspirators, to boycott or refuse to deal with the API Entities.   This group boycott or horizontal refusal to deal is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

136.   If not *per se* unlawful, Defendants' agreement with Wayne Farms and Koch Foods unreasonably restrained competition under the rule of reason.   This illegal group boycott or concerted refusal to deal with Plaintiffs harmed competition in the market for the provision of poultry rendering services in the Southeast Poultry Rendering Market.   The unlawful agreement deprived Plaintiffs of sufficient raw material supply to profitably operate their rendering facilities, forced a sale of Plaintiffs' business at a below-market price, eliminated an independent rendering

42

provider incentivized to maintain reasonable pricing to supplies from the marketplace, and replaced Plaintiffs with a vertically integrated monopolist with the anticompetitive marketplace incentives described above. Defendants' market power and control over the market for rendering services in the Southeast Poultry Rendering Market, acquired as a result of its illegal agreement, allows them to raise prices to independent customers not involved in the collusive scheme.

137. Defendants' conduct produces no procompetitive benefits. Any alleged basis for their conduct is an improper and contrived pretextual justification.

138. Defendants' unlawful boycott of the API Entities and acquisition of market power in rendering in the Southeast Poultry Rendering Market occurred within the flow of and substantially affected interstate commerce.

139. As a direct and proximate result of Defendants' illegal collusion, Plaintiffs have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Defendants' conduct has damaged Plaintiffs in the form of lost profits, being forced to sell their long-time family business at a depressed price below fair market value, and the costs of investigation and suit. Plaintiffs are entitled to treble damages and attorneys' fees for the violation of the Sherman Act alleged herein.

140.   Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive collusion.

## COUNT II
### (Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2)
### Against All Defendants

141.   Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 140 as if fully set forth herein.

142.   Defendants, through their anticompetitive conduct, acquired a monopoly over the provision of rendering services in the Southeast Poultry Rendering Market.   Rendering services constitutes a relevant antitrust product market because poultry processors have no realistic alternative to rendering services for the disposal of materials that are not processed for human consumption.   The geographic market in which Defendants acquired a monopoly is no larger than the Southeast Poultry Rendering Market identified in **Exhibit A** because poultry processors can transport raw materials for rendering no further than 125 miles and there are no rendering facilities within the necessary proximity to any poultry processors other than those within the identified boundaries of the Southeast Poultry Rendering Market.

143.   Defendants acquired monopoly power over the relevant market by engaging in anticompetitive conduct.   Specifically, Defendants entered into long-

#157521097_v1

term agreements with Plaintiffs' suppliers at prices below Defendants' costs of

supplying rendering services, depriving Plaintiffs of raw material supply necessary

to operate their facilities profitably, and forcing Plaintiffs to sell their facilities to

Defendants.  Defendants' anticompetitive conduct also included reaching a collusive

agreement with two of their poultry processor competitors, Wayne Farms and Koch

Foods, to discontinue doing business with Plaintiffs.  Defendants' conduct lacks any

business justification other than eliminating Plaintiff from the rendering market and

allowing it to obtain a dominant market position.

144.   By virtue of its anticompetitive conduct, which forced Plaintiffs to sell

their rendering business to Defendants at a below-market price, Defendants obtained

a monopoly in rendering in the Southeast Poultry Rendering Market, controlling

approximately 90% of rendering in the Market.

145.   Defendants' unlawful acquisition of a monopoly occurred within the

flow of, and substantially affected, interstate commerce.

146.   As a direct and proximate result of Defendants' acquisition of a

monopoly, Plaintiffs have been injured in their business and property by reason of

Defendants' violation of Section 2 of the Sherman Act, within the meaning of

Section 4 of the Clayton Act, 15 U.S.C. § 15.  Defendants' conduct has damaged

Plaintiffs in the form of lost profits, being forced to sell their long-time family

business at a depressed price below fair market value, and the costs of investigation and suit. Plaintiffs are entitled to treble damages and attorneys' fees for the violation of the Sherman Act alleged herein.

147.   Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

<u>**COUNT III**</u>
**(Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**Against All Defendants**

148.   Plaintiffs incorporate by reference the allegations of Paragraphs 1 through 147 as if fully set forth herein.

149.   The Defendants' conduct as alleged herein constitutes a conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

150.   The Defendants entered into an agreement with direct horizontal processing competitors Wayne Farms and Koch Foods, and with as-yet unknown co-conspirators to boycott the API Entities, force the API Entities to sell their business to Defendants, and with the specific intent for the Tyson Entities to achieve a monopoly in the Southeast Poultry Rendering Market.

151.   Defendants' unlawful agreement with Wayne Farms and Koch Foods deprived Plaintiffs of sufficient raw material supply to profitably operate their rendering facilities, forced a sale of Plaintiffs' business at a below-market price,

46

eliminated an independent rendering provider incentivized to maintain reasonable pricing to supplies from the marketplace, and replaced Plaintiffs with a vertically integrated monopolist with the anticompetitive marketplace incentives described above. Defendants' market power and control over the market for rendering services in the Southeast Poultry Rendering Market, acquired as a result of its illegal agreement, allows them to raise prices to independent customers not involved in the collusive scheme.

152.   Defendants' conduct produces no procompetitive benefits. Any alleged basis for their conduct is an improper and contrived pretextual justification.

153.   Defendants' conspiracy to monopolize the Southeast Poultry Rendering Market occurred within the flow of and substantially affected interstate commerce.

154.   As a direct and proximate result of Defendants' illegal conduct, Plaintiffs have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15. Defendants' conduct has damaged Plaintiffs in the form of lost profits, being forced to sell their long-time family business at a depressed price below fair market value, and the costs of investigation and suit. Plaintiffs are entitled to treble damages and attorneys' fees for the violation of the Sherman Act alleged herein.

155.   Plaintiffs injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive collusion.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that this Court enter judgment in their favor and award the following relief:

1) Enter an Order permanently enjoining the Defendants from ongoing violations of Section 1 and Section 2 of the Sherman Act;

2) Restore competition to the Southeast Poultry Rendering Market by ordering that the Tyson Entities divest the Transferred Assets and naming a Trustee to sell the Transferred Assets to a buyer that is not a vertically integrated poultry processor;

3) Award compensatory and trebled damages in favor of the Plaintiffs and against Defendants, jointly and severally, and punitive damages, including all interest thereon;

4) Award Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

5) Any such further relief as the Court deems appropriate.

#157521097_v1

/s/ Cynthia G. Burnside
Cynthia G. Burnside
Matthew T. Covell
**HOLLAND & KNIGHT LLP**
Regions Plaza, Suite 1800
1180 West Peachtree Street NW
Atlanta, Georgia 30309
Telephone:  (404) 817-8500
Facsimile:  (404) 881-0470
cynthia.burnside@hklaw.com
matthew.covell@hklaw.com

*Counsel for Plaintiffs*

OF COUNSEL:

Kenneth L. Racowski
**HOLLAND & KNIGHT LLP**
2929 Arch Street, Suite 800
Philadelphia, Pennsylvania 19104
Telephone:  (215) 252-9600
Facsimile:  (215) 867-6070
kenneth.racowski@hklaw.com

Caitlin Saladrigas
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida 33401
Telephone:  (561) 833-2000
Facsimile:  (561) 650-8399
caitlin.saladrigas@hklaw.com