IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., AMPRO PRODUCTS, INC. n/k/a CROSSROADS PROPERTIES B, INC., and GEORGIA FEED PRODUCTS COMPANY, L.L.C. n/k/a CROSSROADS PROPERTIES C, LLC, | |
| Plaintiffs, | Civil Action No. |
| v. | 2:22-CV-91-RWS |
| RIVER VALLEY INGREDIENTS, LLC, TYSON POULTRY, INC., and TYSON FARMS, INC., | |
| Defendants. | |

**ORDER**

This case comes before the Court on Defendants' Motion to Dismiss [Dkt. 18] and related filings [Dkts. 1, 24, 27, 29]. Also pending before the Court are Plaintiffs' Motion to Establish Timing and Sequence of Discovery [Dkt. 26] and Plaintiffs' Motion for Leave to File Sur-Reply [Dkt. 29]. As an initial matter, Plaintiffs' Motion for Leave to File Sur-Reply [Dkt. 29] is **GRANTED**. The Court has considered Plaintiffs' additional arguments [Dkt. 29] and Defendants'

responses thereto [Dkt. 33] when considering the Motion to Dismiss [Dkt. 18].

After reviewing the parties' briefings, the Court enters the following Order.

## BACKGROUND[1]

Plaintiffs American Proteins, Inc. n/k/a Crossroads Properties A, Inc.

("American Proteins"), AMPRO Products, Inc. n/k/a Crossroads Properties B, Inc.

("AMPRO"), and Georgia Feed Products Company, L.L.C. n/k/a Crossroads

Properties C, LLC ("Georgia Feed") filed this complaint seeking relief under the

Sherman Act, 15 U.S.C. § 1, *et seq.* [Dkt. 1 – Complaint at 3, ¶¶ 133–55]. Named

as Defendants are River Valley Ingredients, LLC ("River Valley"), Tyson Poultry,

Inc. ("Tyson Poultry"), and Tyson Farms, Inc. ("Tyson Farms"). [Complaint at 3,

¶¶ 1, 15–17].

As recently as 2018, Plaintiffs were the largest poultry renderer in the

southeastern United States. [Complaint at ¶ 25]. Rendering is "essentially a

recycling and waste disposal process involving animal parts used to manufacture

various animal feed products." [Complaint at ¶ 25]. After poultry processors

slaughter and process the chicken for human consumption, they sell leftover

chicken parts that are nonedible for humans to poultry renderers. [Complaint at ¶

---

[1] As the case is before the Court on a motion to dismiss, the Court accepts as true the facts alleged in the Complaint. <u>Cooper v. Pate</u>, 84 S. Ct. 1733, 1734 (1964).

27]. Poultry renderers take the leftover chicken parts and render them into meal products for livestock and pets. [Complaint at ¶ 27]. Rendering is an essential service to poultry processors because waste disposal of the nonedible raw materials through other methods, such as landfilling, are far too expensive. [Complaint at ¶¶ 43–44].

Many poultry processors serve as both suppliers and customers for poultry renderers—they supply renderers with nonedible chicken parts as inputs, and, after renderers transform these into livestock and pet meal products, the processors purchase those outputs from the renderers. [Complaint at ¶ 28]. Plaintiffs' contracts with many of their "supplier-customers" accounted for both the purchase of raw materials from the poultry processors and the sale of finished feed products back to those processors. [Complaint at ¶ 28].

Poultry processors can only ship nonedible chicken parts out approximately 125 miles before the materials become rancid and unusable. [Complaint at ¶ 35]. To account for this, poultry renderers must strategically locate their facilities within a 125-mile radius of the processors they intend to serve. [Complaint at ¶ 35]. Plaintiffs had four poultry rendering plants, including three in Georgia and one in Alabama. [Complaint at ¶ 37]. Collectively, the viable 125-mile radii of Plaintiffs' four rendering plants allowed them to serve processors located in

Georgia, Alabama, north Florida, and south Tennessee. [Complaint at ¶ 29].

Plaintiffs consider these regions the "Southeast Poultry Rendering Market."

[Complaint at ¶ 29].

