## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., | ) ) ) ) | |
| Movants, | ) ) | C.A. No. 2:22-cv-00091-RWS |
| v. | ) ) | |
| DARLING INGREDIENTS, INC., | ) ) | |
| Respondent. | ) ) ) | |
| ----------------------------------------------- | ) ) | |
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RIVER VALLEY INGREDIENTS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## PLAINTIFFS' MOTION TO ENFORCE SUBPOENA DIRECTED TO NON-PARTY DARLING INGREDIENTS, INC., AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs American Proteins, Inc. n/k/a Crossroads Properties A, Inc., AMPRO Products, Inc. n/k/a Crossroads Properties B, Inc. and Georgia Feed Products Company, L.L.C. n/k/a Crossroads Properties C, LLC (collectively, "API" or "Plaintiffs"), pursuant to Federal Rules of Civil Procedure 37 and 45, seek an order compelling Darling Ingredients, Inc. ("Darling") to produce documents for the antitrust action (the "Lawsuit") against River Valley Ingredients, LLC, Tyson Poultry, Inc., and Tyson Farms, Inc. (collectively, "Tyson").

## I.    INTRODUCTION

Served with a lawful subpoena, Darling refuses to produce a single document for this $2 billion Lawsuit, despite months of conferral efforts to tailor the scope of the requests, address Darling's concerns, and propose reasonable solutions for compliance. API's subpoena sought Darling's transactional data representing raw material supply purchases and rendered output sales, contracts and related negotiations, communications with and about the parties in this Lawsuit, and market and financial analyses reflecting the impact of and response to Tyson's anticompetitive conduct. As one of the few poultry rendering alternatives to Tyson in the Market,[1] the only independent renderer in the Market, and a competitor to Tyson inside and outside the Market, Darling is unique in that its documents will provide a first-hand account of Tyson's anticompetitive scheme, reactions to the scheme, and harm to competition in the Market.

---

[1] The relevant geographic market includes Alabama, Georgia, parts of Tennessee, and northern Florida (the "Market"). *See* [Dkt. 1 Compl. ¶ 1].

But Darling refused to cooperate. It objected to *all* of API's requests with boilerplate and conclusory objections. Then, rather than meeting and conferring, Darling derailed the conferral process with strawman arguments and speculative hypotheticals, stating it would not produce a single document absent a court order. To make matters worse, Darling also interfered with a subpoena to at least one other non-party, insisting that the other non-party object to API's document requests and refuse to produce documents, even though Darling has no ownership (and refused to substantiate any ownership) over the requested information from that non-party. The Court should not countenance such tactics and should order Darling to comply with the subpoena in its entirety with an admonition to refrain from (or else fully substantiate) any interference with others' subpoena obligations in this case.

## II.    BACKGROUND

API brought the underlying Lawsuit for an anticompetitive scheme employed by Tyson in collusion with competitors Wayne Farms, LLC ("Wayne") and Koch Foods, Inc. ("Koch"), to oust API from the Market. API brings claims for an illegal boycott under Section 1 of the Sherman Act and for monopolization and conspiracy to monopolize under Section 2 of the Sherman Act.

### A.    Darling's Significance to this Lawsuit and API's Subpoena

Darling is a publicly traded company with multinational operations and 100+ years of experience in the rendering industry.[2] In fiscal year 2022, Darling reported

---

[2]    *See Our History*, DARLING INGREDIENTS, available at: https://www.darlingii.com/about-us/our-history (last visited Dec. 11, 2023).

revenue exceeding $6.5 billion.[3] Like API prior to the Tyson acquisition, Darling is an independent poultry renderer, *i.e.*, it has no poultry processing division, and is the last such renderer in the Market.

Darling is witnessing, operating, and trying to compete on the unlevel playing field created by Tyson's anticompetitive behavior detailed in the Complaint. API alleged that, prior to its acquisition, API was an "independent rendering operation that depended entirely on third-party suppliers for raw material inputs," that "reliance created significant incentives for [API] to keep prices and margins low" and "to benefit the supplier-customers," and that *within the Market* Tyson was a supplier-customer for rendering services. *See* [Dkt. 1, Compl. ¶¶ 96-100]. API further alleged that Tyson was a vertically-integrated poultry processor and renderer *outside the Market*, where it used its "own captive internal sources of raw material inputs for rendering … and are not subject to the same incentives to keep prices and margins low with regard to third party supplier customers"; but through an anticompetitive scheme, it converted itself to a vertically-integrated poultry processor *and* renderer with monopoly and monopsony power *inside the Market*. *Id.* Tyson now has unrestrained control in the Market, augmented by broad access to customer-processors' confidential information, to manipulate prices and supply at will, reduce outputs, and harm competition. *Id.* ¶¶ 51, 98, 100–10, 112.

---

[3]    *See* DARLING INGREDIENTS, 2022 ANNUAL REPORT (2022), https://ir.darlingii.com/2022-Annual-Report/images/Darling_Ingredients-AR2022.pdf (last visited Dec. 11, 2023).

