# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

AMERICAN PROTEINS, INC. n/k/a
CROSSROADS PROPERTIES A,
INC., et al.,

       Movants,

**v.**

DARLING INGREDIENTS, INC.,

       Respondent.

-----------------------------------------------

AMERICAN PROTEINS, INC. n/k/a
CROSSROADS PROPERTIES A,
INC., et al.,

       Plaintiffs,

 v.

RIVER VALLEY INGREDIENTS,
LLC, et al.,

       Defendants.

Civil Action No. 2:22-CV-00091-RWS

## NON-PARTY DARLING INGREDIENTS INC.'S:

## (1) OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SUBPOENA DIRECTED TO NON-PARTY DARLING INGREDIENTS, INC.

## (2) BRIEF IN SUPPORT OF MOTION TO QUASH SUBPOENA

## AND

## (3) BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................1

II.   LEGAL STANDARD ....................................................................2

III.  ARGUMENT AND CITATION OF AUTHORITY .......................3

      A.    The Subpoena Is Facially Invalid...........................................3

      B.    Each of API's Requests Should Be Quashed........................4

      C.    The Protective Order Should Be Modified ..........................23

      D.    API Should Be Ordered to Pay Darling's Costs of Compliance. .......25

      E.    Darling Should Be Awarded Attorneys' Fees.....................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug*,
  2022 U.S. Dist. LEXIS 117135 (N.D. Fla. Apr. 26, 2022) .........................17, 18

*Alig-Mielcarek v. Jackson*,
  286 F.R.D 521 (N.D. Ga. 2012) ...........................................................................1

*In re ANC Rental Corp.*,
  2002 U.S. Dist. LEXIS 12260 (E.D. Pa. June 20, 2002)...................................7, 9

*BMO Harris Bank, N.A. v. Richert Funding, LLC*,
  2017 U.S. Dist. LEXIS 234735 (N.D. Ga. July 3, 2017) ...................................25

*Bridgestone Ams., Inc. v. IBM*,
  2017 U.S. Dist. LEXIS 229583 (N.D. Ga. June 15, 2017)..................................25

*Brilliant Alts., Inc. v. Feed Mgmt. Sys.*,
  2011 U.S. Dist. LEXIS 17768 (N.D. Ga. Feb. 22, 2011).....................................4

*BRP Colleague Inc. v. Gillen*,
  2023 U.S. Dist. LEXIS 101236 (N.D. Ga. Mar. 7, 2023) .....................................8

*Doe I v. Paulie Walnuts*,
  2008 U.S. Dist. LEXIS 70986 (W.D. Va. Sept. 19, 2008)....................................4

*Electro-Mech. Prods., Inc. v. Alan Lupton Assocs. Inc.*,
  2023 U.S. Dist. LEXIS 180502 (D. Colo. Sept. 21, 2023).....................................9

*Equal Emp. Opp. Comm'n v. Sirdah Enters.*,
  2015 U.S. Dist. LEXIS 181962 (N.D. Ga. Feb. 25, 2015)....................................2

*Fausten v. AT&T Servs.*,
  2021 U.S. Dist. LEXIS 249657 (N.D. Fla. Oct. 27, 2021)..................................17

*FTC v. Peabody Energy Corp.*,
  2020 U.S. Dist. LEXIS 57051 (E.D. Mo. Apr. 1, 2020) .....................................24

*FTC v. Sysco Corp.*,
  83 F. Supp. 3d 1 (D.D.C. 2015).........................................................................24

*J.D. Fields & Co. v. Nucor-Yamato Steel Co.*,
  2015 U.S. Dist. LEXIS 194916 (E.D. Ark. June 15, 2015) ...............................23

*Jordan v. Comm'r Miss. Dep't of Corr.*,
    947 F.3d 1322 (11th Cir. 2020) ...................................................2, 3, 6

*Kleen Prod. LLC v. Packaging Corp. of Am.*,
    2013 U.S. Dist. LEXIS 3016 (N.D. Ill. Jan. 9, 2013).........................7

*KPN Healthcare Servs. v. Mylan*,
    2023 U.S. Dist. LEXIS 20706 (D. Kan. Feb. 7, 2023).....................8, 9

*Monitronics Int'l, Inc. v. Hall Booth, Smith, P.C.*,
    2016 U.S. Dist. LEXIS 166402 (N.D. Ga. Dec. 2, 2016) ..................25

*Moore v. Pooches of Alrgo*,
    2023 U.S. Dist. LEXIS 47798 (M.D. Fla. Mar. 21, 2023) ..................3

*Morton v. Lien Filers of Heath W. Williams*,
    2021 U.S. Dist. LEXIS 201607 (N.D. Ga. Aug. 19, 2021) ..................8

*In re Novartis & Par Antritrust Litig.*,
    2019 U.S. Dist. LEXIS 191606 (E.D. Pa. Nov. 5, 2019) ...................7

*PhishMe, Inc. v. Wombat Sec. Techs., Inc.*,
    2017 U.S. Dist. LEXIS 150862 (D. Del. Sept. 18, 2017)...................24

*Pinnacle Agric. Distrib. v. Mayo Fertilizer, Inc.*,
    2017 U.S. Dist. LEXIS 30978 (N.D. Ga. Mar. 6, 2017) ....................12

*R&D Bus. Sys. v. Xerox Corp.*,
    152 F.R.D. 195 (D. Colo. 1993) ...........................................................3

*Rudd Equip. Co. v. Volvo Constr. Equip. N. Am.*,
    2020 U.S. Dist. LEXIS 247971 (W.D. Ky. June 12, 2020) ................9

*Saint Alphonsus Med. Ctr. v. St. Luke's Health Sys.*,
    2013 U.S. Dist. LEXIS 4857 (D. Idaho Jan. 10, 2013) .....................23

*Small v. Amgen*,
    2016 U.S. Dist. LEXIS 195093 (M.D. Fla. Sept. 28, 2016).........13, 22

