# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | |
|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., <br><br>　　　　Plaintiffs, <br><br>v. <br><br>RIVER VALLEY INGREDIENTS, Inc., Tyson Poultry, Inc., and Tyson Farms, Inc., <br><br>　　　　Defendants. | C.A. No. 2:22-cv-00091-RWS |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SUBPOENA DIRECTED TO NON-PARTY DARLING INGREDIENTS, INC.

API submits this Reply in Support of its Motion to Enforce Subpoena Directed to Darling [Dkt. 76] (the "Motion") and in opposition to Darling's Response [Dkt. 100] (the "Response").

Darling's connection to this lawsuit cannot be overstated. Darling is the largest renderer competitor to Tyson in the Market. Tyson's acquisition of API gave Tyson monopoly power to inflict significant anticompetitive harm, including reducing the availability of raw material supply and controlling access to Poultry Rendering Output. As one of the few poultry rendering alternatives to Tyson in the Market (and the largest), the only independent renderer in the Market, and a competitor to Tyson inside and outside the Market, Darling is unique in that its documents will provide a first-hand account of Tyson's anticompetitive scheme, reactions to the scheme, and harm to competition in the Market. Because of its unique position in the Market, Darling is a both a competitor directly harmed by Tyson's anticompetitive conduct and one of the best sources of evidence showing Tyson's harm to competition more generally in the Market.

Specifically, Darling's documents are a critical source of evidence on Tyson's anticompetitive impact on the price, volume and substitutability of Rendered Output to large pet food companies. Documents in Darling's exclusive custody and control will also serve as a rubric to measure which side of Tyson's double-speak regarding substitutability of rendered outputs is true. [Dkt. 107-1]. ███████████
███████████████████████████████████████████

1

███████████████████████████████████████████████████████

██████████████████████████████████ *See* Ex., 1. ████████████████████

████████████████████████████████████████████████████████ *See*

Ex., 2.[1] If the former, Darling's documents and data are expected to show new rendered output customers and raw material suppliers seeking out Darling as a business partner and existing customers and suppliers seeking to increase their dealings. If the latter, demand for Darling's services may have remained static pre and post- acquisition. Either way, Darling's information is indispensable to evaluating the potential anticompetitive effects of Tyson's acquisition of API.

Against this backdrop, Darling's Response is merely a series of distractions and deflections. Littered with contorted readings of API's Requests, questionable evidentiary support, and procedural improprieties,[2] the Response fails to adequately address the arguments raised in API's Motion. Critically, the Response rests on a hollow foundation because Darling has not engaged in any effort to search for responsive documents. Darling's compliance "estimates" are, therefore, speculative at best. Moreover, Darling glosses over its connection to this lawsuit, as Tyson's single largest renderer competitor, and over its capabilities and resources as a publicly traded company with over $6.5 billion in annual revenue.

---

[1] Pursuant to Appendix H, Section II.J.2(e) of the Local Rules, API is filing Exhibits 1 and 2 as a provisionally sealed filing and will be separately moving for leave from Court to file Exhibits 1 and 2 under seal.

[2] API is contemporaneously filing a motion to disregard to address the procedural improprieties.

Thus, the Court should reject Darling's arguments and grant API's Motion.

## ARGUMENT

### A. <u>The Subpoena is Facially Valid</u>

Darling's contention that the Subpoena is invalid because of the place of compliance is wholly without merit. To begin, Darling (1) never raised a place of compliance objection in its written response to the Subpoena, (2) never raised the issue despite raising a host of strawman and nonsensical arguments during the months of conferrals between the parties, and (3) never moved to quash the subpoena prior to API's Motion.[3] This is easily verified by looking at Darling's written responses and objections, and the meet-and-confer correspondence between API and Darling. *See* Mot. at Exs. 3–8. Courts consistently reject non-parties' attempts to raise untimely place of compliance objections in response to a motion to compel. *See, e.g., Takeda Pharm. Co. Ltd. v. Caremark RX, LLC*, No. CV 23-MC-111, 2023 WL 6201363, at *2 (E.D. Pa. Sept. 22, 2023) ("There is nothing to indicate [non-party] was concerned with the [c]ourt's jurisdiction until after [party] filed its motion

