# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | |
|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., <br><br>     Movants, <br><br> v. <br><br> DARLING INGREDIENTS, INC., <br><br>     Respondent. <br><br> ------------------------------------------------ <br><br> AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., <br><br>     Plaintiffs, <br><br> v. <br><br> RIVER VALLEY INGREDIENTS, LLC, et al., <br><br>     Defendants. | Civil Action No. 2:22-CV-00091-RWS |

## NON-PARTY DARLING INGREDIENTS INC.'S RULE 45 MOTION FOR REIMBURSEMENT OF FEES AND COSTS INCURRED IN RESPONSE TO SUBPOENA AND <u>MEMORANDA OF LAW IN SUPPORT THEREOF</u>

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................1

II.   BACKGROUND.................................................................................4

  A.  Background on API's Subpoena and Motions Relating Thereto. ...................4

  B.  The Court's February 22, 2024, Order. ........................................................7

  C.  Subsequent Conferrals and Document Production.......................................8

  D.  Darling's Significant Expenses. ................................................................14

    1.  Darling's Attorneys' Fees. .........................................................15

    2.  Darling's e-Discovery Costs. ......................................................17

III.  ARGUMENT...................................................................................17

  A.  Legal Standard ........................................................................................17

  B.  API's Likely Counterarguments Are Meritless..........................................22

IV.  CONCLUSION.................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barracuda Networks v. J2 Global*,
2020 U.S. Dist. LEXIS 183538 (C.D. Cal. July 17, 2020)................................23

*In re Blue Cross Blue Shield Antitrust Litig.*,
2018 U.S. Dist. LEXIS 246306 (N.D. Ala. Oct. 24, 2018)...............................25

*Duncan v. Golden Rod Broilers, Inc.*,
2008 U.S. Dist. LEXIS 131695 (N.D. Ala. July 22, 2008) ...............................24

*First Am. Corp. v. Price Waterhouse LLP*,
154 F. 3d 16 (2d Cir. 1998) ...................................................................17, 20, 22

*Fla Int'l Univ. Bd. Of Trs. v. Fla Nat'l*,
2019 U.S. Dist. LEXIS 101714 (S.D. Fla. June 17, 2019)................................24

*Gamache v. Hogue*,
2023 U.S. Dist. LEXIS 55184 (M.D. Ga. Mar. 15, 2023)............................18, 21

*In re Gladstone Consulting*,
2018 U.S. Dist. LEXIS 238762 (S.D. Fla. Sept. 21, 2018) ...............................17

*Henderson v. Emory Univ.*,
2020 U.S. Dist. LEXIS 218676 (N.D. Ga. Nov. 4, 2020) .................................16

*Hernandez v. Hendrix Produce, Inc.*,
2014 U.S. Dist. LEXIS 30861 (S.D. Ga. Mar. 10, 2014).............................4, 18

*Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*,
2018 U.S. Dist. LEXIS 224352 (N.D. Fla. May 28, 2018) ...............................24

*Johnson v. Velocity*,
2018 U.S. Dist. LEXIS 81590 (N.D. Ga. Mar. 12, 2018) .................................25

*Kipperman v. Onex Corp.*,
2008 U.S. Dist. LEXIS 130598 (N.D. Ga. Mar. 19, 2008)
........................................................................ 4, 18, 19, 20, 21, 22, 23

*Linglong Americas, Inc. v. Horizon Tire*,
   2018 U.S. Dist. LEXIS 57777 (N.D. Ohio Apr. 4, 2018) ..................................23

*Monitronics Int'l, Inc. v. Hall*,
   2016 U.S. Dist. LEXIS 166402 (N.D. Ga. Dec. 2, 2016) ..................................18

*New Prods. Corp. v. Dickinson Wright*,
   577 B.R. 690 (W.D. Mich. Sept. 22, 2017) ........................................................25

*Norelus v. Denny's, Inc.*,
   628 F.3d 1270 (11th Cir. 2010) ..........................................................................25

*Ovalle v. Perez*,
   2017 U.S. Dist. LEXIS 186494 (S.D. Fla. Nov. 9, 2017) ..................................24

*Pierre-Louis v. Baggage Airline Guest Servs.*,
   2021 U.S. Dist. LEXIS 146340 (S.D. Fla. Aug. 4, 2021) ..................................24

*Pinon v. Daimler AG*,
   2021 U.S. Dist. LEXIS 249510 (N.D. Ga. Nov. 30, 2021) ..........................16, 17

*Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*,
   2016 U.S. Dist. LEXIS 58208 (S.D. Fla. Apr. 26, 2016) ..................................21

*In re Zantac Ranitidine Prods. Liab. Litig.*,
   2022 U.S. Dist. LEXIS 242697 (S.D. Fla. May 20, 2022) ..........................19, 23

*Zediker v. OrthoGeorgia*,
   857 Fed. App'x 600 (11th Cir. 2021) ..................................................................25

Pursuant to Fed. R. Civ. P. 45, non-party Darling Ingredients Inc. moves for reimbursement of the significant fees, costs, and expenses ("Expenses") it incurred responding to American Proteins, Inc.'s ("API") subpoena (the "Subpoena").

## I.   INTRODUCTION

Although Rule 45 requires API to "avoid imposing undue burden or expense" on non-parties like Darling, API did the opposite. For nearly a year, Darling was forced to incur significant Expense (i) conferring to try to get API to narrow its overly broad Subpoena; (ii) engaging in motions practice, which succeeded in narrowing the Subpoena and allowing Darling to obtain necessary protections over its trade secrets; and (iii) searching for, reviewing, and producing **a decade** of largely irrelevant transactional data and electronically-stored information ("ESI").