Plaintiffs controlled over 90% of the market share for poultry rendering

within the Southeast Poultry Rendering Market (the "Market") prior to August

2018. [Complaint at ¶ 30]. At the time, Defendants did not have any rendering

plants within the Market, but they "were a competitor for rendering services in

[other parts of] Tennessee and areas adjacent to Georgia and Alabama."

[Complaint at ¶ 34]. Defendants were, however, supplier-customers of Plaintiffs

for rendering services in the Market prior to August 2018. [Complaint at ¶¶ 74,

97].

In the summer of 2017, Defendants approached Plaintiffs to communicate

Defendants' interest in acquiring the Plaintiffs or their assets, including their four

poultry rendering plants. [Complaint at ¶¶ 72–73]. Defendants and their

representatives indicated that they had signed up two of Plaintiffs' long-time

supplier-customers, Wayne Farms and Koch Foods, to ten-year exclusive

contracts. [Complaint at ¶¶ 74–75]. These exclusive contracts would have deprived

Plaintiffs of most of their raw material supply and effectively foreclosed Plaintiffs'

ability to continue operating their rendering plants at the required minimum

capacity. [Complaint at ¶ 74]. Plaintiffs immediately undertook efforts to retain Wayne Farms and Koch Foods by offering them new contracts at prices below the parties' prior agreements and at competitive term lengths. [Complaint at ¶ 75]. Wayne Farms and Koch Foods "refused to even consider the proposals and advised [Plaintiffs] that the agreements with [Defendants] were done from the start." [Complaint at ¶ 75].

Defendants, along with Wayne Farms and Koch Foods, misrepresented their ten-year exclusive agreements to Plaintiffs by omitting and concealing that Defendants had retained contractual "outs" in each agreement that would permit them to back out of the contracts if they failed to acquire the Plaintiffs or Plaintiffs' rendering plants. [Complaint at ¶¶ 76–77, 128–30]. Plaintiffs did not learn of the contractual outs until sometime after August 20, 2018. [Complaint at ¶¶ 94, 127].

Plaintiffs allege that Defendants built upon a "long history of collusion with Wayne Farms and Koch Foods" to convince Wayne Farms and Koch Foods to boycott Plaintiffs by withholding their collective raw materials. [Complaint at ¶¶ 80–82, 117–26]. Plaintiffs further allege that Defendants and their co-conspirators, Wayne Farms and Koch Foods, "formed their collusive agreement with the specific intent for the [Defendants] to monopolize the Southeast Poultry Rendering

Market."[2] [Complaint at ¶ 85]. Finally, Plaintiffs allege that Defendants put significant pressure on Plaintiffs to ensure the success of their illegal boycott.[3]

Plaintiffs considered the alleged group boycott to be "an existential threat to their continued ability to operate," and reluctantly agreed to discuss selling their assets to Defendants. [Complaint at ¶ 90]. Defendants proposed a purchase price between $800 and $850 million for Plaintiffs' assets. [Complaint at ¶ 91]. Plaintiffs allege that, based on Defendants' board presentation materials, Defendants internally valued Plaintiffs' assets at approximately double the proposed purchase price range. [Complaint at ¶ 92]. Plaintiffs further allege that even Defendants' internal valuation of Plaintiffs' assets was still well below fair market value. [Complaint at ¶ 92].

On May 14, 2018, Plaintiffs and Defendants executed an asset purchase agreement (the "APA"), under which the Defendants agreed to pay $825 million

---

[2] To support this assertion, Plaintiffs note that Defendants' Board materials indicate that Defendants planned to use the contracts with Wayne Farms and Koch Foods as leverage to force Plaintiffs to sell. [Complaint at ¶ 78]. Plaintiffs state that this intent was evident throughout the Market—a senior executive of Koch Foods told Mark Ham, American Proteins' C.E.O. at the time, that Defendants were "coming after" Tommy Bagwell, Plaintiffs' owner, and were going to force Bagwell to sell. [Complaint at ¶ 89].