Similarly, Darling identifies itself as a non-captive renderer and specifies the "procurement of raw materials" as the leading factor in the "Competition" section of its annual report for 2018 (the same year Tyson acquired API, but also in other years' reports).[4] Darling then recognizes the "consolidation within the meat processing industry," the large processors that "utilize 'captive' rendering operations integrated with the meat or poultry packing operation," and the "limited to no growth in the number of small meat processors, which have historically been a dependable source of supply for non-captive renderers."[5] Tyson easily fits Darling's description as a processor and renderer outside of the Market and, now that it has acquired API, a processor with integrated rendering in the Market. Indeed, in the next paragraph of this annual report that describes competition for finished products, Darling states "we compete with a number of well capitalized companies across our business" and then identifies Tyson by name as an example.[6]

Against this background, on July 10, 2023, API served a subpoena on Darling (the "Subpoena") that identified the undersigned's Atlanta office as the place of compliance, which is within 100 miles of where Darling regularly transacts business

---

[4] *Compare* Darling Ingredients*, 2018 Annual Report*, at 11, https://ir.darlingii.com/2018-Annual-Report/HTML1/darling_ingredients-ar2018_0011.htm (last visited Dec. 7, 2023) *with* Annual Reports, Darling Ingredients, available at: https://ir.darlingii.com/digital-annual-reports (last visited Dec. 7, 2023).

[5] *See* Darling Ingredients, 2018 Annual Report, at 11, https://ir.darlingii.com/2018-Annual-Report/HTML1/darling_ingredients-ar2018_0011.htm.

[6] *Id.*

in Georgia and within this District's jurisdiction. *See* **Ex. 1,** Subpoena; *see also* **Ex. 2** Aff. of Serv. The Subpoena seeks fifteen categories of documents about Darling's presence, activities, and relationships in and out of the Market (the "Requests") and also contained a copy of this Court's two-tiered Protective Order. In **Request Nos. 1-3**, API requested Darling's transactional data to show, *inter alia*, changes in price and supply for rendering inputs and outputs before and after Tyson's entry in the Market. When subject to expert analyses, increases in price, reductions in supply, or other fluctuations (or even flat levels) may be evidence of competitive injury in the Market. The same type of data and trends outside of the Market may serve as a comparator or a "control" for analyzing the in-Market data and trends, which again may be evidence of competitive injury in the Market.

In **Request Nos. 5-7 and 10**, API requested communications with and regarding Tyson, the acquisition of API, this Lawsuit, and Tyson's operation or planned acquisition of rendering facilities in the Market. Darling's communications with processors about, for example, concerns with Tyson's acquisition of API or whether Darling can render those processors' raw poultry material, how much, and at what price in the aftermath of Tyson's acquisition of API are directly relevant to whether Tyson inflicted a competitive injury in the Market. In **Requests Nos. 9, 11-13**, API requested contracts, negotiations, raw material supply and pricing, rendered output supply and pricing, and related communications. For example, Darling's contracts and related communications with, for example, pet food companies for the

sale of rendered poultry outputs, how much those companies can purchase, and at what price—particularly in the context of Tyson's acquisition of API—are similarly relevant to showing the effects of Tyson's scheme.

API's other discovery requests target similar information. For **Request No. 8**, Darling's trade group participation and related communications involving Tyson for the time period just before the acquisition in 2018 to the present are relevant to show Tyson's engagement of its competitors, such as Koch and Wayne as alleged in the Complaint, the content and context of such discussions, and the persons involved. This discovery is relevant to show Tyson's anticompetitive conduct, anticompetitive intent, and causation of the effects in the Market. For **Request Nos. 4, 14, and 15**, Darling's market analyses, financial documentation, and reports about rendering operations, supply, and outputs are similarly relevant to showing the effects of Tyson's anticompetitive scheme as well as differing levels of access to information between Tyson as a processor and renderer and Darling as an independent renderer. As the last independent renderer available in the Market as well as one that competes with Tyson for rendering both inside and outside the Market, Darling is well-suited to provide documents of Tyson's anticompetitive scheme, the effects of that scheme in the Market, and out-of-Market benchmarks to compare to those in-Market effects.

In broad terms, these documents are relevant to key elements of API's claims, including for example Tyson's anticompetitive intent, Tyson's market power, competitive or antitrust injury, causation, and damages.

**B.      Darling Refused to Meet and Confer Meaningfully**

On August 4, 2023, Darling timely served responses and objections to the Subpoena, attached as **Exhibit 3**, refusing to produce a single document. Specifically, Darling lodged a litany of boilerplate objections to each and every request on grounds such as confidentiality, cost, vagueness, relevance, breadth, burden, and privilege. *Id.* API then engaged in a months-long process to resolve Darling's objections or at least narrow the issues in dispute and, if nothing else, satisfy this Court's Standing Order requiring good faith conferral prior to presenting a discovery dispute. [Dkt. 9].