*Steel, LLC v. Archer W. Constr., LLC*,
    2022 U.S. Dist. LEXIS 236837 (N.D. Ga. Sept. 30, 2022)..............2, 3

*In re Subpoenas Issued to Labatt Food Serv., LLC*,
    2022 U.S. Dist. LEXIS 62122 (W.D. Tex. Apr. 1, 2022) ...................7

*TattleTale Portable Alarm Sys. v. Calfee, Halter & Griswold, LLP*,
    2012 U.S. Dist. LEXIS 50102 (D.N.J. Apr. 10, 2012)........................4

*Weems Indus., Inc. v. Teknor Apex Co.*,
    2022 U.S. Dist. LEXIS 240800 (N.D. Ga. May 16, 2022) ................17

**Other Authorities**

Fed. R. Civ. P. 45(c)(2)(A) ...................................................................... 3

Fed. R. Civ. P. 45(d)(2)(B)(ii) ............................................................... 25

Fed. R. Civ. P. 45(d)(3)(B) ..................................................................... 8

# I.    INTRODUCTION

Plaintiffs ("API") seek to enforce their Subpoena against Darling Ingredients Inc. ("Darling"), yet their Motion fails to quote the document requests ("Requests") at issue. That is by design. API hopes to hide the very Requests it asks this Court to enforce because they are vastly overbroad, unduly burdensome, and demand that Darling—a non-party—produce Trade Secrets to one of its largest competitors.[1]

Consider Request Nos. 5 and 6, which seek **for a <u>ten-year</u> period "[a]ll communications between [Darling] and Defendants"** and **"[a]ll communications between [Darling] and any entity about Defendants."** DE 76-1 at 12. These Requests are not remotely tailored to the claims at issue. Rather, they purport to require Darling, a company with over 14,000 employees, to search for every email (i) sent to or from any Defendant or (ii) just mentioning a Defendant—**regardless of topic**. Thus, if John (at Darling) emailed Tim (at Tyson) to meet for lunch, that email is a "communication between [Darling] and Defendants" that must be searched for and produced. Likewise, if Kim (at Darling) emails her friend at Coke that "Tyson's stock took a hit today," that email must be produced as it is a "communication between [Darling] and another entity about [Tyson]." A valid

---

[1] A "Trade Secret" is information that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and for which Darling has undertaken reasonable efforts to maintain its secrecy.

subpoena must be "narrowly tailored" to the issues in dispute. *Alig-Mielcarek v. Jackson*, 286 F.R.D 521, 528 (N.D. Ga. 2012). These Requests are the opposite.

The Requests are improper for several other reasons, including that they demand that Darling produce its Trade Secrets to Tyson—its largest competitor. For example, Request No. 4 seeks not only Darling's **current** "forecasts [and] budgets," but also the business plans Darling **"is still developing or implementing."** *See* DE 76-7 at 5. Darling's current business plans have no bearing on whether Tyson engaged in anticompetitive conduct **in 2018** when it acquired API. Darling should not be forced to produce its Trade Secrets to its competitor when they are irrelevant. For these and other reasons, the Motion should be denied and the Subpoena quashed.

## II.    LEGAL STANDARD

The standards below govern a Rule 45 subpoena to a non-party:

**Relevance**: "[A] subpoena issued under Rule 45 should be quashed to the extent it seeks irrelevant information." *Id.* The proponent of the Subpoena bears the burden of showing relevance. *Equal Emp. Opp. Comm'n v. Sirdah Enters.,* 2015 U.S. Dist. LEXIS 181962, at *1 (N.D. Ga. Feb. 25, 2015).

**Undue Burden:** A subpoena should be quashed if it "subjects a person to undue burden." *Jordan v. Comm'r Miss. Dep't of Corr.*, 947 F.3d 1322, 1337 (11th Cir. 2020). To assess whether a burden is undue, the Court balances "the requesting party's need for the discovery against the burden imposed on the subpoenaed party."

*Steel, LLC v. Archer W. Constr., LLC*, 2022 U.S. Dist. LEXIS 236837, at \*4 (N.D. Ga. Sept. 30, 2022). In assessing burden, "the status of the person as a non-party is a factor often weighing against disclosure." *Id.*

**Trade Secrets**: A subpoena seeking disclosure of a trade secret or confidential commercial information should be quashed unless the party serving the subpoena shows a "**substantial need**" for the discovery. *Jordan*, 947 F.3d at 1335; *R&D Bus. Sys. v. Xerox Corp.*, 152 F.R.D. 195, 196 (D. Colo. 1993). Where, as here, a subpoenaed party shows that the information sought is a trade secret and its disclosure might be harmful, the burden shifts to the subpoenaing party to "establish that disclosure of the trade secrets is both relevant and necessary." *Id.* at 196–97.

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.    The Subpoena Is Facially Invalid.

The place of compliance for a subpoena must be "within 100 miles of where the [subpoenaed entity] resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(2)(A). "[F]or a nonparty corporation," the place of compliance "is where the corporation is headquartered." *Moore v. Pooches of Alrgo,* 2023 U.S. Dist. LEXIS 47798, at \*4 (M.D. Fla. Mar. 21, 2023) (collecting cases).

Darling is headquartered in Irving, Texas. Yet the Subpoena purports to require Darling to produce documents in Atlanta—more than **700 miles** away. DE 76 at Ex. 1. The Subpoena is thus invalid. *Moore*, 2023 U.S. Dist. LEXIS 47798, at

*3 (subpoena defective if production demanded outside 100-mile limit).[2]

## B. Each of API's Requests Should Be Quashed.

Darling quotes each Request below and explains why it should be quashed.