---

[3] The first time Darling raised any concern regarding the Subpoena's place of compliance was in an email with unsolicited legal argument from Darling's counsel to the Court's Deputy Clerk after API requested permission to brief its Motion. *See* **Ex.** 3. Darling's untimely and improper objection on place of compliance was waived by this time. *See, e.g., Manhattan Construction Company v. Phillips*, No. 1:09–CV–1917–WSD–AJB, 2011 WL 13214355, at *13 (N.D. Ga. May 11, 2011) ("[C]ourts have held that Rule 45's requirement to file objections includes the dictate that **all** objections be raised") (emphasis added) (citing to *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998) ("We believe that Rule 45(c)(2)(B) does require the recipient of a subpoena to raise all objections at once, rather than in staggered batches, so that discovery does not become a 'game.'")).

. . . an alleged lack of jurisdiction appears absent from [non-party's] arguments over the course of the last sixteen months."); *Henry Schein, Inc. v. Drea*, No. 421CV00192RGEHCA, 2022 WL 18584628, at *3 (S.D. Iowa May 31, 2022) (rejecting non-party's place of compliance argument raised in response to a motion to compel where non-party did not previously move to quash subpoena).

In any event, the Subpoena's Atlanta, Georgia, place of compliance is "within 100 miles of where [Darling] regularly transacts business." Fed. R. Civ. P. 45(c)(2)(A). Darling has substantial and continuous business operations in Smyrna, Ellenwood, and Calhoun, Georgia—all within 100 miles of the place of compliance and within the territorial jurisdiction of this District.[4] For Darling to contest this Court's jurisdiction is simply another baseless delay tactic.

### B. Darling Must Produce its Transactional Data (Request Nos. 1–3)

Darling fails to credibly refute the relevancy of the transactional data as detailed in API's Motion.[5] *See, e.g, North Shore-Long Island Jewish Health Sys.,*

---

[4] *See Locations*, DARLING INGREDIENTS, available at: https://www.darlingii.com/locations (last visited Jan. 22, 2024).

[5] Darling's case law regarding the transactional data is inapposite. In *In re Subponeas Issued to Labatt Food Serv.*, LLC, No. SA-21-MC-01242-XR, 2022 WL 1000318, at *1 (W.D. Tex. Apr. 1, 2022), the non-party agreed to produce fifteen-years worth of purchase data and select categories of sales data. The court held that this portion of data was relevant and only quashed the remainder of the data sought. *Id.* at *3–4. In contrast, Darling is refusing to produce any transactional data. Further, *In re ANC Rental Corp.*, No. MISC. 02-148, 2002 WL 34729302, at *2 (E.D. Pa. June 20, 2002) involved a subpoena issued in a bankruptcy proceeding where the court acknowledged that over seventy franchises, as well as each of their creditors and

4

*Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018) ("Once the requesting party has made a prima facie showing of relevance, it is up to the responding party to justify curtailing discovery."). Darling argues that because API had different suppliers, costs, profit, margins, pricing formulas, and customers, Darling's data is therefore irrelevant.[6] *See* Resp. at 6. Nonetheless, this Court has already recognized that API must prove the anticompetitive effects of Tyson's conduct on the Market either through the "actual detrimental effect [of Tyson's behavior] on competition" or through "the potential for genuine adverse effects [of Tyson's behavior] on competition." [Dkt. 35 at 22] (*citing Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1071 (11th Cir. 2004)).

As Tyson's largest renderer competitor, Darling is a critical source of relevant information regarding the adverse and detrimental effects of Tyson's behavior. ▌

---

debtors, who were direct competitors with the non-party would have access to the non-party's data at an anticipated evidentiary hearing. Here, Darling's transactional data would not be subject to widespread disclosure, particularly under the "Highly Confidential" designation of the Protective Order.

[6] Further underscoring the need for an evidentiary hearing are the misleading and factually incorrect statements contained in Darling's supporting affidavits. For example, Mr. Lairmore attests that Darling and API had different suppliers and customers. *See* Resp. at Ex. B ¶ 7. This is untrue because API and Darling shared a number of overlapping suppliers and customers. Indeed Darling interfered with former API customer, non-party Fries' document production in this case precisely because it is apparently a supplier to Darling. *See* Mot. at 9 n.7.