API served its Subpoena on July 10, <u>2023</u>. The Subpoena improperly demanded that Darling incur significant Expense searching for, reviewing, and producing more than ten million items of transaction data and searching through more than two million emails. *See* Ex. A (Rosenwasser Aff.) ¶¶ 5, 17-18. Critically, despite Darling's status as a non-party, API made little effort to narrow the Subpoena to the claims or defenses in this case. For example, the Subpoena demanded that Darling search for and review a decade of ESI on the following broad categories:

- "All communications between [Darling] and Defendants" **regardless of subject matter**.

- "All communications between [Darling] and any entity about Defendants"

**regardless of subject matter**.

- "**All internal and external communications** regarding pricing and output volumes of Raw Material Supply and Poultry Rendering Output." Given that "Poultry Rendering Out" is defined as "any output resulting from the poultry rendering process" and "Raw Material Supply" is defined as "any poultry materials supplied by any poultry processor to be used by a poultry rendered for any purpose," this Request sought a decade of ESI about nearly every aspect of Darling's poultry rendering business.

- All "financial statements, summaries, forecasts, business plans, budgets, and analyses concerning Raw Material Supply and Poultry Rendering Output."

*See* DE 76-1. The Subpoena also demanded that Darling search for, compile, and produce a decade of data "for all transactions involving the sale of Raw Material Supply" and "the purchase of Poultry Rendering Outputs," *i.e.*, a decade of data about every purchase and sale relating to Darling's poultry rendering business. *Id.*

Because API's Subpoena attempted to foist significant Expenses on Darling, Darling spent months conferring with API. *See* Ex. A ¶¶ 4-28. When those conferrals failed because API refused to narrow the scope of the Requests and refused to address Darling's confidentiality concerns, Darling was forced to incur Expenses on motions practice that was largely successful. For one, the Court held "that Darling has legitimate confidentiality concerns that must be addressed." *See* DE 126 at 5. The Court also held that at least 40% of the Requests were "clearly overbroad and not proportional." *Id.* at 4-5. The Court, however, concluded that "the parties did not fully engage in a good faith effort to resolve" their disputes and directed the parties to continue conferring, noting that the Court "expects that Plaintiffs will endeavor

in good faith to reduce the burden of their Requests." *Id.* at 6.

Per the Court's Order, from February until May, Darling incurred additional Expenses engaging in *dozens* of conferrals with API to try and narrow the Subpoena. *See* Ex. A ¶¶ 4-28. While Darling's conferrals and motions practice allowed Darling to reduce some of the significant burden API sought to impose on Darling (*e.g.*, Darling was able to reduce the number of documents it had to review by more 100,000 pages), Darling was still required to spend over 100 hours searching for, reviewing, and producing ten years of data and ESI at a significant Expense.

Once Darling's production was complete, Darling tried to confer with API on reimbursement. *Id.* ¶ 43. Unfortunately, API refused to engage in good faith discussions. Indeed, even though Darling presented API with detailed invoices showing that it incurred over $200,000 responding to the Subpoena, API refused to reimburse Darling more than $29,500. *Id.* To put that number into perspective, to comply with the Subpoena Darling had to pay its **outside** e-discovery vendor over $40,000. API's $29,500 offer does not even 75% of those out-of-pocket costs, let alone a single penny of Darling's attorneys' fees. API's position is not only unfair to a non-party like Darling, but it also ignores Rule 45 and this Court's precedent. Under Rule 45(d)(2)(B)(ii), the Court "must protect [a non-party] from significant expense resulting from compliance." Reimbursement is mandatory: the "Court *must* shift to [Plaintiffs] any non-party's subpoena compliance costs if they are

significant." *Hernandez v. Hendrix Produce, Inc.*, 2014 U.S. Dist. LEXIS 30861, at *2 n.5 (S.D. Ga. Mar. 10, 2014); *Kipperman v. Onex Corp.*, 2008 U.S. Dist. LEXIS 130598, *1 (N.D. Ga. Mar. 19, 2008) (shifting costs for motions and production). Incurring more than $200,000 in Expenses is "significant" by any measure.

Given API's unwillingness to offer fair reimbursement, Darling is left with no choice but to file this Motion. Darling asks the Court to order API to reimburse Darling 90% of its attorney's fees and 100% of its e-discovery vendor costs, for a total of $217,263. This Expense could have been greatly reduced had API taken reasonable steps to reduce the burden it imposed on Darling.

## II.   BACKGROUND

### A.   Background on API's Subpoena and Motions Relating Thereto.

API served its Subpoena on July 10, 2023. Darling timely objected. In the months that followed, Darling and API conferred regarding Darling's objections to the Subpoena, which Darling argued was overbroad, unduly burdensome, and sought trade secret information without ensuring that such information would not be disclosed to one of Darling's largest competitors (Tyson). *See* Ex. A ¶¶ 4-28. From Darling's first objection in July 2023 through the date its production was complete in June 2024, Darling made clear that, if it was forced to comply with API's broad Subpoena, it would incur significant Expense. *Id.* For example, Darling wrote:

> Before addressing the specific Requests, it is important to reiterate that API has refused, and continues to refuse, to respond to Darling's

4

concerns about the substantial costs associated with responding to the Subpoena, particularly as drafted.