[3] A representative of Defendants purportedly attempted to physically intimidate Ham by aggressively threatening that Defendants were "either going to buy [Plaintiffs] or put [Plaintiffs] out of business." [Complaint at ¶ 87].

for the "Transferred Assets," including all four of their rendering facilities. [Complaint at ¶ 93]. The APA transaction closed on August 20, 2018. [Complaint at ¶ 94].

Following the APA transaction, Defendants now possess over 90% of the market share for rendering within the Market. [Complaint at ¶ 49]. Plaintiffs allege that, through the APA transaction, Defendants acquired monopoly and monopsony[4] power within the Market. [Complaint at ¶ 100]. Defendants' market power gives them the ability to "reward, punish, and to discriminate between and among customers, including those that compete with [Defendants] in poultry processing and other market segments." [Complaint at ¶ 100].

Plaintiffs allege that the APA transaction allowed the Defendants to attain unique positioning as a vertically integrated operation in the Market, because Defendants now own processing and rendering divisions. [Complaint at ¶ 98]. Nonedible chicken parts from Defendants' processing operations provide Defendants' newly acquired rendering facilities with their own captive internal source of raw material inputs. [Complaint at ¶ 98]. Defendants could withstand

---

[4] Monopsony is "often thought of as the flip side of monopoly. A monopolist is a seller with no rivals; a monopsonist is a *buyer* with no rivals." Monopsony, Black's Law Dictionary (11th ed. 2019) (emphasis added) (quoting Lawrence A. Sullivan & Warren S. Grimes, The Law of Antitrust: An Integrated Handbook 137–38 (2000)).

reduction in raw material supply from third parties by increasing or reallocating internal raw material supply from their processing operations. [Complaint at ¶ 108]. As such, compared to Plaintiffs and other independent rendering operations, which depend entirely on third-party supplier-customers for their raw material inputs, Defendants are not subject to the same incentive to keep rendering prices low for third-party supplier-customers, particularly those that compete with Defendants in the poultry processing arena. [Complaint at ¶ 98].

Plaintiffs assert that Defendants have already used their market power to raise prices and contract term lengths on customers, including Pilgrim's Pride Corporation ("Pilgrim's"), which is Defendants' largest processor competitor and the largest supplier of raw materials for rendering in the Market. [Complaint at ¶¶ 101–02, 105]. Plaintiffs allege that Defendants' anticompetitive tactics against Pilgrim's and others since the APA transaction will cause prices to increase and output to decrease within the Market. [Complaint at ¶ 105]. Plaintiffs allege that Defendants' internal documents show that harming Pilgrim's was a strategic rationale for its collusive scheme to force Plaintiffs out of the Market. [Complaint at ¶ 106].

Finally, Plaintiffs note that Defendants own and operate rendering plants *outside* of the Market that service some of the same independent processors with

whom Defendants compete in the Market. [Complaint at ¶ 116]. Defendants can "abuse their market power by tying pricing in other markets to their provision of rendering services within the Southeast Poultry Rendering Market." [Complaint at ¶ 116]. In other words, Defendants can threaten to refuse to provide rendering services to processors within the Market unless those same processors pay above-market prices for Defendants' rendering services at facilities outside the Market. [Complaint at ¶ 116].

Based on the foregoing facts, Plaintiffs assert three antitrust claims against Defendants for violations of the Sherman Act, 15 U.S.C. § 1, *et seq.* [Complaint at ¶¶ 133–55]. In Count I, Plaintiffs assert that Defendants violated Section 1 of the Sherman Act by unreasonably restraining trade with a group boycott or concerted refusal to deal. [Complaint at ¶ 133–40]. In Counts II and III, Plaintiffs allege that Defendants violated Section 2 of the Sherman Act by conspiring to monopolize, and ultimately acquiring a monopoly over, the Market. [Complaint at ¶¶ 141–55].

Defendants move to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. 18 – Defs.' Mot. to Dism. at 1]. More particularly, Defendants assert that: (1) Plaintiffs lack antitrust standing to pursue their claims, [Dkt. 18 – Defs.' Brf. in Support of Mot. to Dism. ("Defs.' Mot. to Dism. Brf.") at 13–20]; (2)

9

Plaintiffs' inability to provide specific allegations prevents them from plausibly establishing the elements of their Sherman Act claims, [Defs.' Mot. to Dism. Brf. at 20–21]; and (3) the applicable statute of limitations bars Plaintiffs' claims. [Defs.' Mot. to Dism. Brf. at 21–25]. After conducting the antitrust standing and statute of limitations inquiries at the outset, the Court considers Defendants' Motion to Dismiss as to each count.