On August 25, API sent Darling a letter addressing the deficiencies with Darling's objections and requesting the parties to meet and confer by phone. *See* **Ex. 4**, Letter from K. Racowski to S. Rosenwasser (Aug. 25, 2023). On September 6, the parties held a lengthy call where Darling raised concerns regarding: (1) the sufficiency of the Protective Order, (2) the breadth of the Requests, and (3) the cost of compliance with the Subpoena. The parties agreed to defer the third point until they addressed the other two points, both sides reserving all rights.

API explained the confidentiality designations in the Protective Order, including the obligations on anyone receiving Highly Confidential documents, to facilitate Darling's production of documents, including any alleged proprietary or trade secret information. *See* **Ex. 5**, R. Quinto Ltr. to S. Rosenwasser (Oct. 19, 2023). API narrowed the scope of requested documents, such as limiting the request for communications with Tyson to the subject matter of processing and rendering and

further limiting the scope to only those custodians who would be reasonably expected to have any such communications with Tyson—a meaningful limitation, given that Darling and Tyson are competitors who should not be communicating extensively. *Id.* API further requested specific information on the nature of the purported burden on Darling in responding to the Requests, along with providing proposed search terms for Requests implicating ESI custodial data to target Darling's search efforts. *Id.*

Darling responded on October 31. But rather than seriously considering any of API's proposals or potential approaches to search for documents, it unilaterally shut down the meet-and-confer process and refused any compromise. *See*, *e.g.*, **Ex. 6**, Letter from S. Rosenwasser to R. Quinto, at 9 (Oct. 31, 2023) ("[I]f API seeks documents, it must either move to enforce the Subpoena as written or serve a new subpoena and we will evaluate the Requests contained therein."). In a 10-page letter, Darling presented far-fetched and cynical hypotheticals to argue that this Court's protective order is toothless; baited API to prove the merits of its claims against Tyson to Darling's satisfaction; and rattled off the cost and volume of documents it expected to uncover with no substantiation. *Id.*

In its final effort, API detailed the numerous factual and legal deficiencies underlying Darling's positions and requested a resolution without court intervention. *See* **Ex. 7**, Letter from R. Quinto to S. Rosenwasser (Nov. 13, 2023). On December 1, 2023, Darling responded without providing any resolutions or agreement to

produce a single document. *See* **Ex. 8**, Letter from S. Rosenwasser to R. Quinto (Dec. 1, 2023). Rather than accept API's proposals wholly or partly, Darling's final position was that API must serve an entirely new subpoena with different requests for Darling to evaluate. *Id.* Additionally, Darling's counsel has instructed at least one subpoena recipient to withhold critical information from API.[7] Darling left API no choice but to file this Motion. (*See* **Exhibit 9**, Chart of Requests at Issue).[8]

## III.  ARGUMENT

The "scope of discovery under a Rule 45 subpoena is the same as that allowed under Federal Rules of Civil Procedure 26(b) and 34." *Scoggins v. Floyd Healthcare Mgmt. Inc.*, No. 4:14-CV-274-HLM-WEJ, 2015 WL 13777035, at *2 (N.D. Ga. Mar. 18, 2015); *see also* Fed. R. Civ. P. 45(a)(2)(C), (c)(1). "The party resisting discovery bears the burden of showing the discovery requests to be improper, unreasonable, or burdensome." *Friday v. Sallie Mae, Inc.*, No. 1:14-CV-558-TCB-ECS, 2014 WL 12860394, at *1 (N.D. Ga. Nov. 20, 2014). Further, "[u]nder well-settled law . . . the objecting party must show specifically how each [request is]

---

[7] Counsel for Fries Farms ("Fries") confirmed that Darling's counsel instructed Fries to object to the production of its transactional data because Darling deemed the information as confidential. *See* Ex. 10. When API asked Darling to explain how Fries' sales data of Raw Material Supply or purchases of Poultry Rendered Output constituted Darling's proprietary information, Darling provided no response to those specific questions. *Compare* Ex. 7 at 7 *with* Ex. 8 at 8.

[8] Due to the page limitation prescribed in Rule 7.1D of the Local Civil Rules of this Court, this Motion incorporates Exhibit 9 showing each of the verbatim requirements of Local Rule 37.1 for the at-issue Requests. In addition, each of API's Requests and Darling's Responses thereto are attached as Exhibit 1 and 3, respectively.

burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *See Hammon v. Cherokee Cnty., Georgia*, No. 1:06-CV-839-JTC, 2008 WL 11333688, at *2 (N.D. Ga. Mar. 25, 2008); *see also Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985).