**No. 1**: **"Transactional data, in a machine-readable form agreed upon by You and Plaintiffs, for all transactions involving the sale of Raw Material Supply for poultry rendering from January 1, 2014, to the present."**

**No. 2: "Transactional data, in a machine-readable form agreed upon by You and Plaintiffs, for all transactions involving the purchase of Poultry Rendering Outputs from January 1, 2014, to the present."**

Request Nos. 1 and 2 seek **all** data relating to Darling's raw material purchases and rendering output sales for the last decade.[3] DE 76-1 at 12. API seeks not only pricing and volume data, but also data relating to "input/output type and product composition, and other characteristics, such as date of transaction and geographic origin/destination." DE 76 at 12. These broad Requests should be quashed.

_____

[2] API may rejoin that Darling waived its objection. But API admits Darling timely objected to the Subpoena. DE 76 at 7. Regardless, this Court is loath to find waiver where the "subpoena is overbroad on its face," "the subpoenaed witness is a non-party acting in good faith," and "counsel for the witness and counsel of the subpoenaing party were in contact [] prior to the time the witness challenged the [] subpoena." *Brilliant Alts., Inc. v. Feed Mgmt. Sys.*, 2011 U.S. Dist. LEXIS 17768, at *15-17 (N.D. Ga. Feb. 22, 2011). Alternatively, API may ask the Court to amend the Subpoena to cure its defect, but federal courts routinely reject such requests. *See, e.g.*, *TattleTale Portable Alarm Sys. v. Calfee, Halter & Griswold, LLP*, 2012 U.S. Dist. LEXIS 50102, at *14 (D.N.J. Apr. 10, 2012) ("The Court also finds that it cannot amend the subpoena or waive this defect."); *Doe I v. Paulie Walnuts*, 2008 U.S. Dist. LEXIS 70986, at *16–17 (W.D. Va. Sept. 19, 2008) (same).

[3] "Poultry Rendering Output" is defined as "any output resulting from the poultry rendering process" and "Raw Material Supply" is defined as "any poultry materials supplied by any poultry processor to be used by a poultry renderer for any purpose."

**First**, complying with these Requests would be extremely burdensome. Over the past decade, Darling has engaged in billions of dollars of transactions and, consequently, these Requests seek **tens of millions of items of data**. *See* Ex. A ¶ 15. Contrary to API's speculation, Darling does **not** "maintain[] its purchase and sale data in accounting software that is readily accessible." DE 76 at 17. Rather, the data is dispersed among nine systems and dozens of servers located nationwide:

(1) Given the breadth of its Requests, the data API seeks is not stored in the same software or server. *Id.* ¶ 16, 19. For example, Darling's trucking data (*i.e.*, origin/destination data) is not always stored with its pricing data. *Id.* ¶ 11. Thus, data for one transaction can be stored in multiple locations. *Id.* ¶ 16, 19.

(2) During the last ten years, Darling acquired several companies and, after an acquisition occurs, Darling often does **not** integrate the acquired entity's historical data into Darling's own systems. *Id.* ¶¶ 6–9. As a result, responding to these Requests would require Darling to incur time and expense trying to locate historic data for entities it acquired over the last ten years. *Id.*

(3) The data sought may span nine different systems, each of which requires a distinct skill set to query, and be dispersed among dozens of servers, each of which would need to be searched individually. *Id.* ¶ 8, 26. There is no way to search across all applications and servers simultaneously, e.g., by using a keyword search. Each server would need to be individually searched. *Id.* ¶ 13.

For those reasons, Darling estimates that responding to Request Nos. 1 & 2 would require at least 10–12 employees working full time more than six months and cost at least $1.2 million . *Id.* ¶ 20. This excludes the IT costs associated with producing what is likely more than a terabyte of data. *Id.* ¶ *Id.*

Darling should not have to incur substantial time and expense locating and producing this vast amount of data, particularly because it is irrelevant. *See, e.g.,*

*Jordan*, 947 F.3d at 1329 ("a subpoena [] should be quashed to the extent it seeks irrelevant information."). Darling and API were competitors. *See* Ex. B ¶ 6. Thus, Darling and API had different suppliers, costs, profit margins, pricing formulas, and customers. *Id.* ¶ 7. Those differences render Darling's data irrelevant:

> [T]his case is not about changes in **Darling's** prices, volumes, or contractual terms. It is about API. And, critically, the fact that Darling's prices and other terms may have change[d] has no bearing on API as the parties are wholly unrelated. Thus, by way of hypothetical example, if Darling's price for a certain raw material increased by 0.5% in 2018, that provides no relevant information to API because that increase could be due to factors wholly unrelated to API's business, such as increase in fuel costs, Darling's desire to establish a relationship with a new supplier, a higher lease rate for Darling's supplier, or a host of other reasons. Thus, a price increase says nothing about whether Tyson did or did not engage in any wrongdoing. *See* DE 76-8 at 6.

By way of further example, assume that, in 2019, Darling paid 5% more for poultry from Processor X. That fact says nothing about whether Tyson engaged in an antitrust conspiracy, let alone whether such conspiracy impacted API. Indeed, the price increase could have resulted from many factors, including (1) Darling having to place a rush order; (2) increased utility costs; (3) higher delivery costs; or (4) the renegotiation of an old contract. *See* Ex. B ¶ 8. Moreover, simply because Darling had a price increase from Processor X does not mean that **API** suffered any impact. Among other things, API may not even purchase from Processor X and/or its prices may not have changed. This case is about **API's** pricing and volume and the causes of any changes thereto. Darling's independent pricing and volume changes, based on different factors, are irrelevant.