5

████████████████████████████████████████████████

████████████ *See* Ex. 1. Further, ████████████████████████

████████████████████████████████████████ *Id.* Darling falls squarely into the category of limited renderers who produce Poultry Rendering Output for sale to pet food companies. Tyson's acquisition further constrained the few alternative sources of Poultry Rendering Output, which would have had a direct impact on Darling. Darling's transactional data in particular will provide details regarding any increase to prices, decrease to the availability of supply, and other hallmarks evidencing the effects of Tyson's illegal group boycott and monopoly. Although Darling goes to great lengths to highlight non-Tyson factors that could cause fluctuations in Darling's data, Darling's causation argument has no bearing on whether the transactional data is relevant. API is entitled relevant discovery to support its claims; any arguments as to evidentiary inferences are premature.

Second, Darling's claims of undue burden are highly questionable. For the first time since service of the Subpoena, Darling purports to quantify the alleged burden to produce its transactional data as "requir[ing] at least 10–12 employees working full time more than six months and cost at least $1.2 million." Resp. at 5. Such an assertion raises facial credibility questions. Darling is a publicly traded company with revenue in excess of $6.5 billion yet claims to have no efficient means to track its historical transactional data for the raw material supply and poultry

6

rendering output it purchases and sells on a daily basis. Darling's claim is simply implausible. Notably, Tyson and several other publicly traded non-parties having already produced similar transactional data without issue.

Further, notably absent from either affidavit attached to Darling's Response is a discussion of Darling's accounting department's capabilities (or lack thereof) to access the transactional data. To the extent Darling's transactional data is scattered across multiple servers in different locations, then Darling's accounting department would need to routinely scour each of these servers and locations just to identify information on a particular transaction. If such a fundamental shortcoming were indeed at the core of Darling's primary business, surely it would be material to shareholders and discussed at length in Darling's SEC filings. Not surprisingly, no such fantastical business accounting or record keeping problem appears in any such disclosures. Given the wild and unsupported statements about Darling's supposed burden, there are sufficient, legitimate questions that would require an evidentiary hearing[7] on the statements in Mr. Holder's and Mr. Lairmore's affidavits, before crediting them for purposes of preventing what should be a simple, straightforward export of financial information kept in the ordinary course of Darling operating its business. *See* Resp. at Exs. A and B.

---

[7] *See, e.g., Express Homebuyers USA, LLC v. WBH Mktg., Inc.*, No. 18-60166-CIV, 2018 WL 1814310, at *1 (S.D. Fla. Mar. 19, 2018) (conducting evidentiary hearing on motion to compel non-party subpoena).

Lastly, Darling continues to harp on its objection that the transactional data constitutes trade secrets that are not subject to disclosure. But "there is no absolute privilege for trade secrets or similar confidential information" and Darling fails to demonstrate how the Protective Order is insufficient. *Sams v. GA W. Gate, LLC*, 316 F.R.D. 693, 698 (N.D. Ga. 2016) (citations and internal quotations omitted). As observed in *Amer Needle Inc. v. New Orleans*, No. 04 C 7806, 2012 WL 4327610, at *3 (N.D. Ill. Sept. 21, 2012) (compelling non-party to produce its royalty and sales data because the data was relevant to the plaintiff's antitrust claims):

> [a]lthough [non-party] has a valid interest in protecting its confidential business information, confidentiality is not a sufficient reason to altogether prohibit the disclosure of relevant material and [non-party's] consent is not necessary for disclosure in litigation. Third-parties cannot simply refuse to produce relevant, albeit confidential, information. Federal litigation invariably involves discovery of some sensitive information . . . and protective orders are used to protective [sic] confidential commercial information.

(internal citations and quotations omitted). Darling's transactional data is not shielded from discovery merely because of potential commercial sensitivity. Nor should the data be shielded given the ample Protective Order in place.