As discussed more below, API has, for the most part, been unwilling to modify the extremely broad nature of the Requests. Instead, API claims that Darling can reduce the burden by conducting keyword searches of relevant custodians' email boxes. That claim ignores two points.

First, as written, the Subpoena would require Darling to search a substantial number of employees' email boxes. Indeed, the Subpoena seeks "**[a]ll documents**" on a variety of broad topics such as (i) purchasing raw materials; (ii) sales price; (iii) forecasting; (iv) budgeting; (v) acquisitions; (vi) financial performance; and (vii) trade shows. In fact, **Request No. 6 seeks "[a]ll communications" that even mention any Defendant**. To fully respond to these Requests would require Darling to search thousands of current and former employees' email boxes over a nearly ten-year period. That is precisely why the Requests need to be narrowed before the custodians are identified.

Second, API simply ignores the cost of ESI review, even if it is limited to conducting keyword searches. For Darling to conduct keyword searches, it will need to, among other things, (i) retain a e-discovery vendor; (ii) gather emails for a nearly ten-year period for all the custodians; (iii) have those emails ingested into the e-discovery vendor's review platform; and (iv) search them. Assuming *arguendo* that Darling identifies ten custodians, and assuming each custodian sends and receives 150 emails per business day, that equates to 39,000 emails per year or 390,000 emails per custodian for the requested ten-year period. Thus, to simply conduct keyword searches of ten custodians, Darling would have to gather and ingest nearly 4 million emails. As I am sure you are aware, that comes with a substantial cost, which could easily exceed $75,000, particularly once hosting costs are included. And, of course, that does not include any attorney time for gathering or reviewing the emails.

*Id.* ¶ 7; *id.* at Ex. 3.

Darling also made clear to API that "we intend to seek all fees, costs, and expenses once this process is complete. Thus, the more you ask/require us to do, the

higher the request for reimbursement will be. Your client should be mindful of how much it asks/requires us to do for that reason." *Id.* ¶ 27. Darling's extensive efforts to narrow the Subpoena and reduce the Expenses are shown in Ex. A. *Id.* ¶¶ 4-28.

Despite being on notice that Darling was entitled to (and would) seek reimbursement, API was unwilling to meaningfully narrow the Subpoena. For example, Request No. 5 sought "[a]ll communications between [Darling] and Defendants." *See* DE 76-1. As this Court found, this Request was "overbroad and not proportional" because it was not narrowly tailored to the claims in this case but rather sought "all communications" regardless of subject matter. *See* DE 100 at 13; DE 126 at 5. Rather than narrow its Request, API demanded that Darling conduct keyword searches to see how many "hits" would be obtained by searching for "Tyson" and reviewing all emails sent to or from the @tyson.com domain. *See* Ex. A ¶ 8; *id.* at Ex. 4; DE 76-7 at 6. Darling declined to follow that process because, as described above, the process of conducting keyword searches is not free. Rather, an antecedent step to running keyword searches is retain an outside e-discovery vendor (DISCO) to ingest the emails that need to be searched and then host them on its document review platform. *See* Ex. A ¶ 9; *id.* at Ex. 3. Notably, the more emails Darling required DISCO to host, the higher the monthly cost. *Id.* For that reason, the proper approach, which API refused to follow, was for API to first modify its Request and then for Darling to identify custodians for the narrowed Request so the

number of emails to be ingested and searched was lower. *Id.*

After reaching an impasse, API moved to enforce the Subpoena. Darling opposed that motion, arguing that (1) many of the Subpoena's Requests were "vastly broad" and "unduly burdensome"; (2) API improperly refused to narrow the Requests (but rather demanded that Darling ingest millions of emails and then conduct keyword searches of them regardless of cost); and (3) "the Protective Order should be modified to permit disclosure [of Darling's trade secrets] only to outside counsel and experts." *See* DE 101-1 at 1, 28. Darling also showed that, under Rule 45, if the Court required Darling to incur significant Expense complying with the Subpoena, it "must" order API to reimburse Darling. *Id.* at 30.

## B.     The Court's February 22, 2024, Order.

On February 22, 2024, the Court ruled on API's motion to enforce, holding that "Darling has legitimate confidentiality concerns that must be addressed" and that at least 40% of API's Requests were "clearly overbroad and not proportional."[1] *See* DE 126 at 4-6. The Court also found that, "[w]ithout assigning total blame to either party," the parties had not fully conferred and ordered the parties to confer again. *Id.* at 4-6. On reimbursement, the Court stated:

> The possible reimbursement of expenses for compliance with discovery
> requests is not off the table. The Court will reserve ruling on that issue
> until discovery is completed. The Court expects that Plaintiffs will
> endeavor in good faith to reduce the burden of their Requests. **In the**

---

[1] The Court also overruled some of Darling's relevance objections.

**end, if the Court finds Plaintiffs have sought a dollar's worth of discovery to recover a dime's worth of relevant evidence, Plaintiffs can expect to bear some of the costs of the discovery.**

### C.    Subsequent Conferrals and Document Production.

Following the Court's Order, Darling and API conferred on (i) modifying the Protective Order to address Darling's "legitimate confidentiality concerns" and (ii) narrowing the Subpoena's "clearly overbroad and not proportional" Requests.

On the Protective Order, Darling incurred significant Expense conferring for *four* months on modifications necessary to ensure that Darling's trade secrets would not be disclosed to its competitor (Tyson). *See* Ex. A ¶¶ 30-31. Those conferrals were successful. Prior to Darling's objections, the Protective Order did not have an "Outside Counsel Eyes Only" provision and thus documents produced in discovery could be shown to certain Tyson employees. *See* DE 101-1 at 28. As a result of Darling's objections and opposition to API's motion, an Amended Protective Order was entered with an "Outside Counsel Eyes Only" provision preventing Tyson from receiving Darling's trade secret information. *See* DE 162.