## DISCUSSION

### I.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964–65 (2007)). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 127 S. Ct. at 1974). A claim to relief is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coco-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 127 S. Ct. at 1965.

## II.   Analysis

### A. Antitrust Standing

To have antitrust standing, a party "must do more than meet the basic 'case or controversy' requirement that would satisfy constitutional standing; instead, the party must show that it satisfies a number of 'prudential considerations aimed at preserving the effective enforcement of the antitrust laws.'" Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp., 604 F.3d 1291, 1299 (11th Cir. 2010) (quoting Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991)). Courts in the Eleventh Circuit employ a two-pronged approach to decide whether a plaintiff has antitrust standing. Florida Seed Co., Inc. v. Monsanto Co.,

105 F.3d 1372, 1374 (11th Cir. 1997). "First, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." Todorov, 921 F.2d at 1449.

### 1. Antitrust Injury

Antitrust injury is defined as:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would be likely to cause.

Id. at 1449 (citation omitted). Defendants assert that Plaintiffs' alleged injury does not reflect the anticompetitive effect, if any, of Defendants' alleged conduct. [Defs.' Mot. to Dism. Brf. at 16–20]. Defendants cite McDonald v. Johnson & Johnson, 722 F.2d 1370 (8th Cir. 1983), and several other cases for the assertion that a plaintiff lacks standing to bring suit for antitrust violations when it voluntarily withdraws from the market.

In opposition, Plaintiffs argue that Defendants mischaracterize Plaintiffs' exit from the Market as "voluntary" and attempt to distinguish the cases Defendants cite on that basis. [Dkt. 24 – Pls.' Resp. to Defs.' Mot. to Dism. ("Pls.'

Resp.") at 7, 11–15].  Additionally, Plaintiffs put forth several cases which, they contend, stand for the well-settled proposition that the victim of a group boycott suffers antitrust injury. [Pls.' Resp. at 7–9]. Plaintiffs also maintain that Defendants' ultimate goal, monopolizing the Market to exert anticompetitive power over rendering suppliers-customers and over their processor competitors, relied on forcing Plaintiffs from the Market. [Pls.' Resp. at 9–11]. As such, Plaintiffs' injuries were "the instrumentality and means by which" Defendants carried out their scheme, sufficient to constitute antitrust standing under Hanover 3201 Realty, LLC v. Vill. Supermkts., Inc., 806 F.3d 162 (3d Cir. 2015). [Pls.' Resp. at 11]; [Complaint at ¶ 95].

Defendants maintain that Plaintiffs' alleged injury stems entirely from being forced to sell its business at a depressed price below fair market value. [Defs.' Mot. to Dism. Brf. at 16]; [Dkt. 27 – Defs.' Reply Brf. in Support of Mot. to Dism. ("Defs.' Reply") at 4]. Plaintiffs, however, consistently characterize their injury more broadly: "being forced out of the market as part of an anticompetitive scheme designed to interfere with competition." [Pls.' Resp. at 3, 7, 15 n.6]; [Dkt. 29 – Pls.' Sur-Reply to Defs.' Reply Brf. in Support of Mot. to Dism. ("Pls.' Sur-Reply") at 4]. Plaintiffs have also not tortured their original allegations to retroactively reflect this broader characterization. Rather, their Complaint

13

repeatedly notes that they involuntarily exited the Market due to Defendants' actions. [Complaint at ¶¶ 11, 74, 79, 90, 139, 146, 154]. In <u>Palmyra Park</u>, the Eleventh Circuit found that a defendant hospital's exclusivity arrangements with insurers, which prevented the plaintiff hospital from competing in the relevant market, created "precisely the type of harm that [courts] allow plaintiffs to vindicate through the antitrust laws." 604 F.3d at 1303. Moreover, in <u>Inform Inc. v. Google LLC</u>, 2022 WL 3703958, at *6 (11th Cir. Aug. 26, 2022) (reversing the district court's dismissal on the ground that plaintiff lacked antitrust standing), the plaintiff's allegation that it lost millions of dollars because Google excluded it from competing was sufficient for antitrust injury purposes. Likewise, because Plaintiffs consistently assert that Defendants' actions prevented them from competing in the Market, Plaintiffs have plausibly alleged that they suffered antitrust injury.[5]