As this Court previously recognized, "in antitrust cases . . . liberal discovery is particularly appropriate" and "[b]road discovery is permitted because evidence of an anticompetitive conspiracy is often difficult to obtain." Order Granting in Part and Denying in Part Plaintiffs' Omnibus Motion to Compel [Dkt. 60 at 6]; *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1363 (N.D. Ga. 2012) ("[W]here the proof is largely in the hands of alleged conspirators, antitrust plaintiffs must be given ample opportunity for discovery." (citations and internal quotations omitted)); *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct . . . Such conduct is generally covert and must be gleaned from records, conduct, and business relationships."). API seeks discovery from Darling based on the rationale underlying these cases.

A. **Darling's transactional data is critical to API's antitrust analysis.**

In **Request Nos. 1-3**, API requested Darling's transactional data for the purchase of raw material supply (a renderer's inputs, identified as "Raw Material Supply" in the Subpoena) and sale of finished products (a renderer's outputs, identified in the Subpoena as "Poultry Rendering Outputs") both within and outside

the Market. *See* Ex. 9. This data should show basic economic datapoints, such as price and quantity, qualitative datapoints, such as input/output type and product composition, and other characteristics, such as date of transaction and geographic origin/destination. The quantitative data is necessary to show changes in price and/or supply levels, the qualitative data to ensure "apples-to-apples" comparisons, and the other characteristics to control for external factors.

Within the Market, the corresponding trends in this data may show price increases or supply decreases for Raw Material Supply or Rendered Poultry Outputs, which subjected to expert analysis may comprise evidence of competitive harm. *See*, *e.g.*, *Kleen Prod. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2013 WL 120240, at *9 (N.D. Ill. Jan. 9, 2013) (compelling production of transactional data from 2000 through 2012 because data was relevant to demonstrate "the before and after effect of the alleged conspiracy upon prices"); *In re Novartis and Par Antitrust Litig.*, No. 2:19-mc-149, 2019 WL 5722055, at *9 (E.D. Pa. Nov. 5, 2019) (compiling cases ordering production of sales data needed to perform "before and after" analysis; ultimately ordering production of sales data for timeframe "to the present").

Moreover, the out-of-Market data and corresponding trends compared to the in-Market data and corresponding trends, subject to expert analysis, may also serve as evidence of competitive harm. *See* Order on Mot. to Compel, Dkt. 60 at 14 ("[A] party's conduct in another geographic market may be relevant to whether that party operated with anticompetitive intent in the relevant market."). Darling's data is

particularly relevant because Darling competes with Tyson both inside and outside the Market, as discussed in the Background (*see supra* Part II.A).

Darling grounds its primary objection to producing this data in trade secret and confidentiality concerns. Darling states that the commands of this Court's Protective Order [Dkt. 43] are "insufficient" and not "proper," that those bound by it will simply "contrive a basis to show the information to persons who can use it to their advantage," and that the Court's directive to "only use this information for the underlying litigation" is ineffective. *See* Ex. 6 at 1–3. This position is based on far-fetched speculation regarding two groups of people: (1) in-house legal counsel and staff; and (2) non-legal employees responsible for sales, marketing, and/or pricing that would, according to Darling, manipulate their way into accessing the documents and using the information for illicit purposes. *Id.*

With respect to group (1), the Highly Confidential designation contemplates that only those individuals "who are assisting with the Litigation" may view such materials. [Dkt. 43 at 9]. This provision necessarily denies access to counsel and staff who represent the parties, particularly Tyson, in matters other than this Lawsuit, such as the transactional or business corporate counsel who Darling fears may be working on marketing or pricing strategies. With respect to group (2), the Protective Order unambiguously mandates the materials "shall be used ***solely for purposes of this Litigation and shall not be used for any other purpose, including without limitation, any business or commercial purpose***." [*Id.* at 13] (emphasis added).

Despite these robust protections, Darling nevertheless conjures what-if scenarios of rogue employees running amok with Darling's confidential information.[9] Yet this can be said of any protective order, even an order with different language that Darling finds satisfactory. The solution to Darling's concern lies in the Court-imposed consequences for non-compliance with the Protective Order, not in entirely avoiding complying with API's subpoena.

It is a fundamental reality in antitrust cases that competitively sensitive information will need to be divulged as part of the discovery process. *See, e.g., Royal Crown Cola Co. v. Coca-Cola Co.*, 11 Fed. R. Serv. 2d 823 (N.D. Ga. 1967) ("[I]n an action under the antitrust laws . . . a competitor's business records, where good cause has been shown, are not only not immune from inquiry, but they are precisely the source of the most relevant evidence.") (citations omitted); *see also In re K-Dur Antitrust Litig.*, No. 03-21589-CIV, 2003 WL 27375780, at *1-2 (S.D. Fla. Aug. 21, 2003) (ordering non-party to produce its sales data over non-party's objection that data would be disclosed to its competitors). Tyson, API, and dozens of other subpoena recipients have availed themselves of the Protective Order for documents