The cases cited by API are inapposite. *See* Mot. at 12. For instance, *Kleen Prod. LLC v. Packaging Corp. of Am.*, 2013 U.S. Dist. LEXIS 3016 (N.D. Ill. Jan. 9, 2013) involved a motion to compel **the defendant** to produce its own data. Of course, a defendant's own price changes are relevant to claims that **it** fixed prices. By contrast, API's Requests seek data involving neither Plaintiffs nor Defendants, *e.g.*, Darling (a non-party) buying poultry from Claxton (another non-party).[4]

More relevant cases show that courts often quash subpoenas seeking broad transactional data on burden, confidentiality, and other grounds. *See, e.g.*, *In re Subpoenas Issued to Labatt Food Serv., LLC*, 2022 U.S. Dist. LEXIS 62122, at *8–9 (W.D. Tex. Apr. 1, 2022) (quashing subpoena for "sales data"); *In re ANC Rental Corp.*, 2002 U.S. Dist. LEXIS 12260, at *4 (E.D. Pa. June 20, 2002).

In short, Request Nos. 1 and 2 should be quashed because the burden to comply with those requests is disproportionately greater than any purported benefit.

---

[4] *In re Novartis & Par Antritrust Litig.*, 2019 U.S. Dist. LEXIS 191606 (E.D. Pa. Nov. 5, 2019), is also distinguishable. There, Plaintiffs alleged that defendants conspired to delay the launch of a generic version of Exforge, which increased the price of all Exforge generics **including those made by Alembic**. *Id.* at *2. Plaintiffs subpoenaed Alembic for its generic Exforge sales data. *Id.* at *17. Thus, the Alembic data was directly related to Plaintiffs' claims, *i.e.*, it showed an increase in the price of the very product Plaintiffs sold. That is not the case here. On the contrary, that Darling may have sold outputs at a higher price says nothing about API's claims because (1) Darling's outputs are not the same as API's (*e.g.*, they are of a different quality); (2) Darling sells to different customers; and (3) Darling's and API's prices are individually negotiated and vary based on factors such as volume and delivery options. Thus, while the price of **Alembic's** drug showed whether **Alembic's** price was artificially raised, data on **Darling's** prices say nothing about **API's** prices.

7

*See, e.g.*, *Morton v. Lien Filers of Heath W. Williams*, 2021 U.S. Dist. LEXIS 201607, at *8–10 (N.D. Ga. Aug. 19, 2021) (quashing on burden grounds).

**<u>Second</u>**, even if Darling could readily obtain the extensive data API requests, Darling should not have to produce its Trade Secrets to one of its largest competitors (Tyson), particularly when those secrets are irrelevant. *See* Fed. R. Civ. P. 45(d)(3)(B) (proper to quash subpoena requiring "disclosure [of] a trade secret or other confidential [] or commercial information."). API concedes that Darling is "a competitor to Tyson." DE 76 at 2. And there can be no legitimate dispute that Darling's cost, pricing, and other data is a Trade Secret that, if disclosed to Tyson, would put Darling at a competitive disadvantage. *See* Ex. B ¶ 14; *see also BRP Colleague Inc. v. Gillen*, 2023 U.S. Dist. LEXIS 101236, at *16 (N.D. Ga. Mar. 7, 2023) (data maintained in secrecy and provides a competitive advantage can be a trade secret). Among other things, it would allow Tyson to know (1) how much Darling pays for raw materials (which Tyson can use in its own negotiations) and (2) what Darling charges its customers (which Tyson can use to compete against Darling given that outputs are not sold using published list prices). *Id.* ¶¶ 14–16. That information would allow Tyson to unfairly compete against Darling. *Id.*

Critically, the fact that some of the requested data dates back a few years does not render its disclosure any less harmful. As explained in the Affidavit of Brandon Lairmore, Tyson can use earlier-created data to ascertain Darling's cost and pricing

formulas and thereafter extract Darling's **current** costs and pricing. Ex. B ¶ 17.

In these circumstances, courts quash subpoenas to protect a non-party from competitive harm. For example, in *KPN Healthcare Servs. v. Mylan*, 2023 U.S. Dist. LEXIS 20706 (D. Kan. Feb. 7, 2023), the plaintiffs, like API here, brought unlawful monopolization claims and served a subpoena on a non-party seeking its sales data. *Id.* at *4. The subpoena was quashed because the requested data was confidential, the non-party "could suffer real and substantial harm if" the data was disclosed, and "the existence of a protective order [wa]s not sufficient to eliminate the risk of irreparable harm." *Id.* at *6-14. The same was true in *In re ANC Rental Corp.*, 2002 U.S. Dist. LEXIS 12260, at *4 (E.D. Pa. June 20, 2002).[5] It is also true here.

At a minimum, if the Court orders Darling to produce transactional data, the Protective Order should be modified to mitigate competitive harm. *Infra* at 22–23.

**No. 4:** **Your internal and public annual, quarterly, and monthly financial statements, summaries, forecasts, business plans, budgets, and analyses concerning Raw Material Supply and Poultry Rendering Outputs, including profit and loss statements and comparisons to budget from January 1, 2014, to the present."**

This Request should be quashed. **First,** it is overbroad and unduly burdensome. To comply with this Request, Darling would have to locate, review,

---

[5] *See also Rudd Equip. Co. v. Volvo Constr. Equip. N. Am.*, 2020 U.S. Dist. LEXIS 247971 (W.D. Ky. June 12, 2020) (denying motion to compel non-party subpoena when compliance would cause competitive harm); *Electro-Mech. Prods., Inc. v. Alan Lupton*, 2023 U.S. Dist. LEXIS 180502 (D. Colo. Sept. 21, 2023) (same).

and produce every "financial statement, summar[y], forecast [including forecasts for sales, transport costs, utility costs, etc.], business plans, and analys[i]s" for a decade. Darling estimates (1) there are at least dozens of employees who are reasonably likely to have responsive documents and (2) to identify responsive documents (and cull for privilege) would require a review of over one million pages. *See* Ex. A ¶ 24.