Moreover, Darling fails to articulate any clear or serious injury beyond mere speculation of what Tyson *could* do with the transactional data. *See, e.g., Alexander Hous. LLC v. Int'l Bhd. of Elec. Workers*, No. 04 C 1650, 2004 WL 1718654, at *3 (N.D. Ill. July 29, 2004) ("[T]his standard requires a showing that disclosure will cause the business a clearly defined and very serious injury.") (internal quotations

and citations omitted); *Sullivan v. Gov't Emps. Ins. Co., No. 617CV891ORL40KRS*, 2018 WL 5717430, at *1 (M.D. Fla. Nov. 1, 2018) ("[T]he requirement of a showing of harm is designed to prevent the parties from designating [] information about which the designating party can only articulate a speculative belief that the information might, someday and somehow, be damaging if it were revealed."). Darling contends that even for data that is more stale in age, Tyson could use that data to extract Darling's current costs and pricing. *See* Resp. at 8–9. In addition to the hypothetical series of events that would need to occur for this scenario (including willful violations of the Protective Order), Darling mistakenly believes that its transactional data should be afforded trade secret status into perpetuity. *See, e.g., Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 903 (N.D. Ill. 2019) (explaining that sales data "is already many months old and becomes increasingly stale and less valuable as market conditions, prices, and profit margins change and industry relationships evolve."). Darling's position must be rejected.

    **C.    Darling Must Produce Responsive Communications or, at a Minimum, Be Required to Confer in Good Faith to Identify Custodians and Search Terms (Request Nos. 5, 6, 7, 9, 10 and 11)**

Darling repeats the same posturing it did during the one-way, meet-and-confer process with the respect to Request Nos. 5, 6, 7, 9, 10 and 11 that seek categories of communications. Ignoring the arguments in API's Motion concerning the relevancy and proportionality of the communications, Darling repeats its speculative claim that

9

API is seeking to search inboxes across 14,000 employees and seeking emails on "whether Publix carries Tyson chicken." *See* Resp. at 13, 14, 19. Darling feigns a lack of comprehension regarding the necessary collaborative nature of conducting ESI searches that is expected of modern litigants. As explained in *Cahoo v. SAS Inst. Inc.*, No. 17-10657, 2019 WL 7971900, at *6 (E.D. Mich. June 25, 2019):

> [T]he [non-party] that possesses and stores the sought-after data would be in the better position to begin the negotiations by proposing a range of custodians and search terms. Once the plaintiffs see the proposal, they can either agree with the scope or propose additional terms or custodians. That has become the conventional approach when dealing with large-volume ESI production.

Throughout the conferral process, API offered to narrow the search terms and custodians used to identify relevant communications, but Darling refused to engage meaningfully in that discussion and still refuses to run a single search or identify a single custodian. As the Subpoena recipient, it was incumbent on Darling to identify potential custodians and search terms. *See id.* Darling's wholesale refusal to engage in any good-faith ESI negotiations deflates all attempts by Darling to argue that API is seeking irrelevant communications that are not proportional to a case with over $2 billion in controversy. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL11539486, at *2 (N.D. Ala. Aug. 1, 2017), *objections overruled*, No. 2:13-CV- 20000-RDP, 2017 WL 11539485 (N.D. Ala. Sept. 25, 2017) (holding that "as large as the collection of responsive documents might be, it is not *unduly* burdensome or disproportionate to the needs of this case").

Upon close inspection, Darling's undue burden objections are manufactured. Without having conducted a single search or identified a single custodian, Darling nonetheless speculates that millions of pages of responsive documents exist, dozens of current and former and employees possess responsive information, and substantial time and expense will be imposed on Darling. *See, e.g.,* Resp. at 20. Indeed, Darling fails to provide any concrete estimate to substantiate its burden claim and merely conjures that it could "cost hundreds of thousands of dollars (excluding how much Darling would have to pay its outside counsel to review, redact, and produce the documents)." Resp. at Ex. B ¶ 27. This is insufficient. *See, e.g., Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *6 n.3 (E.D. Pa. June 8, 2016) (claim that searching custodians "would easily exceed $50,000" was "pure conjecture" because it provided "no yardstick for the [c]ourt to gauge that "such costs are disproportional and unduly burdensome") (internal quotations omitted).[8]