As for the scope of the Subpoena, Darling will not burden the Court with unnecessary detail surrounding the *second* conferral process, which spanned three months and involved dozens of conferrals. It will instead focus on a few points illustrating that API imposed unnecessary and significant Expense on Darling.

**API Refused to Narrow the Requests:** Darling repeatedly asked API to narrow its

Requests rather than engage in a premature exchange of ESI search terms and hit reports because API's approach would require Darling to incur Expenses hosting over two million emails with no relevance to the case. *See* Ex. A ¶¶ 7-14. By way of background, the extraction of documents from a custodian and subsequent ingestion into an e-discovery platform is an antecedent step to running a keyword hit report. *Id.* ¶ 7. API's position—that Darling needed to extract and ingest documents and produce a hit report *before* API would modify its Requests—forced Darling to identify a broader set of custodians than warranted and then locate and gather their ESI for a ten-year period (*i.e.*, the scope of the Subpoena). *Id.* ¶¶ 17-18. Because the volume of that data (**over two million emails**) was too large for Darling to host and search through its own internal software, Darling was required to retain an outside vendor (DISCO) to ingest and host the documents **at a cost of over $13,000 <u>per month</u>**. *Id.*; *id.* at Ex. 8. Had API handled the ESI process as it is normally handled and how Darling proposed—*i.e.*, first modify the Requests so they are narrowly tailored to the case—Darling could have avoided most of that expense. *Id.* ¶¶ 17-20. Indeed, of the over two million emails API forced Darling to ingest, Darling ended up producing only 2,446 of them, *i.e.*, less than 0.15%. *Id.*

**<u>API insisted that Darling run broad search terms</u>:** Until the Court's February 22, 2024, Order, API insisted that Darling search for and review ESI containing broad keywords that were not narrowly tailored to this case. For example, before the Court's Order, API demanded that Darling review: (1) all emails that were sent to or received from the @tyson.com domain, *i.e.*, **every email that was sent to or received from Tyson regardless of subject matter** and (2) all emails that contained the words "poultry" or "chicken" and one of many broad terms such as "supply," "demand," "price," "volume," "market," **<u>or</u>** "output," *i.e.* API was demanding that a poultry rendering company locate and review effectively every email discussing poultry. *See* Ex. A ¶ 22; *id.* at Ex. 4.

After this Court's February 22, 2024, Order held that many of API's Requests were "clearly overbroad and not proportional," API agreed to modify its keywords. However, API remained steadfast in insisting on overly broad terms. For example, on April 2, 2024, Darling informed API that its latest iteration of proposed keywords remained unduly burdensome because (1) they "hit" 37,560 documents and (2) Darling reviewed a random sample of those documents and determined they were almost all irrelevant. *Id.* at Ex. 9. API responded that it "disagree[d] that 37,560 hits presents an undue burden for Darling." *Id*. at Ex. 10. API was wrong. Based on Darling's actual review rate of 102 documents per hour (which is less than 10 seconds per page), it would have taken Darling roughly 351 hours to review 37,560

10

documents. *Id.* ¶¶ 25-27. Using a *first-year* associate's *discounted* hourly rate ($423), **that would have cost Darling $148,484**. *Id.*

Given the significant Expense associated with reviewing 37,560 documents (constituting over 137,000 pages), Darling continued to confer to try and narrow the Subpoena. Unfortunately, API refused to narrow the Requests, instead demanding that Darling have its vendor run seriatim "hit" reports. Darling put API on notice that its demands for such reports cost money that API must reimburse: "each time you ask us to run a report costs money. We did the first few without an agreement that you pay costs. But we cannot do that indefinitely. We are glad to run keyword searches (within reason) and seek reimbursement on the back end." *Id.* at Ex. 11

After weeks of additional conferrals, on April 18, 2024, Darling and API agreed on a set of keywords that yielded 8,249 documents for review. Ultimately, only 2,446 of those documents were even arguably responsive.[2] *Id.* ¶¶ 20, 29. Two critical points can be taken from these facts. One, if Darling had not objected to the breadth of the Subpoena and had this Court not made clear to API that many of its Requests were too broad, Darling would have been unfairly forced to review over 75,000 documents instead of the 8,249 documents that the parties ultimately agreed

---

[2] Hundreds of the 2,446 documents were iterations of a weekly report that has no relevance to the case but were technically responsive to API's overbroad Request. *See* Ex. A ¶ 20. Darling produced those reports in an abundance of caution, but they show that API imposed significant Expense on Darling for little, if any, gain.

to.[3] *Id.* ¶ 23. Based on Darling's actual review rate, but for Darling's conferrals and objections, Darling would have had to spend over 700 hours reviewing documents at a cost of over $296,000. *Id.* Because of Darling's objections, conferrals, and this Court's February 22, 2024, Order, Darling ultimately had to spend roughly 77 hours reviewing 8,249 documents. Thus, Darling's objections saved Darling over $175,000 in review Expenses. *Id.*

Two, given that only 2,446 documents were even arguably relevant (the actual number of relevant documents is far lower), had Darling been unfairly forced to review over 75,000 as API originally demanded, or the 37,560 documents API later demanded, less than 10% of those documents would have been even arguably relevant (and the actual relevant documents would have been below 2%). And, even after the review set was reduced to 8,249, the number of arguably responsive documents was only 29% and the actual relevant documents was well below 10%.