---

[5] The Court also finds persuasive cases which recognize that a "'voluntarily exited the market' theory is inapplicable if the exit was involuntary." <u>Coast Mountain Hardwoods, Inc. v. Weyerhauser Co.</u>, 2004 WL 4076673, at *3 (D. Or. Feb. 25, 2004); <u>see</u> <u>Isra Fruit Ltd. v. Agrexco Agric. Exp. Co.</u>, 631 F. Supp. 984, 986–87 (S.D. N.Y. 1986) (distinguishing voluntary exit cases because plaintiff agreed to the transaction as a "last gasp effort to survive defendant's predatory and monopolistic tactics, which had already driven plaintiff to the brink of elimination from competition"); <u>McDonald</u>, 722 F.2d at 1378 (explaining that antitrust standing would exist if it were alleged that a competitor "forced or attempted to force competitors to sell out to them by threats or other predatory conduct").

### 2.  Efficient Enforcer[6]

In addition to showing antitrust injury, Plaintiffs must be an efficient

enforcer of the antitrust laws. <u>Palmyra Park</u>, 604 F.3d at 1299. Courts consider a

number of non-exhaustive factors when deciding whether a plaintiff would be an

efficient enforcer: the directness or indirectness of the injury, the remoteness of the

injury, whether other potential plaintiffs were better suited to vindicate the harm,

whether the damages were highly speculative, the extent to which the

apportionment of damages was highly complex and would risk duplicative

recoveries, and whether the plaintiff would be able to efficiently and effectively

enforce the judgment. <u>Todorov</u>, 921 F.2d at 1451–52; <u>Associated Gen. Contractors</u>

<u>of Cal., Inc. v. Cal. State Council of Carpenters</u>, 103 S. Ct. 897, 908–12 (1983).

"These factors are often intertwined, and no single factor will necessarily

predominate over the others." <u>Palmyra Park</u>, 604 F.3d at 1299 (citing <u>Associated</u>

---

[6] Plaintiffs assert that Defendants waive any challenge to Plaintiffs' status as an efficient enforcer because they did not so challenge in Defendants' Brief in Support of Motion to Dismiss. [Pls.' Resp. at 16].  Plaintiffs argue that they do qualify as an efficient enforcer, [Pls.' Resp. at 16–18], which Defendants attempt to rebut in their reply. [Defs.' Reply at 11–12]. The Court addresses the efficient enforcer prong here because "Defendants were entitled to address this [issue] in their reply brief after Plaintiff[]s interjected this issue in their response. To hold otherwise would be to preclude Defendants from responding to Plaintiffs' arguments." <u>Jones v. City of Atlanta</u>, 2009 WL 10696224, at *3 (N.D. Ga. Sept. 23, 2009).

Gen. Contractors, 103 S. Ct. at 908–12). Finally, Plaintiffs "need be only 'an efficient enforcer' of the antitrust laws, . . . not the only or even the most efficient one." Inform, 2022 WL 3703958, at *6 (citing Palmyra Park, 604 F.3d at 1299).

The Court finds that the efficient enforcer factors cut in Plaintiffs' favor at the motion to dismiss stage. Because Plaintiffs were the target of Defendants' alleged group boycott,[7] Plaintiffs' alleged injury is direct. IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 68 (2d Cir. 2019). Likewise, Plaintiffs allege that they suffered a direct loss of supplier-customers because of the group boycott, making them the "immediate victim" of the alleged boycott—as such, Plaintiffs are sufficiently motivated and positioned to effectively enforce the judgment. [Complaint at ¶ 74–75]; IQ Dental, 924 F.3d at 68 (citing Associated Gen. Contractors, 103 S. Ct. at 910). Plaintiffs' injury is also not unduly remote; their involuntary exit from the Market did not occur "several steps down the causal chain." See Palmyra Park, 604 F.3d at 1303–04 (finding plaintiff an efficient enforcer even when their injury occurred several steps down the causal chain).