---

[9] At bottom, Darling's concerns amount to layer upon layer of speculation, where (a) corporate counsel at a competitor is handling both Litigation and transactional/business matters, (b) this dual-role litigation and transactional in-house counsel would be the attorney selected to view Darling's Highly Confidential Information, (c) this attorney would then disregard the commands of the protective order and use information gleaned from the Highly Confidential documents for purposes other than the Litigation; and (d) this attorney would risk sanctions and his or her name as an attorney to "devis[e] marketing and or pricing strategies to compete against Darling." *See* Ex. 6 at 1–3.

produced in the Lawsuit, including for document requests that are largely the same as, if not identical to, those propounded on Darling. Accordingly, there is no basis for continued withholding of Darling's transactional data on confidentiality and trade secret grounds because the Protective Order addresses those concerns.[10] *See, e.g., Festus & Helen Stacy Found., Inc. v. Merrill Lynch, Pierce Fenner, & Smith Inc.*, 432 F. Supp. 2d 1375, 1380 (N.D. Ga. 2006) (compelling non-party to produce discovery over trade secret objections because of protective order); *Coventry First LLC v. 21st Services, No. 1:05-CV-2936-JEC, 2006 WL 8432922*, at*2 (N.D. Ga. Jan. 4, 2006) (finding that "the Confidentiality Order in place in the underlying litigation should [] appropriately protect [a third party] against its concerns about disclosure of proprietary information").

Second, the 2014-present date range for this data is appropriate because conducting the above-referenced comparisons and analysis requires a sufficient range of data. It is widely recognized that "the temporal scope of discovery in antitrust cases should not be confined to the limitations period of the antitrust statutes or the damage period." *Arrowpac Inc. v. Sea Star Line, LLC*, 2014 WL 12617575, at *3 (M.D. Fla. Sept. 11, 2014). Accordingly, courts routinely compel non-parties

---

[10] Moreover, within the requested date range for these requests, Darling has never explained how the older data is still competitively sensitive. *See, e.g., In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2021 WL 308552, at *3 (D. Kan. Jan. 29, 2021) (rejecting parties' confidentiality argument because documents with information that was "several years old" constituted "stale business information").

to produce transactional data before and after the anticompetitive conduct, which may prove claims or defenses related to price hikes or supply drops. *See, e.g., Kleen Prod.*, 2013 WL 120240, at *9; *In re Novartis and Par*, 2019 WL 5722055, at *9.

Finally, Darling refused to support its burden objections. *See Hammon v. Cherokee Cnty., Georgia*, No. 1:06-CV-839-JTC, 2008 WL 11333688, at *2 (N.D. Ga. Mar. 25, 2008). While Darling has indicated it would provide the Court with such evidence, the purpose of meeting and conferring is to confront those issues during informal discussions to avoid involving the Court unnecessarily. *Compare* Ex. 6 at 4 ("Darling stands by those [burden objections] and, if required to do so, will provide the Court with sufficient evidence demonstrating [burdens].") *with Randstad Gen. Partner (US), LLC v. Beacon Hill Staffing Grp. LLC*, No. 1:19-CV-1655-ODE, 2020 WL 10460621, at *9 (N.D. Ga. Mar. 18, 2020) (observing that to comply with meet-and-confer requirements, "parties must treat the informal negotiation process as a substitute for, and not simply a formal prerequisite to, judicial review of discovery disputes") (citations omitted).

Despite Darling's refusal to provide any substantiation for the purported burdens, courts across the country have found that structured data, like the data API seeks here, is one of the easiest and least costly forms of documents to produce. *See, e.g., Cattle & Beef Antitrust Litig. v. JBS S.A.*, No. 8:22CV204, 2022 WL 17718553, at *14 (D. Neb. Dec. 15, 2022); *Midnight Rider, Inc. v. Forever 21 Inc.*, No. CV1609298SJOJEMX, 2017 WL 11634980, at *1 (C.D. Cal. Nov. 6, 2017)

("[S]ales data is on computer and can be easily produced with little burden or expense."). A sophisticated, multi-billion dollar entity like Darling presumably maintains its purchase and sale data in accounting software that is readily accessible and identifiable such that any burden on Darling is minimal. The Court should compel Darling to produce the requested transactional data.

B.    **Darling should also produce contracts and related communications with Tyson and other in-Market contracts with processors.**

**Request Nos. 12 and 13** seek, respectively, all contracts between Darling and Tyson and all contracts between Darling and other poultry processors in the Market.[11] *See* Ex. 9. **Request No. 9** seeks communications related to Darling's contracts and negotiations with Tyson. **Request No. 11** seeks communications regarding pricing and volumes for poultry inputs and outputs after Tyson's acquisition of API. Similar to (but not the same as) the transactional data, these documents should show product specifications, minimum requirements (in terms of quantity or quality), pricing formulas, freight and other handling charges, and contract duration for rendering inputs. These documents should also show the related negotiations (only for the Tyson agreements) to arrive at the contract terms.