As to the number of employees whose emails would have to be searched, complying with this Request would require Darling to search the emails of (i) a large number of employees in its finance department (who prepare financials); (ii) its former and current sales force (who receive sales and pricing forecasts); (iii) its accounting department (who prepare budgets and analyses); and (iv) employees involved in sourcing materials and selling finished product. *Id.* ¶ 22. Even if Plaintiffs agreed that Darling could limit its review to a subset of employees, given the scope of the Request (covering numerous departments) and the ten-year temporal scope (which implicates different employees at different times), it would be difficult to reduce the custodians for this Request to any reasonable number. *Id*.

As to the Request's substantive scope, it is essentially unbounded, seeking any document containing any financial, forecasting, budgetary, or business planning information. Such documents include: (i) weekly, monthly, quarterly, and annual budgets (and **all** emails about changes thereto); (ii) weekly, monthly, quarterly, and annual forecasts (and **all** emails about changes thereto); (iii) all draft and final

financial statements and narratives (which would involve a privilege review for attorney/accountant client privilege); (iv) any email in which an employee discusses any budget, forecast, pricing issues or "analyses" thereof, and (v) any discussions of Darling's business plans. Darling reasonably estimates that, over the last decade, it has created **millions** of pages of documents containing this information. *Id.* ¶ 23.

Like Request Nos. 1 and 2, the substantial burden required to comply with this Request is disproportionately greater than any benefit. Again, API's business was not identical to Darling's. The two companies had different suppliers, customers, costs, and budgets. *Supra* at 5–6. For example, because Darling and API operated from different locations, Darling's budgets and forecasts would necessarily differ from API's due to differences in wages, utility costs, and taxes in their respective locales. *See* Ex. B ¶ 9. Relatedly, any given cost increase Darling may have forecast could stem from location-specific issues—*e.g.*, a local utility raising rates or localized labor shortage—rather than alleged conspiracy. *Id.* The same is true for sales forecasts, which are specific to Darling's customers' needs and have nothing to do with API and its separate customer base.[6]

During conferrals, API was open to modifying the Request to the period "**in**

---

[6] For these same reasons, Darling's profit and loss statements are irrelevant. For example, even assuming Darling's profits decreased 1% from 2014 to 2015, that decrease could stem from many factors that have nothing to do with anti-competitive conduct, such as supply chain issues or higher utility costs. *Id.* ¶ 9.

**anticipation of or in response to, in whole or in part, Tyson's [2018] acquisition of API or operation of the former API assets**." DE 76-7 at 5. That limitation is akin to no limitation at all. API is still demanding that Darling produce every category of document from 2018 to the present. In fact, API demands that Darling produce documents relating to its **2022** acquisition of Valley Proteins, even though it occurred four years after Tyson acquired API. *Id.* Perhaps more troubling, API insisted that Darling produce acquisition and business plans it "is still developing or implementing." *Id.* Darling's current business plans have no relevance to whether Tyson engaged in anticompetitive conduct in 2018. Thus, any production of Darling's current business plans does nothing except inform Darling's competitors of precisely how Darling intends to compete with them in the future.

**Second**, because the documents sought by this Request are irrelevant, Darling should not be forced to risk disclosing its Trade Secrets—particularly its "forecasts," "profit and loss statements," and **current** "business plans"—to one of its largest competitors. *See, e.g.*, *Pinnacle Agric. Distrib. v. Mayo Fertilizer, Inc.*, 2017 U.S. Dist. LEXIS 30978, at *14 (N.D. Ga. Mar. 6, 2017) ("Pinnacle's profit and loss statements…are trade secrets."). While Darling recognizes that a Protective Order is in place, that Order (as currently written) permits Tyson's in-house counsel, as well as other Tyson employees who are "witnesses and deponents," to review Darling's Trade Secrets. *Infra* at 22–23. Darling should not be forced to risk competitive harm

by producing Trade Secrets that are of little, if any, relevance to this case.

**Third**, this Request seeks "public" documents. Darling is not required to incur the burden of searching for and producing public documents that API can obtain itself. *Small v. Amgen,* 2016 U.S. Dist. LEXIS 195093, at *20 n.8 (M.D. Fla. Sept. 28, 2016) (denying motion to compel information Plaintiff can obtain itself).

In short, this Request is overbroad, unduly burdensome, and fails the proportionality test. *See* DE 60 at 10 (denying API motion to compel where requests were "unduly burdensome and not proportional.").

**No. 5:** "**All communications between You and Defendants**."

This Request, which seeks "[a]ll communications" between any one of Darling's more than 14,000 employees and any one of Tyson's more than 142,000 employees **on any subject matter**, is overly broad, unduly burdensome, and seeks irrelevant information. For example, as written, Darling would have to search for, review, and produce the following irrelevant emails: (1) John (at Darling) emailing his friend Jane (at Tyson) about meeting for lunch and (2) Mark (at Darling) emailing Harry (at Tyson) about the Falcons game.

Darling repeatedly asked API to narrow this and other Requests so they are narrowly tailored to this case. API refused:

> Setting aside [that] the Requests are overly broad and seek irrelevant information, you claim that Darling's claim that responding to the Requests would be cost prohibitive is "mere speculation." It is not. Darling does not need to speculate to know that searching 14,000

employees' emails for "[a]ll communications" that in any way reference Tyson or any other Defendant would be prohibitively time consuming and costly. If you are now claiming that you want something other than that information, then you should have modified the Requests to so indicate. We asked you to do that repeatedly. And you have repeatedly refused. *See* DE 76-8 at 7.

…

I asked API to send Darling revised requests that were narrowly tailored to the claims and defenses at issue…your Letter makes no such revisions. Instead, API continues to improperly demand that Darling respond to the overly broad Requests as written. *See* DE 76-6 at 4.

Rather than properly narrow the Request, API instead demanded that Darling somehow identify relevant custodians (even though there is no reasoned basis to do so given the breadth of the Request) and conduct keyword searches to see how many "hits" would be obtained by searching for the word "Tyson" and reviewing all emails sent to or from the @tyson.com domain. DE 76-7 at 6. But if Darling followed that process, it would have to review scores of emails simply because they were sent to, received from, or even mention Tyson **regardless of the subject matter**. The proper approach, which API refuses to follow, is for API to *first* serve a proper Request and then can Darling identify the relevant custodians and conduct keyword searches.