---

[8] Darling's unreasonable positions are particularly egregious with respect to Request Nos. 5 and 9 that seek communications with Tyson and communications regarding contract negotiations with Tyson. On the one hand, Darling argues that 14,000 employees might be communicating with Tyson and that conducting a privilege review of its internal communications will "cost at least $25,000." Resp. at 13, 18. On the other hand, Darling's contract negotiations, and other documents sought by the Subpoena, are all trade secrets that cannot be disclosed to Tyson. Given that 14,000 Darling employees are apparently communicating with Tyson and that Darling is regularly contracting with Tyson such that a substantial privilege review is required, Darling should have limited to no expectations that its trade secrets are not being routinely disclosed to Tyson in the ordinary course of business. Darling cannot have its cake and eat it, too: Tyson and Darling are either competitors who should not be interacting or transacting with the frequency Darling seeks to portray, or Darling and Tyson are business partners who frequently communicate and transact such that Darling should have no concern regarding producing documents

### D. Darling Must Produce Its Market Analyses and Financial Impact Documents (Request Nos. 4, 14 and 15)

Darling fails to respond to any of API's arguments concerning the relevance and proportionality of the market analyses and financial impact documents sought by Requests Nos. 4, 14, and 15. *See North Shore-Long Island Jewish Health Sys.*, 325 F.R.D. at 48. Instead, Darling contorts API's Requests beyond recognition. For example, with respect to Request No. 4, Darling erroneously claims the Request is "unbounded, seeking any document containing any financial, forecasting, budgetary, or business planning information." Resp. at 10. Yet Darling conveniently omits that the Request is specifically limited to "Raw Material Supply" and "Poultry Rendering Outputs," both of which are defined terms that can easily be crafted into specific ESI searches that would cull out, for example, Darling's budget planning for employee lunches. Darling purposefully does this to, again, inflate and exaggerate its claims for undue burden. Darling offers the same unspecific estimates of needing to search across "dozens of employees" and to "review over one million pages" without having conducted a single search and while operating under a misreading of the requested documents. Resp. at 10.

Further, Darling seeks to have the Court assume that producing all these documents requires searching through custodial data. Absent from Darling's Response and accompanying affidavits is any indication on whether some of the

---

under the Protective Order. Darling's kitchen-sink approach to delay producing relevant discovery is transparent and unpersuasive.

12

responsive documents sought by these Requests are located in a central depository and/or are readily accessible. It would seem doubtful that members of Darling's accounting or finance departments would, for example, need to search through employee inboxes to locate a financial statement prepared for a prior year. Darling's purported lack of capabilities and sophistication are simply non-credible for a company of its size and scale, represented one of the largest, national law firms.[9]

Darling also fails to sustain its burden in establishing that all the documents sought by these Requests constitute trade secrets. *See Sams*, 316 F.R.D. at 698 (rejecting non-party's argument because the fact that some of the responsive documents could contain trade secrets did "not come close to carrying [the non-party's] burden"). Darling protests that these Requests seek *public* information while also arguing that they seek Darling's trade secrets. *See* Resp. at 13, 22. Additionally, Darling neither explains what specific trade secrets are in the documents nor why documents potentially dating back to 2014 continue to be commercially sensitive. Darling's blanket assertions must be rejected.

### E. Darling Must Produce its Contracts (Request Nos. 12 and 13)

---

[9] Darling must provide quarterly Form 10-Qs and annual Form 10-Ks to the Securities and Exchange Commission. These mandatory filings contain comprehensive financial information that would present a significant undertaking if Darling's employees had to search across multiple servers in different locations and/or search through employee inboxes to obtain the underlying financial information.

Darling warps two straightforward Requests into something they are not. For Request No. 13, despite API's offer to narrow the scope to contracts and agreements, Darling continues with nonsensical examples like API seeking an email where a processor is given an additional week to pay an invoice. *See* Resp at 21. Further, Darling ignores that this Request only seeks contracts and agreements with poultry processors in-Market to purposefully claim that the documents are "housed in different servers nationwide." *See* Resp. at 21. It should not be a "nationwide" undertaking for Darling to locate contracts and agreements that by definition only pertain to five states. Moreover, only a finite number of poultry processors operate in-Market and only a subset of those processors conduct business with Darling. Darling glosses over this fact to avoid quantifying the number of contractual relationships with in-Market processors during the relevant timeframe. Thus, Darling's belated attempt to substantiate any purported burden fails.