**<u>API's meritless reimbursement defense</u>:**  As Darling was preparing to make its production, on May 30, 2024, API revealed for the first time its position that Darling is not entitled to reimbursement under Rule 45(d)(2) because it responded to the Subpoena "voluntarily" rather than by compulsion. In response, Darling explained

---

[3] For clarity, API originally demanded a broader set of keywords. The proposed keywords that "hit" 37,560 documents were only obtained as a result of Darling's objections, Darling's opposition to the motion to enforce, and this Court's February 22 Order. Absent that, API would have demanded that Darling use its original broader keywords that would have "hit" at least 75,000 documents.

that its compliance with the Subpoena was not voluntary because it objected to the Subpoena and opposed API's motion to enforce. Darling then asked whether API would agree that Darling's production was under compulsion for purposes of Rule 45 so the parties could avoid additional Expense on motions practice wherein Darling would have to ask this Court to compel it to produce documents to avoid any claim by API that Darling waived its right to reimbursement. API refused. As a result, Darling was forced to incur yet more Expense on its Motion for an Order Compelling Production. *See* DE 168. In that motion, Darling explained that "[u]nder Plaintiffs' newly disclosed position, if Darling makes its production as planned, Darling is somehow forfeiting its right to recover its Significant Expenses under Rule 45(d)(2)(B)" and thus, "in an abundance of caution, Darling files this Motion to obtain the Order that Plaintiffs claim Darling needs to preserve its right under Rule 45(d)(2)(B) to reimbursement for its Significant Expenses." *Id.* at 3.

On June 4, 2024, the Court rejected API's position. *See* DE 169 at 4–5. Darling could have avoided the Expenses associated with this Motion if API did not take its meritless position about Rule 45(d)(2).

**API Refuses to Negotiate Reimbursement:** Following the Court's Order, Darling again attempted to confer with API regarding reimbursement. To avoid this Motion, Darling provided API with proof of its Expenses, including monthly invoices (with detailed billing entries) and invoices from Darling's e-discovery vendor. *See* Ex. A

13

¶ 43, *id.* at Exs. 8, 12. Despite that evidence and Rule 45's mandate that API "must" reimburse Darling for its significant Expenses, API maintained "that Darling has no right to recover **any** of its fees or expenses." Ultimately, API offered Darling $29,500, an offer that is so low that it does not even cover Darling's outside vendor's costs and, consequently, provides no reimbursement of attorneys' fees. *Id.* ¶ 43. When API transmitted its' lowball offer, it stated that the offer "should be considered a last and best, and will not be increased." *Id.* API stood by that position and refused to move its offer even after this Court's July 18, 2024, email, reiterating that the parties should "confer concerning allocation of costs and fees incurred as a result of the production of discovery by Darling to API."

### D.   Darling's Significant Expenses.

Over the last year since API served the Subpoena, Darling has incurred Expenses totaling $236,907.55:

| Month | Attorney's Fees | E-Discovery Vendor Fees |
|---|---|---|
| July 2023 | $8,701.00 | -- |
| Aug 2023 | $944.00 | -- |
| Sept 2023 | $636.00 | -- |
| Oct 2023 | $4,372.00 | -- |
| Nov 2023 | $4,046.00 | -- |
| Dec 2024 | $59,516.00 | -- |
| Jan 2024 | $19,950.00 | -- |
| Feb 2024 | $11,849.50 | -- |
| Mar 2024 | $12,142.00 | $14,254.75 |
| Apr 2024 | $23,916.57 | $13,486.20 |
| May 2024 | $35,007.10 | $12,630.03 |

14

| June 2024[4] | $15,456.40 | -- |
| **Total** | **$196,536.57** | **$40,370.98** |

### 1.  Darling's Attorneys' Fees.

Darling has incurred $196,536.57 attorney's fees in connection with the Subpoena. Detailed information about those fees is set forth in the detailed billing invoices attached as Exhibits 8 and 12 to Exhibit A. An overview is as follows:

**July-November 2023**: Darling incurred $18,600 in fees during this five month period, which averages to only $3,740/month (less than 1.5 hours per week). That time was spent (i) analyzing the Subpoena and drafting objections thereto; (ii) reviewing and responding to conferral letters; (iii) engaging in conferral calls; and (iv) communicating with Darling.

**December 2023 to February 2024**: Darling incurred $91,315.50 in fees during this three-month period (roughly $30,000/month). Those fees primarily involved (i) reviewing API's motion to enforce and drafting Darling's opposition thereto; (ii) drafting Darling's Motion for Protective Order; and (iii) reviewing the Court's Order and engaging in conferrals in light thereof. Had Darling not incurred these Expenses, it would have (1) been forced to review over 75,000 documents instead of 8,249 documents and (2) been denied the protections of the Amended Protective Order.

**March to May 2024:** Darling incurred $71,065.67 in fees during this three-month period (averaging $23,333/month). Most of this time was spent reviewing the 8,249 "hit" documents and working with Darling to compile, organize, and produce tens of millions of items of transaction data. Darling reviewed the 8,248 documents (constituting 30,274 pages) in approximately 77 hours—less than 10 seconds per page—which is a reasonable (and indeed efficient) rate of review.

**June 2024**: Darling incurred fees of $15,546 in June. This time was spent completing the document review, producing documents, conferring on reimbursement, and drafting this Motion. The fees Darling incurred for this Motion are reimbursable. *Infra* at 24-25.