---

[7] Plaintiffs were a natural target, given their recent status as the largest poultry renderer in the Market. [Complaint at ¶ 25]. Further, Defendants' Board materials, along with the perspective of at least one supplier-customer within the Market, are evidence that Defendants plausibly targeted Plaintiffs. See supra note 2 and accompanying text. Finally, Defendants' physical intimidation tactics and threats plausibly demonstrate that Defendants targeted Plaintiffs. See supra note 3 and accompanying text.

Deprivation of Plaintiffs' raw material supply was, however, a guaranteed effect, or an "inevitabl[e]" result, of Defendants' alleged boycott with Wayne Farms and Koch Foods. Inform, 2022 WL 3703958, at *6 (citing Palmyra Park, 604 F.3d at 1303–04).

Plaintiffs' damages are not necessarily speculative, because their lost profits are "potentially ascertainable business losses" which "might be calculated based on [Plaintiffs'] historical sales data." IQ Dental, 924 F.3d at 68. With respect to Plaintiffs' alleged damages from selling their assets at a depressed price, Plaintiffs have also sufficiently pleaded that, at minimum, they can measure the damages by contrasting the closing price of $825 million with Defendants' alleged internal valuation. [Complaint at ¶ 92–93]. Finally, other potential enforcers, such as Defendants' supplier-customers, rendering or processor competitors, or consumers in the poultry market could not claim any damages in connection with the group boycott of Plaintiffs, thus apportionment of damages does not risk duplicative recovery. IQ Dental, 924 F.3d at 68.

Plaintiffs have alleged sufficient facts for the Court to reasonably infer both antitrust injury and that they are an efficient enforcer of the antitrust laws. As such, the Court finds that Plaintiffs have sufficiently pleaded antitrust standing and denies Defendants' Motion to Dismiss [Dkt. 18] as to their standing argument.

17

**B. Statute of Limitations**

"Under the antitrust laws, 'a cause of action accrues and the statute of limitations begins to run when a defendant commits an act that injures the plaintiffs' business.'" Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 827 (11th Cir. 1999) (quoting Zenith Radio Corp. v. Hazeltine Rsch., Inc., 91 S. Ct. 795, 806 (1971)). A plaintiff must file their claim within four years following a defendant's injurious act. 15 U.S.C. § 15(b). Plaintiffs may bring suit "more than four years after the events that initially created the cause of action only if the action is commenced within four years after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" Morton's Mkt., 198 F.3d at 827–28 (quoting Zenith, 91 S. Ct. at 806). A dismissal on statute of limitations grounds "is appropriate if it is apparent from the face of the complaint that the claim is time-barred." Owens-Benniefield v. BSI Fin. Servs., 806 Fed. Appx. 853, 856 (11th Cir. 2020) (citing Gonsalvez v. Celebrity Cruises Inc., 750 F.3d 1195, 1197 (11th Cir. 2013)).

Given Plaintiffs' allegations regarding the group boycott, Defendants argue that any cause of action accrued in the summer of 2017 when Defendants reached the agreements with Wayne Farms and Koch Foods. [Defs.' Mot. to Dism. Brf. at

22]. Because Plaintiffs "immediately undertook efforts to retain their long-time customers," they were aware of the alleged injurious act in the summer of 2017, more than four years before they filed their Complaint on May 11, 2022. [Defs.' Mot. to Dism. Brf. at 23]; [Complaint at ¶ 75]. Plaintiffs maintain that their claims are not time-barred because the "injury arising from the anticompetitive conduct occurred later than the conduct itself," and because Defendants' last overt act was the closing of the APA transaction, the first point in time when Plaintiffs could establish the damages they now seek. [Pls.' Resp. at 23–24]. Plaintiffs also allege that Defendants fraudulently concealed the contractual outs in their agreements with Wayne Farms and Koch Foods, preventing Plaintiffs from discovering or confirming the anticompetitive intent of Defendants and their conspirators and thus tolling the limitations period. [Complaint at ¶ 131–32]; [Pls.' Resp. at 25].