---

[11] As a concession to narrow the issues in dispute, API proposed to limit Request Nos. 12 and 13 to exclude purchase orders, to the extent such order information was reflected in Darling's transactional data and produced—a significant limitation based on API's experience with other subpoenas.

Obtaining the contracts reflecting these terms—any one of which can be manipulated to affect pricing and/or supply of rendering inputs—should ensure API's ability to conduct an analysis of anticompetitive issues. The contracts between Darling and Tyson and related communications will show any changes to these terms and the rationale for those changes, none of which is reasonably expected to appear in the transactional data, before and after Tyson's acquisition of API. *Cf. Kleen Prod.*, 2013 WL 120240, at *9; *In re Novartis and Par Antitrust Litig.*, 2019 WL 5722055, at *9. The contracts and terms with other processors in the Market will serve as a comparator. The full temporal scope from January 2014 to the present, like the same time period for the transactional data, is relevant to API's claims, including to demonstrate the before-and-after effects of Tyson's scheme. *See Arrowpac*, 2014 WL 12617575 at *3. Those changes subject to analysis and expert scrutiny will show Tyson's anticompetitive intent and harm to competition.

Darling took the same kitchen sink approach to objecting to these requests, citing confidentiality, relevance, and breadth, as well as burden based at least in part on the contention API should obtain the agreements directly from Tyson. *See* Ex. 9. The Court should overrule Darling's confidentiality obligations based on the Protective Order, as discussed above for the transactional data. *See Festus & Helen Stacy Found., Inc.*, 432 F. Supp. 2d at 1380. API has also addressed the relevance and breadth objections, explaining what these documents are expected to show, and how without them API cannot fully assess the competitive harm of Tyson's conduct.

In terms of getting the documents from Tyson, the Darling-non-Tyson agreements are simply not available from Tyson. For the Tyson-Darling agreements, the fact that Tyson may possess some duplicative information (it very well may not) is not a basis for refusal by Darling to produce the requested documents. *See Fudali v. Pivotal Corp.,* No. 1:09-2354-RWS-SSC, 2009 WL 10668516, at *5 (N.D. Ga. Oct. 30, 2009) ("[T]here is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party."); *Ohl v. CSX Transportation, Inc.*, No. 1:19-cv-1446, 2020 WL 12309226, at *3 (N.D. Ga. June 19, 2020). Company records may be inadvertently lost, destroyed, or not produced in party discovery for any number of reasons. Ensuring a complete record of the agreements between Darling and Tyson is not unreasonably cumulative, particularly given the $2 billion in controversy.

Further, Darling's self-serving claims of undue burden must be rejected because they are wholly unsubstantiated for both the contracts (Tyson and non-Tyson) and related communications (Tyson only). *See Hammon*, 2008 WL 11333688, at *2. Throughout the conferral process, API made repeated attempts to understand the nature of Darling's purported burden for producing these documents; and, for the contracts specifically, API inquired whether they were stored in a central location and therefore readily accessible. *See* Ex. 5. But Darling refused to disclose how the documents were kept. The refusal to answer this simple question suggests the contracts are centrally located and communications accessible such that any

burden on Darling is minimal, warranting an order to produce the documents. *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 11681956, at *2 (N.D. Ala. Dec. 5, 2017) (overruling burden objections and ordering non-party to produce contracts). The Court should compel the production of these documents.

### C. <u>As an in-Market and out-of-Market competitor to Tyson, Darling through its documented communications can provide a first-hand, contemporaneous account of Tyson's anticompetitive scheme.</u>

API requested various documents comprising Darling's contemporaneous communications in the context of poultry processing or rendering, including such communications with Tyson (**Request No. 5**) or about Tyson (**No. 6**), Darling's communications about Tyson's acquisition or operation of a rendering facility within the Market (**No. 7**), and Darling's communications regarding the Lawsuit (**No. 10**). For example, these requests would capture contemporaneous communications: between Darling and a processor about the processor's concern with Tyson's planned or completed acquisition of API; between Darling and the same processor looking to use Darling's services in the wake of Tyson's elimination of API as a renderer; between Darling and Tyson canceling Darling's services in the Market post-acquisition of API; or between Darling and a former API customer-processor signaling the processor's approval of the Lawsuit given the lack of rendering options in the aftermath of Tyson's elimination of API. These requests are directed towards

communications that may show Tyson's anticompetitive scheme, the extent of that scheme, Tyson's intent, and the resulting harm to competition.

Darling objected to these Requests based on breadth, burden, relevance, and confidentiality. *See* Ex. 9. For breadth, which is Darling's most emphatic objection, Darling contended numerous times and is expected to repeat in its opposition that API refused to tie the request for Darling communications with Tyson and about Tyson (Nos. 5 and 6) to any subject matter, such that:

> if Darling employee John Doe is friends with James Smith who works at Tyson, Darling would have to locate and review every single email those two individuals sent to each other, including emails on such irrelevant topics as them planning to meet for lunch or to go to their children's high school football game together.