<u>No. 6:</u> "**All communications between You and any entity about Defendants**."

This Request should be quashed for the same reasons as Request No. 5. In fact, it is worse. As written, Darling would have to search for every email where an employee mentioned Tyson, regardless of to whom or the subject matter. Thus, an email between John (at Darling) to Jane (at Publix) asking whether Publix carries

Tyson chicken would have to be searched for and produced. While API claims that hypotheticals like this show that Darling is not "taking the meet-and-confer process seriously," that claim ignores that this email is, in fact, a communication from Darling to "any entity" about Tyson. As shown above, Darling asked API to modify this Request so that it was narrowly tailored to this case. API refused. *Supra* at 13–14. Now that Darling has been forced to spend time and expense on this Motion, API should not be permitted to belatedly modify this or any other Request. Rather, API's Motion should be judged on the Requests that API demanded Darling comply with.

**No. 7:** "**All communications between You and any other, poultry renderer, poultry processor, or <u>any other entity</u> regarding the potential or actual acquisition and/or <u>operation</u> by Defendants of a rendering facility within the Market**."

This Request purports to require Darling to search for and produce "**[a]ll communications**" with "any [] entity" discussing Tyson's "operation" of a rendering facility. Thus, this Request seeks myriad documents that have nothing to do with this case such as (1) an email discussing Tyson's rendering plant becoming unionized; (2) an email to the EPA about rendering emission rates that mentions Tyson; and (3) an email about an accident at a Tyson rendering plant.

API claims that this Request seeks relevant information such as communications between "Darling and a processor about the processor's concern with Tyson's planned or completed acquisition of API." DE 76 at 20. If that is the information API wants, it could have served a Request seeking only those

communications. It did not. Instead, it served a Request seeking "[a]ll communications…regarding…operation by [Tyson] of a rendering facility." That Request is overly broad, unduly burdensome, and disproportionate to the needs of this case. Darling provided API with ample opportunity to amend this Request and API refused. It would be unfair to allow API to change the Request now.

**No. 8:** "**All documents relating to any industry trade group or association meeting in which Defendants were discussed between January 1, 2017 to present.**"

This Request is absurd. Tyson is one of the largest entities in the rendering industry and it is fair to assume that <u>**all**</u> industry trade group meetings involved a discussion about Tyson. Thus, this Request is akin to demanding that Darling produce all documents relating to every trade group meeting in the last six years, including such irrelevant documents as expense receipts and emails discussing where the trade group will meet for dinner.

This Court has already held that this Request is overly broad **even as served on Tyson**. DE 60 at 13. Specifically, API moved to compel Tyson to produce "documents related to Tyson's participation in trade groups." *Id.* The Court denied that motion finding that "the breadth of discovery requested by Plaintiffs is unduly burdensome and falls far short of meeting the proportionality test." *Id.* If the request is overly broad to party Tyson, it is, *a fortiori*, overly broad to non-party Darling.

To try to salvage this overly broad Request, API argues that trade group

meetings provided an opportunity for Tyson to coordinate with co-conspirators. DE 76 at 24. But Plaintiffs do not claim Darling conspired with Tyson. On the contrary, API claims that Darling was a "potential **victim** of Tyson's anticompetitive behavior." DE 76-4 at 5. Thus, API's co-conspirator argument fails.

**No. 9:** "**All internal and external communications related to Your contracts and related negotiations with Defendants.**"

Request No. 9 is overly broad and disproportionate to the needs of this case.

**First**, it seeks communications "**with Defendants**." API is required to obtain such documents from Tyson, a party—not Darling: "Plaintiff can obtain the document from the Defendant. There is no need to burden a non-party" *Fausten v. AT&T Servs.*, 2021 U.S. Dist. LEXIS 249657, at *2 (N.D. Fla. Oct. 27, 2021); *Weems Indus., Inc. v. Teknor Apex Co.*, 2022 U.S. Dist. LEXIS 240800, at *8 (N.D. Ga. May 16, 2022) (quashing subpoena for documents party can obtain outside of non-party). Notably, Darling asked API to represent that (1) it sought these documents from Tyson *and* (2) Tyson did not produce them, a request consistent with the law: "When seeking discovery from a non-party, the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation." *In re 3M Combat Arms Earplug*, 2022 U.S. Dist. LEXIS 117135, at *106–07 (N.D. Fla. Apr. 26, 2022). API refused to explain why it could not obtain the requested contracts from Tyson, likely because **Tyson** was already ordered to produce them. DE 60 at

14 (ordering Tyson to produce its "Poultry Rendering Contracts.").

**Second**, by seeking "internal [] communications" and information "related [to] negotiations" with Tyson, this Request purports to require Darling to review a plethora of privileged emails given that Darling's contract negotiations were conducted by or with counsel. *See* Ex. B ¶ 19. Thus, to comply with this Request, Darling would need to obtain emails from its counsel and conduct a detailed privilege review. *Id*. Darling estimates this process would take at least one month to perform and likely cost at least $25,000 (excluding ESI costs).

The excessive burdens associated with complying with this Request are disproportionately greater than any benefit. Darling's internal communications relating to its negotiations with Tyson are irrelevant. For example, an email asking Tyson to agree to an arbitration clause has nothing to do with whether Tyson fixed prices. Likewise, terms that Darling or Tyson proposed, but never agreed to, are irrelevant. Darling should not have to incur the substantial burdens of performing a large privilege review so it might produce a few documents about proposed contract terms having nothing to do with API.