Request No. 12 simply seeks Darling's in-Market contracts and agreements with Tyson since 2014. Darling neither disputes the relevancy of these documents nor argues that it would be burdensome for Darling to produce them. Rather, Darling's only argument for continued withholding is that API must seek the contracts and agreements from Tyson. But, as explained in API's Motion, there is no prohibition on seeking documents from a non-party that a party might also possess. *See Fudali v. Pivotal Corp.*, No. 1:09-2354-RWSSSC, 2009 WL 10668516, at *5 (N.D. Ga. Oct. 30, 2009). Again, Darling's position remains unconvincing.

### F. Darling Is a Witness to Tyson's Anticompetitive Behavior at Trade Group Meetings (Request No. 8)

Contrary to Darling's assertions, trade group meetings involving Tyson are relevant to API's claims. Recently, a former employee from Fieldale Farms, Inc. testified that Tyson engaged in tactics to block its competitor, Pilgrim's, from building a rendering plant in the Market. *See* [Dkt. 102]. Tyson's anticompetitive conduct occurred during a meeting for the Poultry Protein & Fat Council ("PPFC") of the U.S. Poultry & Egg Association. *Id.* PPFC is comprised of the nation's largest renderers, including Darling who sits on the member council.[10] Accordingly, Darling is likely a material fact witness to Tyson's efforts to block Pilgrim's from building a rendering plant. Request No. 8 is specifically tailored to Darling's trade group participation where Tyson was discussed, and Darling has not provided any concrete estimate on the number of potentially responsive documents or associated costs. Indeed, Darling refuses to run the proposed search terms provided by API for this Request that have yielded a limited number of responsive documents for other subpoena recipients. Thus, Darling's illusory claims of burden lack any merit.

### CONCLUSION

For the foregoing reasons, API respectfully request the Court: (i) grant API's Motion in its entirety; or in the alternative (ii) conduct an evidentiary hearing on Darling's supporting affidavits.

---

[10] *See About PPFC*, POULTRY PROTEIN & FAT COUNCIL, available at: https://www.poultryrenderers.org/about.cfm#councilMembers (last visited Jan. 22, 2024).

Dated: January 29, 2024

**HOLLAND & KNIGHT LLP**

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107
Matthew T. Covell
Georgia Bar No.: 190735
1180 W. Peachtree St., N.W., Suite 1800
Atlanta, Georgia 30309
Tel.: (404) 817-8500 | Fax: (404) 881-0470
cynthia.burnside@hklaw.com
matthew.covell@hklaw.com

OF COUNSEL:

Kenneth L. Racowski
*Admitted Pro Hac Vice*
**HOLLAND & KNIGHT LLP**
2929 Arch Street, Suite 800
Philadelphia, Pennsylvania 19104
Telephone: (215) 252-9600
Facsimile: (215) 867-6070
kenneth.racowski@hklaw.com

Caitlin Saladrigas
*Admitted Pro Hac Vice*
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida 33401
Telephone: (561) 833-2000
Facsimile: (561) 650-8399
caitlin.saladrigas@hklaw.com

*Counsel for Plaintiffs*

# **LR 7.1(D) FONT COMPLIANCE CERTIFICATION**

The undersigned counsel for Plaintiffs hereby certifies that the within and foregoing document was prepared using Times New Roman 14-point font in accordance with Local Rule 5.1 of the United States District Court for the Northern District of Georgia.

This 29th day of January 2024.

                                  **HOLLAND & KNIGHT LLP**

                                  */s/ Cynthia G. Burnside*
                                  Cynthia G. Burnside
                                  Georgia Bar No.: 097107

                                  *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused to be served a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

This 29th day of January 2024.

HOLLAND & KNIGHT LLP

*/s/ Cynthia G. Burnside*
Cynthia G. Burnside
Georgia Bar No.: 097107

*Counsel for Plaintiffs*