---

[4] Darling's reply will include July fees for this Motion and the reply. *Infra* at 24-25.

Darling's hourly rates are not simply reasonable, they are below market, particularly given the background and experience of the attorneys involved. *See* Ex. A ¶ 32. With respect to document review, to minimize Expense, it was primarily performed by first and second-year associates. *Id.* And, to further minimize expense, Greenberg Traurig offered Darling a discount from its standard rates. *Id.* For example, Mr. Rosenwasser, whose standard rate is $940/hr, billed at $795/hr (a 15% discount), and Mr. Eye, whose standard rate is $775/hr, billed at $575/hr (a 25% discount). The first- and second-year associates who reviewed documents billed at $423-$495 per hour. *Id.* Those rates are reasonable in the Atlanta market. *See* Ex. A ¶¶ 34-35; *see also Henderson v. Emory Univ.*, 2020 U.S. Dist. LEXIS 218676 at *6 (N.D. Ga. Nov. 4, 2020) ($1,060 and $900 are reasonable Atlanta rates); *Pinon v. Daimler AG*, 2021 U.S. Dist. LEXIS 249510 at *57 (N.D. Ga. Nov. 30, 2021) ($894 and $742 are reasonable Atlanta rates).

While Darling could request reimbursement of all its attorney's fees, Darling is voluntarily reducing the amount of fees sought by 10% to account for any instances in which API may claim that (1) Darling's counsel spent excessive time on a matter (*e.g.*, if API claims that Darling should have spent 0.5 hours on an issue that Darling billed 0.8 hours for) or (2) Darling's counsel used block billing purportedly making it difficult to determine whether the amount billed is reasonable. Darling's 10% reduction to $19,653 or roughly 34 hours at Mr. Eye's reduced rate.

16

Consequently, Darling respectfully requests that the Court enter an order requiring API to reimburse Darling $176,882 in attorneys' fees.

### 2.    Darling's e-Discovery Costs.

Darling incurred $40,370.98 in outside e-discovery costs, which involve Darling retaining DISCO to (i) ingest and host **481 GB** of data (encompassing over two million emails) and (ii) provide it access to its document review software. *See* Ex. A ¶ 18. Given the size of the data that API required Darling to search, Darling had to pay DISCO over $13,000 per month.[5] *Id.* As explained above, API could have reduced this Expense by modifying its Requests **before** requiring Darling to ingest scores of custodians' ESI into DISCO. Because Darling repeatedly informed API that (1) ingesting more data increases the Expense and (2) "the more you ask/require us to do, the higher the request for reimbursement will be," API cannot complain about this Expense. Darling requests full reimbursement of these ESI-related costs, which are compensable under Rule 45. *See, e.g.*, *In re Gladstone Consulting*, 2018 U.S. Dist. LEXIS 238762, *8-9 (S.D. Fla. Sept. 21, 2018) (ordering reimbursement "of expenses for database hosting, processing and storage of the subpoenaed ESI").

## III.   ARGUMENT

### A.    Legal Standard

Rule 45 provides two avenues for recovery. ***First***, Rule 45(d)(2)(B)(ii)

---

[5] Darling obtained below market pricing from DISCO for this case. *Id.* ¶ 18.

provides that the Court "**must**" protect a non-party subpoena recipient who objects to a subpoena from "significant expense resulting from compliance." That provision is mandatory: the "Court **must** shift to [Plaintiffs] any non-party's subpoena compliance costs if they are significant." *Hernandez*, 2014 U.S. Dist. LEXIS 30861, at *2 n.5; *see also Gamache v. Hogue*, 2023 U.S. Dist. LEXIS 55184, at *5-6 (M.D. Ga. Mar. 15, 2023) ("This protection against 'significant expense' is mandatory[.]"). Indeed, "when discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court **must** order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder non-significant." *Monitronics Int'l, Inc. v. Hall*, 2016 U.S. Dist. LEXIS 166402, *40-41 (N.D. Ga. Dec. 2, 2016) (emphasis added).

***Second***, Rule 45(d)(1) requires the shifting of expenses to the subpoenaing party if it fails to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." This provision "invests the court with an independent duty to enforce a subpoenaing party's duty to take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, at *16.

In determining the proper amount of cost-shifting under both Rule 45(d)(1) and 45(d)(2)(B), courts consider (i) "whether the non-party actually has an interest

in the case," (ii) "whether the non-party can more readily bear the costs than the requesting party," and (iii) "whether the litigation is of public importance." *Id*. at *20; *see also In re Zantac Ranitidine Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 242697, *9 (S.D. Fla. May 20, 2022) ("Courts apply the same three-part balancing test to cost shifting under both Rule 45(d)(1) and Rule 45(d)(2)(B).") (collecting cases). This Court also considers "whether and to what extent the serving party has made efforts to minimize the burden of compliance." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, *20. As explained below, each of the factors weigh heavily in favor of ordering API to reimburse Darling the full amount of its requested $217,263.

**Darling Has No Interest in this Case**: The first factor asks whether Darling "actually has an interest in the case." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, at *16. It does not. API does not allege that Darling was involved in the allegedly anti-competitive conduct. In fact, API alleges the opposite. *See* D.E. 76 at 4 (Darling is "trying to compete on the unlevel playing field created by Tyson").