The Court finds that whether the closing of the APA transaction was an overt act in furtherance of the antitrust conspiracy or a continuing antitrust violation is a fact intensive issue that cannot be decided at the pleading stage. See Morton's Mkt., 198 F.3d at 828–29 ("[W]hether the conspiracy continued into the limitations period . . . is a genuine [fact] question for trial."); Poster Exch., Inc. v. Nat'l Screen Serv. Corp., 517 F.2d 117, 128 (5th Cir. 1975) (remanding for additional factfinding about whether, during the limitations period, there was some

19

specific act that precluded plaintiff from obtaining supplies from defendant). The potential equitable tolling of the limitations period is similarly fact intensive. See Omar ex rel. Cannon v. Lindsey, 334 F.3d 1246, 1251–52 (11th Cir. 2003) (finding dismissal inappropriate where both parties set forth fact intensive reasons why the motion to dismiss on the basis of the statute of limitations should be granted or denied, including the plaintiff's argument that defendants' concealment hampered the plaintiff's ability to learn the full truth of what happened to him); Deal v. Tugalo Gas Company, Inc., 2018 WL 4255857, at *3 (N.D. Ga. Sept. 6, 2018) ("Additionally, there are tolling issues that are fact intensive and that cannot be decided at the pleading stage."), rev'd on other grounds, 2018 WL 10455283 (N.D. Ga. Nov. 29, 2018). As such, the Court denies Defendants' Motion to Dismiss [Dkt. 18] as to their statute of limitations argument.

### C. Sherman Act Claims

The Eleventh Circuit particularly disfavors Rule 12(b)(6) dismissals in fact-intensive antitrust cases. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc., 376 F.3d 1065, 1070 (11th Cir. 2004); Cobb Theatres III, LLC v. AMC Ent. Holdings, Inc., 101 F. Supp. 3d 1319, 1338 (N.D. Ga. 2015).

1.  **Count I – Sherman Act, Section 1 – Unreasonable Restraint of Trade**

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Group boycotts are *per se* violations of § 1 of the Sherman Act because they almost always harm competition. Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1334 (11th Cir. 2010). A group boycott under § 1 involves pressuring a target party by withholding, or enlisting others to withhold, patronage or services. Aquatherm Indus., Inc. v. Florida Power & Light Co., 145 F.3d 1258, 1263 (11th Cir. 1998). "Group boycotts which have been deemed illegal *per se* 'have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" Id. (quoting Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 105 S. Ct. 2613, 2619 (1985)). At this stage in the litigation, Plaintiffs have pleaded facts sufficient for the Court to draw the reasonable inference that Defendants executed an illegal group boycott. [Complaint at ¶¶ 74–95].

Even if Plaintiffs had not sufficiently pleaded a *per se* illegal group boycott, the Complaint contains facts which plausibly establish that Defendants unreasonably restrained competition under rule of reason analysis. Eleventh Circuit courts analyzing alleged Section 1 violations under the rule of reason require a plaintiff to prove the anticompetitive effect of the defendant's conduct on the relevant market.[8] Spanish Broad. Sys., 376 F.3d at 1071. To prove this anticompetitive effect on the market, "the plaintiff 'may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior had the potential for genuine adverse effects on competition.'" Id. at 1072 (quoting Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir. 1996)). At minimum, Plaintiffs have sufficiently alleged a factual connection between Defendants' behavior and the potential for genuine adverse effects on competition in the Market. [Complaint at ¶¶ 51, 98, 100, 101, 102, 105, 108–110, 114–116]. As such, the Court denies Defendants' Motion to Dismiss Count I.

---

[8] Antitrust plaintiffs alleging an unreasonable restraint on trade must also prove that an agreement between two or more businesses existed as a threshold matter; Section 1 does not cover unilateral conduct. Spanish Broad. Sys., 376 F.3d at 1071. Plaintiffs plainly pleaded that Defendants had agreements, long-term exclusive contracts with contractual outs, with Wayne Farms and Koch Foods. [Complaint at ¶¶ 74–84].