*See* Ex. 6 at 5.

But API has said since it first meet and confer with Darling in August: "To the extent it is unclear from the face of the Subpoena, API's Requests are for information related to poultry processing or rendering." Ex. 4 at 4. Still, as recently as December 1, Darling continues to ignore API's limitations of these requests, even appearing to misunderstand that parties can narrow their discovery requests during the meet-and-confer process. *See* Ex. 8 at 6 ("For example, [API's] letter states Darling can identify the persons 'most likely to have Raw Material Supply or Poultry Rendering Output discussions with Tyson . . . [b]ut nothing in the Requests limits the communications to persons involved in Raw Material Supply or Poultry Rendering Output discussions . . . [y]our letter contradicts the Subpoena itself.").

Rather than consider API's requests as API has limited them verbally and in writing for months, Darling simply ignored those limitations and harps on its (mis)understanding of the scope of the requests.

These and other outlandish examples of documents that Darling portrays the requests as seeking do not satisfy Darling's burden to show lack of relevance. *See Pulmonary Assocs. of Charleston, PLLC v. Greenway Health LLC*, No. 3:19-CV-167-TCB, 2020 WL 9073567, at \*2 (N.D. Ga. Sept. 9, 2020) ("[I]t is the nonmovant's burden to show lack of relevance.") (citations omitted). For example, despite API's repeated corrections, Darling misapprehends API as seeking emails that refer to the "price of a McDonald's chicken sandwich" or a "chicken dance is trending on Tik Tok." *See* Ex. 6 at 9. These repeated tactics suggest Darling was neither taking the meet-and-confer process seriously nor tapping the parties' respective and collective expertise and the widely available technology for conducting electronic discovery and formulating effective search strings.[12]

The Court should compel Darling to produce responsive documents or, at a minimum, order Darling to re-engage API in the conferral process with specific

---

[12] For API's request for communications involving Tyson, Darling contends that using the "@tyson" domain as a limiter would be useless and that "searching for every email sent to or from a Tyson employee" would be presumptively time and cost prohibitive, generating "likely hundreds of thousands of emails (if not more)." *See* Ex. 6 at 5–6. But, as noted in its annual reports, Darling and Tyson are competitors, which would not be expected to have such extensive communications. When API pointed that out and asked Darling to substantiate this quantity of emails, Darling simply ignored the question. *Compare* Ex. 7 at 5 *with* Ex. 8 at 6–7.

directives to identify reasonable custodians,[13] develop search terms, and produce responsive documents, all within a short timeframe. *See, e.g., L–3 Commc'ns Corp. v. Sparton Corp.*, 313 F.R.D. 661, 667 (M.D. Fla. 2015) ("[T]he process of crafting keywords must be a cooperative one. The party responsible for production will usually be most familiar with its own records, and therefore will be best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information.") (internal quotations and citations omitted). Indeed, API has successfully done that over and over again with other subpoena recipients without the need for a court order.

Darling's breadth, burden, and relevance objections should be overruled. Similarly, Darling's confidentiality objections—particularly those asserted as to communications with Tyson—are without merit because the Court's Protective Order provides ample protections, as previously discussed. *See Festus & Helen Stacy Found., Inc.*, 432 F. Supp. 2d at 1380. The Court should compel Darling to produce these communications or, at a minimum, order Darling to engage API meaningfully to develop appropriate custodians and search terms directed at API's requests, as previously narrowed, and then produce responsive documents.

D.    **Trade group meetings are notorious for collusive discussions.**

---

[13] API suggested to Darling that a handful of custodians might be reasonable, as it had been for other subpoena recipients, but Darling continued to insist API was seeking as custodians Darling's employee base of "over 14,000 employees." *Compare* Ex. 7 at 5 *with* Ex. 8 at 6. Darling's cost estimates of $150,000 or more, built on such speculative assumptions, can and should be summarily rejected.

**Request No. 8** seeks documents related to Darling's trade group participation specifically for meetings where Tyson was discussed from January 2017 to the present. *See* Ex. 9. Darling, again, refused to produce documents based on the same litany of boilerplate relevance, over breadth, burden, and confidentiality objections. *Id.* But API alleged Tyson was involved in an anticompetitive scheme to collude with its competitors, *see e.g.*, Compl. ¶¶ 5, 11, 62, and trade group meetings are recognized as opportunities to collude. *See generally, In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) (finding that there are "opportunities to collude at industry and trade association meetings"). Accordingly, this request is tailored to documents that would demonstrate potential collusion by Tyson at trade group events where Darling was also present.

The rest of Darling's objections should be overruled for the same reasons discussed above. To the extent Darling was a witness to or participated in Tyson's collusive behavior, such information is patently relevant to API's conspiracy claim. The Court should grant API's motion and compel Darling to produce documents.