**Finally**, Darling's internal communications relating to its contract negotiations with Tyson are Trade Secrets whose disclosure would put Darling at a competitive disadvantage. *See* Ex. B ¶ 20. Among other things, producing Darling's strategies for contract negotiations would afford Tyson invaluable knowledge that it

can use to its competitive advantage the next time it negotiates with Darling. *Id.* ¶ 21. As shown below, even if Tyson has the best of intents in complying with the Protective Order, there is no means for its lawyers and witnesses to simply forget what they learn about Darling's negotiating strategies the next time the parties negotiate. Darling should not be forced to disclose its negotiating strategies to Tyson (the very party it is negotiating with) when they are irrelevant. *See infra* 22–23.

**No. 10:** **All documents reflecting internal or external communications regarding this Lawsuit.**

This Request demands that Darling search its 14,000 plus employees' email boxes to find each instance when an employee mentioned this lawsuit, even if such discussion were nothing more than "did you hear API sued Tyson?" The burden of responding to this Request is disproportionately greater than any purported benefit for two reasons. ***One***, Darling is unaware of any meaningful way to reduce the number of custodians to search for responsive emails. Since this Request apparently seeks Darling employees' opinions about the lawsuit, which employee opinions matter? ***Two***, when Darling asked API to explain how its employees' "opinions or thoughts about this lawsuit, if any, have [any] bearing on any claim or defense," API responded that "Darling may have internal communications or information that directly bear on relevant issues in the Lawsuit." DE 76-4 at 4. If API wants documents that "directly bear on relevant issues in the Lawsuit" then it should ask for **those** documents, not for documents reflecting an employee's (subjective and

19

inadmissible) opinion about the lawsuit itself. It did not.

**No. 11:** **All internal and external communications regarding pricing and output volumes of Raw Material Supply and Poultry Rendering Output after Closing.**

For the reasons set forth above with respect to Request Nos. 1, 2, and 4, this Request should be quashed. To comply with this Request, Darling would have to search over a six-year period for all emails "regarding pricing and output volumes," which includes **all** emails relating to: (1) raw material purchases; (2) output sale; and (3) any budgeting, forecasting, or estimating raw material costs, output pricing, or sales volume. Darling estimates that (1) there are at least dozens of current and former employees who are reasonably likely to have responsive information; (2) there are at least one million pages of documents that contain responsive information; and (3) it would take months and substantial expense to search for, ingest, review, redact, and produce responsive information. *See* Ex. A ¶ 26.

While the burden of responding to this Request is great, any benefit is minimal at best. As described above with respect to Request Nos. 1, 2, and 4, Darling's suppliers, customers, costs, and margins are different than API's. Thus, broad information about Darling's pricing and volumes has no bearing on whether Tyson engaged in anti-competitive behavior or whether any such alleged behavior harmed API. Indeed, even if Darling shows negative financial performance, such performance could be due to many factors having nothing to do with this case. Darling should not face a risk of competitive harm by having to produce its Trade

Secrets to a competitor when the secrets are irrelevant. *Supra* at 5–6.

**No. 12:** **All documents reflecting contracts, agreements, purchase orders, or other arrangements of any kind between You and Defendants from January 1, 2014, to the present limited to the Market.**

This Request should be quashed for the same reasons as Request No. 9.

**No. 13:** **All documents reflecting contracts, agreements, purchase orders, or other arrangements of any kind between You and any Poultry Processor in the Market from January 1, 2014, to the present.**

This Request demands that Darling search for and produce all contracts, purchases orders, and "arrangements," with any poultry processor over the last ten years. It is facially overly broad, unduly burdensome, and seeks irrelevant information. For example, because this Request seeks "arrangements," it would require Darling to search for an email agreeing to give a processor an extra week to pay a shipping invoice and an email agreeing that Darling could pick up material on Mondays instead of Fridays. Further, this Request would require Darling to search for and produce every purchase order and invoice it sent or received with any poultry processor in the last ten years. All such documents are irrelevant.

Further, it would be unduly burdensome for Darling to comply with this Request. For one, the information sought is not centrally stored, but housed in different servers nationwide. Ex. B ¶ 27 Moreover, because this Request seeks "agreements" and "arrangements," compliance would require Darling to review ten years of emails to find any instance where an employee agreed to a one-time

"arrangement" relating to delivery, payment timing, or other issues. *Id.* ¶ 28. Darling estimates that it would take months of employee time and substantial expense to comply with this Request. That burden is disproportionately greater than any benefit.

**No. 14: All documents concerning any research, report, survey, study, or analysis of pricing, price levels, output volumes, competitive conditions, or market conditions related to Raw Material Supply and Poultry Rendering Outputs from January 1, 2014, to the present.**

This Request should be quashed for the same reasons as Nos. 1, 2 and 4.

**No. 15: All documents concerning Poultry Rendering industry trends, including but not limited to, trade articles, reports, and studies.**

This Request purports to require Darling to search ten years of emails relating to any trends in the poultry rendering business, regardless of the subject matter. Thus, an email discussing poultry renderers using new equipment to reduce emissions or changing the way they store poultry would be responsive even though it is irrelevant. Because this Request is overbroad and makes no effort to tie the requested documents to the issues in dispute, it should be quashed.

This Request should also be quashed because (1) it seeks public information, *i.e.*, "trade articles, reports, and studies." *Small*, 2016 U.S. Dist. LEXIS 195093, at n.8 and (2) to the extent it seeks Darling's Trade Secrets, *e.g.*, business plans.[7]

---

[7] Darling reviewed the briefs opposing API's motions to compel compliance with other non-party subpoenas. Darling generally agrees with the positions taken in those briefs but notes: (i) given its size, acquisition history, and method for storing ESI, the Subpoena imposes a greater burden on it than other non-parties; (ii) as a direct

## C.     The Protective Order Should Be Modified.

If the Court orders Darling to respond to the Subpoena, Darling moves to modify the Protective Order to prevent disclosure of its Trade Secrets to parties like Tyson, one of its largest competitors in the Market. *See* Ex. B. ¶ 12. Given the commercial sensitivity of Darling's Trade Secrets—which includes data about its pricing and marketing strategies—the Protective Order should be modified to permit disclosure only to outside counsel and experts.