API may try to argue that Darling, as a market participant, might somehow benefit if API wins this case. Not so. Darling is not a party and will not receive any recovery should API obtain a settlement or judgment. Thus, if Darling is denied reimbursement, it will be left holding the bag on its Expenses regardless of whether API wins or loses. Moreover, API's claims have little, if anything, to do with Darling. API asserts that Tyson "orchestrated an anticompetitive scheme…to drive

19

**Plaintiffs** [] from the poultry rendering market in Georgia, Alabama, north Florida, and south Tennessee." *See* DE 1 ¶ 1 (emphasis added). That claim has nothing to do with Darling and, consequently, any relief relating thereto will not impact Darling.

**API Can and Should Bear the Expenses:** The second factor asks whether Darling "can more readily bear the costs than the requesting party." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, at *16. API asserted during conferrals that this factor cut against cost shifting because Darling is a publicly-traded company and API is no longer in business. That is a red herring. This is not an action with an indigent party struggling to afford this case. This is a contingency fee case brought by a major law firm **seeking "more than $2 billion."** *See* DE 146 at 1. If API prevails and recovers only 50% of its alleged damages, API will receive $670 million and its lawyers will receive $330 million. Darling would not get a penny. It is perfectly reasonable under these circumstances that API should bear the Expenses of its billion-dollar gambit. Indeed, Darling should not bear the risk while API reaps **all** the reward.

**The Litigation Is Not of Great Public Import:** The third factor asks "whether the litigation is of public importance." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, at *16. Only rare cases are deemed of public import for purposes of Rule 45, such as actions brought by the government or where "the U.S. will receive the proceeds of any award or settlement reached in the action." *First Am. Corp. v. Price Waterhouse LLP*, 154 F. 3d 16, 22 (2d Cir. 1998). By contrast, this case is "litigation [] between

private parties with no apparent public importance." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, 2016 U.S. Dist. LEXIS 58208, *24 (S.D. Fla. Apr. 26, 2016); *Gamache v. Hogue*, 2023 U.S. Dist. LEXIS 55184, *18 (M.D. Ga. Mar. 15, 2023) (case not "one of public importance" since "litigation is between private parties.').

API may argue that the enforcement of antitrust laws is of public importance. But if API's argument rang true, Rule 45 would not apply to any antitrust cases. Of course, Rule 45 contains no blanket exception for antitrust cases. Moreover, API's claims are not typical antitrust claims about ongoing activities that harm consumers. Rather, API claims that Defendants schemed "to drive **Plaintiffs** []" from the market by orchestrating a boycott of API to "forc[e] a below fair market value sale of the API Entities." *See* DE 1¶¶ 1, 5. That is a private dispute between private parties.

**API Did Not Reasonably Try to Minimize Darling's Burden:** Courts also consider "whether and to what extent the serving party has made efforts to minimize the burden of compliance." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, *20. This factor strongly supports shifting Darling's Expenses to API.

First, the Subpoena contained facially overbroad Requests, including, but not limited to, demanding that Darling search for, review, and produce: (i) "[a]ll communications between [Darling] and Defendants"; (ii) "[a]ll communications between [Darling] and any entity about Defendants"; and (iii) "[a]ll internal and external communications regarding pricing and output volumes of Raw Material

Supply and Poultry Rendering Output." *See* DE 76-1 at 12.

Second, API required Darling to engage in protracted conferrals to narrow the Subpoena and, when Darling's efforts, failed, Darling was forced to incur Expenses on motions practice. Notably, Darling largely succeeded in its efforts. Had Darling not opposed the Subpoena and sought relief from this Court, Darling (1) would have been forced to review at least 75,000 documents and (2) would not have obtained the "Outside Counsel Eyes Only" protection in the Amended Protective Order.

Third, API rejected nearly all of Darling's proposals to modify the Subpoena's overbroad Requests, insisting that Darling instead host more than **two million emails** for a ten-year period to prematurely produce "hit" reports. Even after this Court ruled that at least five of the Requests were "overbroad and not proportional," API continued to resist modifying the Requests, imposing tens of thousands of dollars of e-discovery and other costs on Darling. *See* Ex. A ¶¶ 7-14.

> **B.    API's Likely Counterarguments Are Meritless.**

**API's "Voluntariness" Argument**: API may argue that Darling is not entitled to reimbursement because it produced documents without being compelled by a Court Order. That argument is incorrect. ***First***, this Court already rejected API's argument. *See* DE 169 at 4-5 (Darling's production does not waive its right to reimbursement). ***Second***, Darling objected to the Subpoena and opposed API's Motion to Enforce, which was sufficient to preserve Darling's right to reimbursement. *Kipperman*, 2008

U.S. Dist. LEXIS 130598, *18 (to "preserve its right to reimbursement, a party has to file both objections and a response to a requesting party's motion to compel."). ***Third,*** API's argument only applies to reimbursement under Rule 45(d)(2)(b)(ii). It has no bearing on Darling's right to reimbursement under Rule 45(d)(1), which vests the Court with "an independent duty to enforce a subpoenaing party's duty to take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." *Kipperman*, 2008 U.S. Dist. LEXIS 130598, at *15.

**<u>Darling May Recover Expenses Relating to Motions Practice:</u>** API will likely argue that Darling is not entitled to recover expenses incurred "resisting the subpoena," as opposed to complying with it. But as this Court has held:

> Rule 45 recognizes that the costs associated with complying with a burdensome subpoena involves more than the actual costs of production. Rule 45 specifically contemplates an objection, a motion to compel which will require the subpoenaed party to respond, and a motion to quash or motion for protective order. Therefore, this court finds that the "significant expense" mentioned in Rule 45 may include the costs of these related motions as well as the cost of actual production.

*Kipperman*, 2008 U.S. Dist. LEXIS 130598, *16. Courts around the country are in accord. *See In re Zantac*, 2022 U.S. Dist. LEXIS 242697, *14-15 (S.D. Fla. May 20, 2022) (rejecting argument that party "cannot be compensated for attorney's fees incurred in resisting subpoena"); *Linglong Americas, Inc. v. Horizon Tire*, 2018 U.S. Dist. LEXIS 57777 (N.D. Ohio Apr. 4, 2018) (rejecting argument that fees incurred opposing subpoena are "not reimbursable"); *Barracuda Networks v. J2 Global*, 2020

23

U.S. Dist. LEXIS 183538 (C.D. Cal. July 17, 2020) (same).

**Block Billing:**  Darling expects API to complain that Darling's invoices contain block billing. But "[a]s a general proposition block billing is not prohibited so long as the Court can determine from the time entry the services that were performed." *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 2018 U.S. Dist. LEXIS 224352, at *16 (N.D. Fla. May 28, 2018); *Duncan v. Golden Rod Broilers, Inc.*, 2008 U.S. Dist. LEXIS 131695, at *10 (N.D. Ala. July 22, 2008) ("block-billing technique is not an absolute bar to recovery of fees"). And courts routinely award attorneys' fees supported by block billing entries. *See, e.g., Pierre-Louis v. Baggage Airline Guest Servs.*, 2021 U.S. Dist. LEXIS 146340, at *64 (S.D. Fla. Aug. 4, 2021) ("block billing alone is not sufficient to further reduce the award of attorneys' fees"); *Fla Int'l Univ. Bd. Of Trs. v. Fla Nat'l*, 2019 U.S. Dist. LEXIS 101714, at *20 (S.D. Fla. June 17, 2019) ("block billing alone is not sufficient to deny or reduce the award").

Nonetheless, Darling is voluntarily reducing the amount of fees sought by 10% (*i.e.*, $19,653, which is equal to roughly 34 hours) to account for any instances in which API may claim that (1) Darling's counsel spent excessive time on a matter or (2) Darling's counsel used block billing making it difficult to determine whether the amount billed is reasonable. *See Ovalle v. Perez*, 2017 U.S. Dist. LEXIS 186494, at *11 (S.D. Fla. Nov. 9, 2017) (reducing fees by 10% to account for block billing).

**Darling's Request is Excessive:**  API may argue that Darling's overall request of

$217,263 is excessive. But Darling's Expenses are reasonable given that it had to litigate for nearly a year and, during that time, it engaged in dozens of conferrals; engaged in motions practice; searched for tens of millions of items of data; ingested and hosted over two million emails; reviewed tens of thousands of pages; drafted a privilege log; negotiated several status reports; and drafted this Motion. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig.*, 2018 U.S. Dist. LEXIS 246306, at *36, 41 (N.D. Ala. Oct. 24, 2018) (awarding $169,095); *New Prods. Corp. v. Dickinson Wright*, 577 B.R. 690, 709 (W.D. Mich. Sept. 22, 2017) (awarding $166,187).

**Reimbursement for this Motion**:  API may argue that Darling is not entitled to reimbursement for this Motion. But a party may "recover the cost of establishing their right to, and the amount of attorney's fees—the right to fees on fees." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1301 (11th Cir. 2010); *Zediker v. OrthoGeorgia*, 857 Fed. App'x 600, 615 (11th Cir. 2021) (awarding 99.34 hours for for "Fees on Fees"). Indeed, "fees incurred in seeking attorneys' fees (known as 'fees-on-fees') are compensable in this Circuit." *Johnson v. Velocity,* 2018 U.S. Dist. LEXIS 81590, at *15-16 (N.D. Ga. Mar. 12, 2018). Moreover, it was API's refusal to confer in good faith that caused this Motion. Rather than negotiate in good faith, API offered a mere $29,500 and stated that it was not open to any negotiation. *See* Ex. A ¶ 43.

## IV.  CONCLUSION

Darling requests reimbursement of $176,882 in fees and $40,370 in costs.

Respectfully submitted, this 19th day of July, 2024.

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser
Georgia Bar No. 614908
William E. Eye
Georgia Bar No. 688914

*Attorneys for Respondent*

**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE
Terminus 200, Suite 2500
Atlanta, Georgia 30305
Telephone: (678) 553 2100
Fax: (678) 553 2212

## CERTIFICATION OF CONFERRAL

Counsel hereby certifies that the parties have engaged in written and oral conferrals to try to resolve this dispute and that such conferrals were unsuccessful. Details of those conferrals are set forth in the motion and Exhibit A.

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser

## LOCAL RULE 7.1(D) CERTIFICATION

Counsel hereby certifies that the text of this document has been prepared with Times New Roman 14-point font, one of the font and point selections approved by the Court in Local Rule 5.1(C).

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser

## CERTIFICATE OF SERVICE

This is to certify that on July 19, 2024, I electronically filed the foregoing **NON-PARTY DARLING INGREDIENTS INC.'S RULE 45 MOTION FOR REIMBURSEMENT OF FEES AND COSTS INCURRED IN RESPONSE TO SUBPOENA** with the CM/ECF e-filing system, which will automatically send email notification of such filing to attorneys of record.

This 19th day of July, 2024

/s/ *Steven J. Rosenwasser*
Steven J. Rosenwasser

ACTIVE 700072392v2