### 2. Count II – Sherman Act, Section 2 – Monopolization

To state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must plead sufficient facts to infer: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 86 S. Ct. 1698, 1704 (1966). Plaintiffs' Complaint adequately defines the Southeastern Poultry Rendering Market as the relevant market, "with a specific set of geographical boundaries and a narrow delineation of the products at issue." Spanish Broad. Sys., 376 F.3d at 1074; [Complaint at ¶¶ 25–44]. Plaintiffs' allegations that Defendants now control over 90% of the relevant market, which has high barriers to entry and no readily available substitutes, satisfies the first element at this stage of the litigation. [Complaint at ¶¶ 44, 49, 52–59, 111]; Eastman Kodak Co. v. Image Tech. Servs., Inc., 112 S. Ct. 2072, 2089–90 (1992); Cobb Theatres, 101 F. Supp. 3d at 1340–42.

Plaintiffs allege the intent necessary for the second element of a monopolization claim by noting the contractual outs in Defendants' agreements with Wayne Farms and Koch Foods, along with Defendants' Board materials and intimidation tactics. [Complaint at ¶¶ 76–78, 86–87]. Pursuant to this second

element, however, Plaintiffs also must show "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1294 (11th Cir. 2004). Defendants threatened Plaintiffs, proposed to purchase Plaintiffs' assets at half of their internal valuation of the assets, and have allegedly abused their monopoly power since the APA transaction. [Complaint at ¶¶ 86–87, 92, 98, 100, 101, 102]. Plaintiffs do focus on the harm to Pilgrim's, which will not suffice for a Section 2 violation, Morris, 364 F.3d at 1294, but the Complaint also notes Defendants' ability to increase prices to other customers, monitor industry-wide supply levels, control market pricing, and execute tying arrangements. [Complaint at ¶¶ 108–112, 114–116]. Based on the foregoing, Plaintiffs have alleged sufficient facts to plausibly suggest exclusionary or predatory conduct. The Court finds a cognizable monopolization claim at this stage of the litigation and denies Defendants' Motion to Dismiss Count II.

### 3. Count III – Sherman Act, Section 2 – Conspiracy to Monopolize

"Conspiracy under Eleventh Circuit law requires (1) an agreement in restraint of trade (2) deliberately entered into with the specific intent of achieving a monopoly (3) which could have had an anticompetitive effect and (4) at least one

overt act in furtherance of the conspiracy." <u>Spanish Broad. Sys.</u>, 376 F.3d at 1078. The Court has already found that Plaintiffs have alleged an agreement in restraint of trade. <u>See</u> discussion <u>supra</u> Section II.C.1; <u>supra</u> note 8. Likewise, the Court has determined that the contractual outs, Defendants' plan to use the long-term exclusive contracts with Wayne Farms and Koch Foods as leverage to force Plaintiffs to sell, and Defendants' intimidation tactics make specific monopolistic intent plausible. [Complaint at ¶¶ 76–78, 86–87]; <u>see</u> discussion <u>supra</u> Section II.C.2. Pursuant to the third requirement, Defendants' conduct could have had an anticompetitive effect. <u>See</u> discussion <u>supra</u> Section II.C.1. Finally, the Court finds that Defendants' own refusal to supply raw material inputs to Plaintiffs, their alleged enlisting of Wayne Farms and Koch Foods to follow suit, or the APA transaction itself plausibly constitute overt acts in furtherance of the conspiracy at this stage of the litigation. [Complaint at ¶¶ 5, 74–77, 91–95]. Here, the Court finds that Plaintiffs sufficiently pleaded a conspiracy to monopolize claim and therefore denies Defendants' Motion to Dismiss Count III.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. 18] is **DENIED.** As required by the Federal Rules of Civil Procedure and the Local Rules, Defendants' answers must be filed within 21 days, and discovery shall commence 30 days thereafter. Plaintiffs' Motion to Establish Timing and Sequence of Discovery [Dkt. 26] is **DENIED** as moot.

**SO ORDERED** this 8th day of November, 2022.

_____
**RICHARD W. STORY**
United States District Judge