E. **As an in-Market and out-of-Market rendering competitor to Tyson, Darling's contemporaneous analysis of the rendering industry can provide a unique, first-hand perspective of the effects of Tyson's anticompetitive scheme.**

**Request Nos. 4, 14 and 15** seek documents reflecting analyses, research, financial statements, and reports of pricing, output volumes, competitive conditions, or market conditions related to rendering inputs and outputs and the poultry rendering industry. *See* Ex. 9.

In the years leading up to Tyson acquisition of API in 2018, Darling's annual report expressed competitive concerns regarding the availability of raw material supply and the consolidation of the meat processing industry. *See supra* n.5. Darling's underlying research, analyses, and reports on these very same issues—which presumably informed these statements in its annual reports—offer the contemporaneous perspective of Tyson's competitor-renderer in the Market and outside of the Market about the state of the rendering business before Tyson's acquisition of API, the year of that acquisition, and the years since that acquisition. These documents should show how the rendering industry in the Market has changed over time and how those changes compare to the changes in the industry more broadly, all with respect to rendering inputs and outputs. Such changes are evidence of Tyson's anticompetitive conduct, anticompetitive intent, and harm to competition in the Market. Such information falls squarely into the ambit of relevant discovery. *See, e.g., In re Mushroom Direct Purchaser Antitrust Litig.,* No. 06-0620, 2012 WL 298480, at *5 (E.D. Pa. Jan. 31, 2012) (compelling non-party to produce pricing analyses because it pertains to or "may lead to information that supports or refutes plaintiffs' claims regarding the impact of the defendants' activities on" pricing).

Darling's breadth, burden, and confidentiality objections also do not pass muster. *See Hammon*, 2008 WL 11333688, at *2; *Festus & Helen Stacy Found., Inc.*, 432 F. Supp. 2d at 1380. As with the other Requests, Darling has derailed the meet-and-confer process by refusing to provide API with any information to assess the

purported burden on Darling. *See* Ex. 6 at 8. Darling's market analyses, research, and reports may be centrally located such that there is no burden in locating responsive documents; but Darling refuses to confirm this fact one way or the other. To the extent the documents are not readily accessible, API offered to provide search terms to run across an agreed-upon list of custodians. *See* Ex. 5 at 3. Darling refused.

Moreover, API offered to narrow Request No. 4 to seek forecasts, business plans, budgets, and analyses concerning raw material supply and poultry rendering outputs in anticipation of/response to the acquisition of API or operation of the former API assets. *See* Ex. 7 at 4. This would include conduct to make Darling more competitive in the Market, which included Tyson as a rendering competitor in 2018, such as business expansions, acquisitions, divestitures, or other activities to preserve or grow market share. API further offered that Darling could redact information that is wholly unrelated to Tyson's acquisition of API or Tyson's operation of the former API assets. Notably, this Court previously determined that similar strategic planning documents from Tyson are relevant and granted API's motion to compel. *See* [Dkt. 60 at 13]. Darling rejected API's proposals. Its objections should be overruled.

## IV. CONCLUSION

The Court should order Darling to produce all responsive documents with an admonition to refrain from interfering with other non-parties' subpoena obligations.

Dated: December 11, 2023

**HOLLAND & KNIGHT LLP**

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107
Matthew T. Covell
Georgia Bar No.: 190735
1180 W. Peachtree St., N.W., Suite 1800
Atlanta, Georgia 30309
Tel.:  (404) 817-8500 | Fax:  (404) 881-0470
cynthia.burnside@hklaw.com
matthew.covell@hklaw.com

OF COUNSEL:

Kenneth L. Racowski
*Admitted Pro Hac Vice*
**HOLLAND & KNIGHT LLP**
2929 Arch Street, Suite 800
Philadelphia, Pennsylvania 19104
Telephone:  (215) 252-9600
Facsimile:  (215) 867-6070
kenneth.racowski@hklaw.com

Caitlin Saladrigas
*Admitted Pro Hac Vice*
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida 33401
Telephone:  (561) 833-2000
Facsimile:  (561) 650-8399
caitlin.saladrigas@hklaw.com

*Counsel for Plaintiffs*

## LR 37.1 CERTIFICATION

Pursuant to Local Rule 37.1 of the United States District Court for the Northern District of Georgia and Federal Rule of Civil Procedure 37(a)(1), counsel for Plaintiffs certify that they have in good faith conferred with counsel for Darling to obtain discovery before filing this Motion.

This 11 day of December, 2023.

**HOLLAND & KNIGHT LLP**

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107

*Counsel for Plaintiffs*

## LR 7.1(D) FONT COMPLIANCE CERTIFICATION

The undersigned counsel for Plaintiffs hereby certifies that the within and foregoing document was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

This 11 day of December, 2023.

**HOLLAND & KNIGHT LLP**

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused to be served a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

This 11 day of December, 2023.

**HOLLAND & KNIGHT LLP**

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107

*Counsel for Plaintiffs*