In its current form, the Protective Order's highest tier of protection is "Highly Confidential," which permits access to "in-house counsel" and "witnesses or deponents." DE 43 at 10–11. Both categories are problematic. In-house counsel is often part of, if not leading, contract negotiations. Ex. B at ¶ 19. And this is a price-fixing case, so the "witnesses [and] deponents" will include Tyson's officers, directors, and managers responsible for sales, marketing, and pricing.[8] Thus, the Protective Order would permit Darling's Trade Secrets to be disclosed to the very people it would never want to view them.

Plaintiffs dismiss Darling's concern as "far-fetched" and "cynical," insisting the Protective Order offers sufficient protection because it states that disclosed

---

competitor of Tyson, disclosure of its Trade Secrets poses a greater threat of harm; and (iii) the attached Affidavits provide a stronger basis for quashing the Subpoena.
[8] While the Protective Order limits disclosure to persons with knowledge, a Tyson employee can claim knowledge of industry pricing to obtain Darling's Trade Secrets.

materials "shall be used solely for purposes of this Litigation." Mot. at 9, 12. But courts nationwide recognize that one cannot simply "purge or unlearn" competitor information. *J.D. Fields & Co. v. Nucor-Yamato*, 2015 U.S. Dist. LEXIS 194916, at *21 (E.D. Ark. June 15, 2015); *Saint Alphonsus v. St. Luke's*, 2013 U.S. Dist. LEXIS 4857, at *4 (D. Idaho Jan. 10, 2013) ("the very nature of competitive information makes it difficult to compartmentalize."); *FTC v. Peabody Energy Corp.*, 2020 U.S. Dist. LEXIS 57051, at *18–19 (E.D. Mo. Apr. 1, 2020) (modifying protective order to prevent disclosure to in-house counsel; "the Court concludes that granting them access to the competitively sensitive data of competitors and customers would create an unacceptably high risk of inadvertent disclosure.").[9]

Darling has repeatedly requested that Plaintiffs modify the Protective Order to ensure that Darling's competitors cannot use its Trade Secret Information to their advantage. *See, e.g.*, DE 76-8 at 6. Plaintiffs refused. If the Court orders Darling to respond to any Requests seeking its Trade Secrets, Darling requests that responsive information be limited to only outside counsel and experts.[10] There is no reason why

---

[9] *See also FTC v. Sysco Corp.*, 83 F. Supp. 3d 1, 3-4 (D.D.C. 2015) (the concern "is not that lawyers [] will intentionally misuse confidential information; rather, it is the risk that such information will be used or disclosed inadvertently because of the lawyer's role in the client's business decisions."); *PhishMe, Inc. v. Wombat Sec. Techs., Inc.*, 2017 U.S. Dist. LEXIS 150862, at *9 (D. Del. Sept. 18, 2017) (denying access to in-house counsel after weighing risk of inadvertent disclosure).
[10] Experts should be precluded from obtaining Darling's Trade Secrets if they have consulted for or otherwise participated in any negotiation with Darling since 2020.

Tyson's employees need to review Darling's Trade Secrets.

### D.     API Should Be Ordered to Pay Darling's Costs of Compliance.

If the Court orders Darling to comply with any part of the Subpoena, it should order API to pay the associated fees and costs. Rule 45 **mandates** the shifting of significant costs to the subpoenaing party. *See* Fed. R. Civ. P. 45(d)(2)(B)(ii) (any court order enforcing a non-party subpoena "**must** protect a person who is neither a party nor a party's officer from significant expense resulting from compliance") (emphasis added); *see also Monitronics Int'l, Inc. v. Hall Booth, Smith, P.C.*, 2016 U.S. Dist. LEXIS 166402, at *13 (N.D. Ga. Dec. 2, 2016).[11]

API refuses to pay the costs the Subpoena would visit upon Darling, arguing that Darling should bear the costs because Darling may benefit from the case as an industry participant. DE 76-4 at 4. But Darling stands to recover no money from this case and should not be forced to incur costs associated with litigation it did not bring.

### E.     Darling Should Be Awarded Attorneys' Fees.

Where, as here, a party serves "requests [that] [a]re extraordinarily broad in both scope and time," an award of attorneys' fees is warranted. *BMO Harris Bank, N.A. v. Richert Funding, LLC*, 2017 U.S. Dist. LEXIS 234735 (N.D. Ga. July 3, 2017). Thus, Darling should be awarded its attorneys' fees.

---

[11] *See also Bridgestone Ams., Inc. v. IBM*, 2017 U.S. Dist. LEXIS 229583, at *1 (N.D. Ga. June 15, 2017) (subpoenaing party must pay cost of compliance).

Respectfully submitted, this 12th day of January, 2024.

/s/ *Steven J. Rosenwasser*

Steven J. Rosenwasser
Georgia Bar No. 614908
William E. Eye
Georgia Bar No. 688914

*Attorneys for Respondent*

**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE
Terminus 200, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553 2100
Fax: (678) 553 2212

## LOCAL RULE 7.1(D) CERTIFICATION

Counsel hereby certifies that the text of this document has been prepared with Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser

## CERTIFICATE OF SERVICE

This is to certify that on January 12, 2024, I electronically filed the foregoing **NON-PARTY DARLING INGREDIENTS INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SUBPOENA DIRECTED TO NON-PARTY DARLING INGREDIENTS, INC., BRIEF IN SUPPORT OF MOTION FOR PROTECTIVE ORDER, AND BRIEF IN SUPPORT OF MOTION TO QUASH SUBPOENA** with the CM/ECF e-filing system, which will automatically send email notification of such filing to attorneys of record.

This 12th day of January, 2024

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser