# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., <br><br>         Movants, <br><br> v. <br><br> DARLING INGREDIENTS, INC., <br><br>         Respondent. <br><br> ------------------------------------------------- <br><br> AMERICAN PROTEINS, INC. n/k/a CROSSROADS PROPERTIES A, INC., et al., <br><br>         Plaintiffs, <br><br> v. <br><br> RIVER VALLEY INGREDIENTS, LLC, et al., <br><br>         Defendants. | Civil Action No. 2:22-CV-00091-RWS |

## <u>DECLARATION OF STEVEN ROSENWASSER</u>

I, Steven Rosenwasser, hereby state as follows:

1.    My name is Steven Rosenwasser. I am over the age of 21 years and am competent to testify to the matters set forth in this Declaration. I have personal knowledge of the matters set forth in this Declaration and could, and would, competently testify to them if called upon to do so.

2.      I am a partner at the law firm Greenberg Traurig, LLP ("GT"), and work out of the firm's office in Atlanta, Georgia. It was and is GT's regular practice to create and maintain billing records for client matters (the "Records"), with such Records including at least the following information for each attorney and paralegal billing time to a case: the date, the timekeeper, the amount of time spent on the matter, and a description of the tasks that are being billed. It is GT's regular practice, and my regular practice, to create the Records on the date for which the tasks were performed. The Records accurately reflect the tasks that were performed on a matter and the amount billed to the client therefore.

3.      I am filing this Declaration on behalf of Non-Party Darling Ingredients, Inc. ("Darling") in support of its Rule 45 Motion for Reimbursement of Fees and Costs Incurred in Response to Subpoena.

4.      Plaintiff American Proteins Inc. ("API") served its Subpoena on Darling on July 10, 2023.

5.      API's Subpoena demanded that Darling search for, review, and produce a substantial amount of transactional data and electronically stored information ("ESI") for a period of roughly ten years. The Subpoena's requests (the "Requests") were not narrowly tailored to the claims and defenses at issue in the underlying litigation. As just some examples:

*      Request No. 5 sought "[a]ll communications between [Darling] and Defendants" regardless of subject matter.

\*      Request No. 6 sought "[a]ll communications between [Darling] and any entity about Defendants" regardless of subject matter.

\*      Request No. 8 sought "[a]ll documents relating to any industry trade group or association meeting in which Defendants were discussed between January 1, 2017 to present." Given that Tyson is one of the industry's largest participants, it is fair to assume that it was discussed at all industry trade group or association meetings. As a result, this Request purported to require Darling to search for, review, and produce all documents relating to any industry trade group meeting over the last seven years regardless of the subject matter of the document (*e.g.*, a plane ticket to a meeting would be responsive).

\*      Request No. 14 sought "[a]ll documents concerning any research, report, survey, study, or analysis of pricing, price levels, output volumes, competitive conditions, or market conditions related to Raw Material Supply and Poultry Rendering Outputs from January 1, 2014, to the present." Given that "Raw Material Supply" was defined as "any poultry materials supplied by any poultry processor to be used by a poultry rendered for any purpose" and "Poultry Rendering Outputs" was defined as "any output resulting from the poultry rendering process," this Request effectively sought all documents relating to every aspect of Darling's poultry rendering business over the past ten years.

\*      Request No. 15 sought, for the time period January 1, 2014 to the present, "[a]ll documents concerning Poultry Rendering industry trends, including, but not limited to, trade articles, reports, and studies."

As discussed more below, on February 22, 2024, this Court found that these and other Requests were "overbroad and not proportional." *See* DE 126 at 4-5.

6.      Given the breadth of API's Subpoena, Darling tried, for months, to confer with API to narrow the scope of the Subpoena. One of the main reasons Darling conferred with API to narrow the scope of the Subpoena was to reduce the

significant fees, costs, and expenses ("Expenses") Darling would incur responding thereto.

7.      Here are just a few examples of the many times Darling conferred with API to narrow the scope of the Requests:

**August 4, 2023 (attached as Exhibit 1)**: On August 4, 2023, Darling served API with Third Party Darling Ingredient Inc.'s Objections and Responses to Plaintiffs' Subpoena (the "Objections"). The Objections stated, *inter alia*, that the Subpoena's Requests were "overly broad, unduly burdensome, and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence" because they "make[] no effort to tie the requested documents to any claim or defense at issue in this case." Darling did not rely on *pro forma* objections, but rather provided specific reasons why the Requests were overly broad. For example, with respect to Request No. 5 seeking "[a]ll communications between [Darling] and Defendants," Darling noted that "if a Darling employee sent an email to one of the Defendants about the dates for an upcoming trade show, Darling would have to incur the time and expense of searching for, reviewing, and producing that email even though it is wholly irrelevant to this case."

Darling's Objections also made clear that the Subpoena imposed undue burden on Darling and that compliance would cause Darling to incur substantial Expense:

**Darling anticipates that complying with this Request and all other Requests would require Darling to incur at least one-hundred fifty-thousand dollars in ESI and attorneys' fees and expenses and likely much more**. Darling, as a third party, is not required to incur the substantial time, disruption, and expense finding, reviewing, and producing nearly a decade of data, particularly given the breadth of data apparently requested here.

…

This Request is also objectionable because "Rule 45(d)(2)(B)(ii) '**requires** the district court to shift a non-party's cost of compliance with a subpoena, if those costs are significant.'" *Monitronics Int'l, Inc. v. Hall*, 2016 U.S. Dist. LEXIS 166402, at *40 (N.D. Ga. Dec. 2, 2016) (citation omitted); *see also Hernandez v. Hendrix Produce, Inc.*, 2014 U.S. Dist. LEXIS 30861, at *2 n. 5 (S.D. Ga. Mar. 10, 2014) ("[P]laintiffs are reminded that this Court **must** shift to them any non-party's subpoena compliance costs if they are significant.") (emphasis in original). Thus, under Fed. R. Civ. P. 45(d)(2)(B)(ii) and associated caselaw, Plaintiffs are required to protect Darling from the "significant expense resulting from compliance" with the Subpoena by, *inter alia*, "reimburs[ing] the non-party's cost of production." *Id.* For that reason, to the extent Darling agrees or is compelled to produce documents in response to the Subpoena, Plaintiffs must reimburse Darling for the reasonable fees, costs, and expenses it incurs in connection therewith. Please confirm, in writing, that Plaintiffs will reimburse Darling for the fees, costs, and expenses it incurs in connection with responding to this Subpoena, including, but not limited to, all attorneys' fees and all ESI fees Darling incurs in connection with locating, ingesting, reviewing, storing, and producing documents/data.

**October 31, 2023 (attached as Exhibit 2)**: During a September 6, 2023, conferral call and in an October 31, 2023, letter, Darling reiterated to API that its Requests were overly broad and not narrowly tailored to API's claims:

During the September 6, 2023, conferral call, I discussed, in detail, why the Subpoena topics are, among other things, extremely overbroad, unduly burdensome and seek information that is not remotely related to

5

any claim or defense in the underlying litigation. I indicated that, while Darling was certainly within its rights to stand on its objections and to require API to draft and serve a new Subpoena that was narrowly tailored and otherwise resolved these issues, as a sign of good faith and cooperation, Darling would instead be willing to discuss material modifications to the topics to see if the parties could reach an agreement and, if so, Darling would not require the issuance of a new subpoena. To that end, **during the September 6, 2023, conferral call, I asked API to send Darling revised requests that were narrowly tailored to the claims and defenses at issue in the underlying litigation and otherwise addressed our concerns**. **While API promised to do so, your Letter makes no such revisions. Instead, API continues to improperly demand that Darling respond to the overly broad Requests as written**.

**December 1, 2023 (attached as Exhibit 3)**: On December 1, 2023, Darling again wrote API and requested that the Requests be narrowed so they are tailored to the claims and defenses and to reduce the significant Expenses Darling faced:

Before addressing the specific Requests, it is important to reiterate that API has refused, and continues to refuse, to respond to Darling's concerns about the substantial costs associated with responding to the Subpoena, particularly as drafted.

As discussed more below, **API has, for the most part, been unwilling to modify the extremely broad nature of the Requests**. Instead, API claims that Darling can reduce the burden by conducting keyword searches of relevant custodians' email boxes. That claim ignores two points.
First, as written, the Subpoena would require Darling to search a substantial number of employees' email boxes. Indeed, the Subpoena seeks "**[a]ll documents**" on a variety of broad topics such as (i) purchasing raw materials; (ii) sales price; (iii) forecasting; (iv) budgeting; (v) acquisitions; (vi) financial performance; and (vii) trade shows. In fact, **Request No. 6 seeks "[a]ll communications" that even mention any Defendant**. To fully respond to these Requests would require Darling to search thousands of current and former employees'

email boxes over a nearly ten-year period. That is precisely why the Requests need to be narrowed before the custodians are identified.

Second, API simply ignores the cost of ESI review, even if it is limited to conducting keyword searches. For Darling to conduct keyword searches, it will need to, among other things, (i) retain a e-discovery vendor; (ii) gather emails for a nearly ten-year period for all the custodians; (iii) have those emails ingested into the e-discovery vendor's review platform; and (iv) search them. Assuming *arguendo* that Darling identifies ten custodians, and assuming each custodian sends and receives 150 emails per business day, that equates to 39,000 emails per year or 390,000 emails per custodian for the requested ten-year period. Thus, to simply conduct keyword searches of ten custodians, Darling would have to gather and ingest nearly 4 million emails. As I am sure you are aware, that comes with a substantial cost, which could easily exceed $75,000, particularly once hosting costs are included. And, of course, that does not include any attorney time for gathering or reviewing the emails. We have asked whether API is willing to incur any of these costs and, to date, API has refused to agree to do so.

8.      Despite Darling's efforts, API repeatedly refused to narrow the scope of the Requests. Instead, API demanded that Darling incur significant Expense by identifying numerous custodians; ingesting their emails for a nearly ten-year period; and then conducting broad keyword searches on those emails. For example, rather than agree to modify its Request that Darling search for and produce "[a]ll communications between [Darling] and Defendants" regardless of subject matter and "[a]ll communications between [Darling] and any entity about Defendants" regardless of subject matter, API demanded that Darling ingest over two million emails and then search those emails for any email sent to or from the @tyson.com domain, *i.e.*, that Darling search for and review any email any of the scores of

custodians received that was sent to or received from Tyson regardless of subject matter. *See* Exhibit 4 (10/19/23 Quinto letter).

9.     Darling repeatedly explained to API that its proposed process of requiring Darling to ingest over two million emails and to search those emails before API would narrow its Request was contrary to how discovery is typically handled and would unfairly and materially increase Darling's Expenses. Specifically, Darling explained to API that its outside e-discovery vendor, DISCO, would charge Darling based upon the volume of ESI that DISCO ingested and hosted. Thus, the more custodians API required Darling to identify, and the more emails Darling had to load into DISCO's review platform, the greater the cost. For example, on December 1, 2023, Darling told API:

> API simply ignores the cost of ESI review, even if it is limited to conducting keyword searches. For Darling to conduct keyword searches, it will need to, among other things, (i) retain a e-discovery vendor; (ii) gather emails for a nearly ten-year period for all the custodians; (iii) have those emails ingested into the e-discovery vendor's review platform; and (iv) search them. Assuming *arguendo* that Darling identifies ten custodians, and assuming each custodian sends and receives 150 emails per business day, that equates to 39,000 emails per year or 390,000 emails per custodian for the requested ten-year period. Thus, to simply conduct keyword searches of ten custodians, Darling would have to gather and ingest nearly 4 million emails. As I am sure you are aware, that comes with a substantial cost, which could easily exceed $75,000, particularly once hosting costs are included. And, of course, that does not include any attorney time for gathering or reviewing the emails. We have asked whether API is willing to incur any of these costs and, to date, API has refused to agree to do so.

*See* Exhibit 3.

10.     Unfortunately, API was, for the most part, unwilling to work with Darling in good faith and instead continued to (1) refuse to narrow the scope of the Requests and (2) demand that Darling ingest over two million emails notwithstanding the significant Expense associated therewith.

11.     For many months, Darling also asked API to modify the Protective Order to ensure that Darling's highly confidential and trade secret information was not disclosed to Tyson, one of Darling's largest competitors. As just some examples:

**August 4, 2023 (attached as Exhibit 1)**: In its Objections, Darling objected to the Subpoena on the ground that:

> it seeks highly confidential, proprietary, and/or trade secret information (together, "Highly Confidential Information"). Darling, a third party, is not required to produce Highly Confidential Information, particularly where, as here, one or more of the receiving parties is Darling's competitor who can use the information to compete against or otherwise harm Darling. Indeed, the Complaint itself identifies Darling as a competitor of both Plaintiffs and Defendants. *See, e.g.*, Complaint ¶¶ 31, 38. While Plaintiffs have indicated that Darling can designate documents it produces as "Highly Confidential," that designation does not prevent the disclosure of Darling's Highly Confidential information to one or more parties, *i.e.,* competitors. On the contrary, the Protective Order contains exceptions that could potentially allow Darling's Highly Confidential Information to be viewed by its competitors.

**August 30, 2023 (attached as Exhibit 5)**: In an August 30, 2023, letter, Darling explained, in detail, why the then existing Protective Order was insufficient:

Further, Paragraph 6(c) allows Darling's competitors to view its Trade Secrets so long as the persons to whom the information is being provided is a witness or deponent. Given the nature of your clients' claims, the "witnesses and deponents" likely include the very people Darling would never want to view its Trade Secrets, including officers, directors, and managers responsible for sales, marketing, and/or pricing. Moreover, as written, the employees can see the documents outside the deposition/trial context so long as the attorney purportedly believes that reviewing the documents are reasonably necessary to "prepare." Further, we do not know what a "witness" means in this context since it is clearly someone other than a deponent. This creates further risk. Again, while we understand that the Protective Order purportedly limits the use of the information, Darling cannot assume or take the risk that its competitors forget what they learn from Darling's Trade Secrets.

**October 31, 2023 (attached as Exhibit 2)**: On October 31, 2023, Darling

tried again to obtain API's agreement to modify the Protective Order writing:

Darling's request that API modify the Protective Order to ensure that Darling's Highly Confidential/Trade Secret Information was not provided to Darling's competitors was reasonable. Unfortunately, API continues to refuse to affirmatively make any modifications to the Protective Order…We reiterate our request that API, the plaintiff and party seeking documents, send us proposed edits to the Protective Order that address our concerns.

**December 1, 2023 (attached as Exhibit 3)**: On December 1, 2023, Darling

once again asked API to modify the Protective Order to address Darling's

confidentiality concerns:

On this issue, there is also a simple solution. Modify the Protective Order as to Darling so that no party's employees can review or otherwise obtain Darling's Highly Confidential/Trade Secret Information unless the witness had previously reviewed it. That is, the only people who can review such information are outside counsel and experts. At bottom, for months Darling has offered a very simple

resolution to the Protective Order issue, *i.e.*, **API should modify the Protective Order to address Darling's concerns. Yet, API has refused to do so**.

12.     Ultimately, because (1) API refused to reasonably narrow the Requests and instead demanded that Darling load roughly ten years of ESI for many custodians into DISCO and (2) refused to modify the Protective Order, motions practice ensued. Specifically, API filed a motion to enforce the subpoena and Darling, in turn, filed a motion for protective order.

13.     On February 22, 2024, this Court ruled on the parties' motions. Among other things, the Court held:

> The Court finds that some of Plaintiffs' requests are overbroad and not proportional. For example, Request Nos. 5 and 6 requesting "All communications" with certain entities, without further limitation, are overbroad and not proportional. Also, Request Nos. 13, 14, and 15 are clearly overbroad and not proportional.
>
> …
>
> The Court finds that Darling has legitimate confidentiality concerns that must be addressed.

*See* DE 126 at 4-5. The Court also overruled some of Darling's relevance objections. *Id.*

14.     The day after the Court's February 22, 2024, Order, Darling reached out to API and, consistent with the Court's ruling, asked API to narrow the scope of its "clearly overbroad and not proportional" Requests:

> **First**, the Court's Order directs that "[t]he parties are expected to review **every** Request and address the concerns of each party regarding the same." *See* Order at 6. Thus, we need to confer on the scope of each of the Requests. Darling has previously stated that each of the Requests, as written, is overly broad and unduly burdensome. As set forth in our conferral letters and briefing, **we have asked API to please send us revised Requests that are more narrowly tailored to the case. Through this email, we are reiterating that request**. Can you please go through <u>each</u> of the Requests and send us a revised Request that is more narrowly tailored both in scope and time frame? Darling notes that the Court has already identified certain Requests as "overbroad and not proportional," including Request Nos. 5, 6, 13, 14, and 15. *Id.* at 4-5. The Court also noted that "[n]arrowing of other Requests may be appropriate." *Id.* at 5. Given the 21-day conferral period, we ask that you please send us revised Requests by no later than the close of business on Monday Feb. 26.

See Exhibit 6 (2/23/24 Rosenwasser email).

15.    Unfortunately, even after the Court's Order, API largely refused to modify the scope of the Requests, but instead continued to demand that Darling identify numerous custodians, ingest ten-years of their emails, and then conduct keyword searches thereof (even though Darling had already repeatedly explained to API that the process of ingesting and hosting ten years of ESI for numerous custodians would require Darling to incur significant Expense).

16.    For example, although the Court explicitly identified Request Nos. 5 and 6 as "overbroad and not proportional," API refused to narrow those Requests and instead demanded that Darling run keyword searches for documents responsive to those Requests. *See* Exhibit 7 (3/1/24 Quinto email).

17.     Despite Darling's repeated good faith efforts, API was unwilling to withdraw its demand that Darling incur significant Expense ingesting and hosting over two million emails for numerous custodians. Thus, after making clear to API that it would be responsible for Darling's e-discovery vendor's costs, in March 2024 Darling sent 481 GB of data (containing over two million emails) to DISCO.

18.     Given the volume of ESI that API insisted Darling ingest and search, *i.e.*, over two million emails, DISCO charged Darling over $13,000 per month to host ESI for this case. Darling was required to have DISCO host the data for roughly three months at a total cost of $40,370.98.[1] True and correct copy of DISCO's invoices for this case are attached hereto at Exhibit 8. Given my long-term relationship with DISCO, the rates DISCO charged for this case are below its standard market rates.

19.     Darling's DISCO costs would and should have been significantly reduced if API had followed the typical process and narrowed the Requests before Darling was required to ingest and host the ESI. Indeed, if the Requests were narrowed before Darling's ESI was ingested into DISCO's platform, Darling could have reduced the number of custodians and the amount of ESI that was ingested.

---

[1] To minimize Expense, Darling asked DISCO to close the database as soon as Darling's production was complete.

20.     Perhaps the clearest evidence that API unfairly forced Darling to ingest and host far more ESI than was warranted is the fact that, of the over two million emails were ingested into DISCO, Darling ended up producing only 2,446 documents (less than 0.15%). Moreover, a material percentage of those 2,446 are clearly not relevant to this case as they involve iterative weekly reports on matters unrelated to this case. Darling only produced them in an abundance of caution because they were arguably responsive to API's broad Subpoena.

21.     From February until May, Darling conferred with API in good faith to narrow the broad keywords API demanded Darling use to search for responsive documents. But for Darling's Objections, those conferrals, and this Court's February 22, 2024, Order, Darling would have been required to review tens of thousands of more documents that it ultimately did, thereby saving Darling at least $175,000 in review Expenses.

22.     Specifically, prior to the Court's February 22, 2024, Order, API insisted that Darling search for and review ESI containing broad keywords that were not narrowly tailored to this case. For example, before the Court's February 22, 2024, Order, API demanded that Darling search for and review: (1) all emails that were sent to or received from the @tyson.com email domain, *i.e.*, every email that was sent to or received from Tyson regardless of subject matter and (2) all emails that contained the words "poultry" or "chicken" and one of many broad terms such as

"supply," "demand," "price," "volume," "market," or "output," *i.e.* API was demanding that a poultry rendering company locate and review effectively every email discussing poultry. *See* Exhibit 4 (10/19/23 Quinto letter).

23.     Based on the results from later keyword "hit" reports, I reasonably estimate that if Darling was required to search for and review documents "hit" by the keywords API demanded prior to this Court's February 22, 2024, Order, Darling would have been required to review well over 75,000 documents. Based on Darling's actual review rate for this case[2], that would have taken at least 701 hours to review and would have cost Darling over $296,495 (using the discounted first-year associate's hourly rate used in this case ($423/hour)).

24.     After the Court's February 22, 2024, Order, making clear that API's Requests were "overbroad and not proportional" and directing that API "endeavor in good faith to reduce the burden of their Requests" on Darling, Darling conferred with API in good faith to materially narrow its overly broad keywords. For example, Darling wrote to API:

> As you know, immediately after API provided proposed keywords we indicated that the proposed keyword were too broad and would result in a large number of false positives. For that reason, we asked that you please narrow the terms. API elected not to do so. Instead, it asked that Darling prepare a keyword "hit" report showing the breadth and burden of the terms. While we maintained our objections, as a sign of good faith, we have now prepared the keyword "hit" report, a copy of which

---

[2] Darling reviewed 8,249 documents in roughly 77 hours, which equates to approximately 107 documents per hour.

is attached. As you will see, Darling's concerns were valid. **The report indicates that the proposed keywords "hit" 37,560 documents**. It would be unduly burdensome and extremely costly for Darling to have to incur the time and expense associated with reviewing those documents for, among other things, relevance and privilege. That ignores the time and expense associated with redactions and confidentiality designations. For these and other reasons, Darling maintains its objections that the proposed keywords are overly broad, unduly burdensome, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

*See* Exhibit 9 (4/2/24 Rosenwasser email).

25.     The 37,560 documents "hit" by API's proposed keywords constituted over 137,000 pages. Based on Darling's actual review rate for this case and using the discounted first-year associate's hourly rate used in this case ($423/hour), reviewing those documents would have cost Darling roughly $148,484.

26.     Despite the roughly $148,484 in review Expenses associated with reviewing 37,560 documents, after Darling informed API that its modified keywords still "hit" 37,560 documents, API responded that it "disagree[d] that 37,560 hits presents an undue burden for Darling." *See* Exhibit 10 (4/2/24 Saladrigas Email). Fortunately, notwithstanding this position, API continued to discuss keyword modifications with Darling.

27.     When Darling and API continued their keyword negotiations, Darling reiterated to API that, under Rule 45, it must reimburse Darling for the significant Expense Darling was incurring and, for that reason, API should be mindful of the breadth of its requests. Specifically, Darling wrote:

Suffice it to say, as you acknowledge below, we intend to seek all fees, costs, and expenses once this process is complete. Thus, **the more you ask/require us to do, the higher the request for reimbursement will be. Your client should be mindful of how much it asks/requires us to do for that reason**.

*See* Exhibit 11 (4/15/24 Rosenwasser email).

28.     Ultimately, Darling and API were able to agree on keywords that "hit" 8,249 documents. Darling was only able to get this material reduction in documents to be reviewed because of its Objections, opposition to the motion to enforce, and this Court's February 22, 2024, Order.

29.     While Darling was able to reduce the number of documents to be reviewed to 8,249 documents (constituting over 30,000 pages), that review still required Darling to incur significant Expense. Indeed, because of, among other things, (i) the length of the documents; (ii) their often dense nature; (iii) the need to determine whether a responsive document contained highly confidential or trade secret information warranting an "Outside Counsel Eyes Only" designation; and (iv) the need to conduct a privilege review, Darling's review of the 8,249 documents took roughly 77 hours to complete. Based on my over twenty years of experience, that amount of time was reasonable (if not fast) under the circumstances. The roughly 77 hours does *not* include the time associated with Darling searching for, compiling, and producing tens of millions of items of transactional data, which included several hours of attorney time relating to Darling's counsel (i) conferring

with API on the availability, scope and format of the transactional data and (ii) conferring with Darling about the availability and production of the data.

30.    As noted above, in addition to ordering API to narrow the Requests, the Court also held in its February 22, 2024, Order "that Darling has legitimate confidentiality concerns that must be addressed." *See* DE 126 at 5.

31.    From February until May 2024, Darling conferred with API, Tyson, and other non-parties on modifications to the Protective Order. Ultimately, an Amended Protective Order was entered that provided Darling with significantly important protections that did not exist in the Protective Order at the time the Subpoena was served. *See* DE 162. Among other things, the original Protective Order did not have an "Outside Counsel Eyes Only" term that provided Darling's competitors, like Tyson, from receiving or reviewing Darling's highly confidential and trade secret information. Darling was only able to obtain those important protections through its Objections and its opposition to API's motion to enforce. As shown by the invoices attached hereto, Darling's counsel spent many hours reviewing and editing proposed modifications to the Protective Order and conferring with API on those edits.

32.    The following paragraphs contain relevant biographical and professional information for the primary GT attorneys who performed work for Darling in this matter:

- The primary GT partner on this matter is Steven Rosenwasser. Mr. Rosenwasser has been practicing law since 1998, including having clerked on both the United States Court of Appeals for the Eleventh Circuit and the Supreme Court of North Carolina. Prior to working at Greenberg Traurig, Mr. Rosenwasser worked at Bondurant, Mixson & Elmore for roughly twenty years. In 2019, Mr. Rosenwasser moved to GT, where he is now a Principal Shareholder in the Atlanta office. Mr. Rosenwasser's work has been recognized by his peers, including having been named in *Chambers USA* and *The Best Lawyers in America*.

- The primary GT associate is William Eye. Mr. Eye has been practicing law since 2016. Following a clerkship with the Eleventh Circuit, Mr. Eye has focused on complex commercial litigation. Mr. Eye's work has been recognized by his peers, having been named in *The Legal 500* and as a *Super Lawyers* "Rising Star."

- Rushton Pope is a first-year GT associate. She is a 2023 graduate of Emory University School of law where she served as the Articles Editor for the *Emory Law Journal*. Ms. Prior to joining GT, Ms. Pope had an externship and internship with the United States Attorney's Office for the Northern District of Georgia.

33.   The hourly rates charged on this matter are as follows:

| Attorney | Standard Rate | Rate Charged for this Matter |
|---|---|---|
| Steven Rosenwasser | $940 | $795 |
| Will Eye | $750 | $575 |
| Rushton Pope | $470 | $423/$450/$470 |

34.   The above rates are reasonable for the work performed and for the geographic area.  In fact, the hourly rates in Paragraph 33 represent a significant discount from GT's standard hourly rates. For example, my standard rate is $940/hour, but I only charged $795/hour for this case representing at 15% discount. Likewise, Will Eye's standard hourly rate is $750, but he only charged $575/hour

for most of his work on this case representing a 25% discount.[3] And Rushton Pope's rate was, for some work, also reduced by roughly 5% or 10%.

35.     GT's standard rates, and certainly the discounted rates charged for this case, are well within the range of rates charged by other law firms in the area with similar skills and experience.

36.     As shown by the invoices attached hereto, GT professionals have worked a total of over 250 combined hours representing Darling in connection with the Subpoena.  This includes:

    a.  Time spent reviewing the Subpoena to determine potential grounds for objections.

    b.  Time spent drafting objections and responses to the Subpoena.

    c.  Time spent drafting, reviewing, and responding to conferral letters.

    d.  Time spent engaging in conferral calls.

    e.  Time spent reviewing API's motion and drafting a response to API's motion to enforce.

    f.  Time spent drafting Darling's Opposition to API's motion to enforce the Subpoena and Darling's Motion for Protective Order and conducting related research.

    g.  Time spent conferring on ESI terms.

    h.  Time spent conducting custodial interviews with Darling employees.

---

[3] In the first few months of this case, I charged $860/hour (still a discount from my standard rate) and Mr. Eye charged $750/hour (his standard rate). Those rates were used for less than ten of each of our hours.

i.   Time spent corresponding with Darling's e-discovery vendor.

j.   Time spent conferring with API and working with Darling to identify, compile and produce tens of millions of items of transactional data.

k.   Time spent identifying and reviewing responsive documents.

l.   Time spent conferring on reimbursement and working on this motion.

37.   In some cases, GT's invoices reflect block billing. Such billing is typical for GT on Darling-related matters. All work shown on a block billing entry was for or relating to compliance with API's Subpoena and was charged to Darling.

38.   The amount and type of work and the time spent on each task was reasonable and appropriate for this action. All the work performed was reasonably necessary to represent Darling in connection with the Subpoena.

39.   Through June 2024, Darling incurred a total of $196,536 in attorneys' fees in this case for the foregoing work. True and correct copies of the invoices reflecting this work and attorneys' fees are attached hereto as Exhibit 12. A small number of entries that contain privileged information are redacted. Darling is continuing to incur fees in connection with this Motion and will provide its fees for July in its reply.

40.   Darling incurred a total of $40,370.98 in costs in this case for the foregoing work from GT, exclusively from its e-discovery vendor. True and correct copies of the invoices reflecting those costs are attached hereto as Exhibit 8.

41.     While I disagree with any claim that GT's fees should be reduced, to avoid a debate over (i) whether a block billing entry includes time that was excessive or irrelevant or (ii) whether a task took longer than it reasonably should have (*e.g.*, an attorney billing 0.8 hours to research a task API claims should have taken 0.5 hours), we have voluntarily reduced the total amount of attorneys' fees we are seeking in the Application by 10% or $19,536. That amount equates to roughly 34 hours at Mr. Eye's reduced billing rate.

42.     I personally reviewed the statements of services rendered in this action, and the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief.

43.     In May and June of 2024, Darling sought to confer in good faith with API on reimbursement of the significant Expenses Darling incurred responding to API's Subpoena. In connection with that effort, Darling sent API its monthly billing invoices and DISCO's invoices. Although those invoices showed that Darling incurred more than $200,000 in Expenses (including more than $40,000 on outside e-discovery vendor costs), API refused to reimburse Darling more than $29,500. API also refused to confer on the reimbursement issue in good faith. In fact, after Darling sent API extensive proof of its significant Expenses, API sent back a single email with its $29,500 offer and made clear that the offer was "a last and best [offer], and will not be increased." *See* Exhibit 13 (6/19/24 Reagin Email).

I swear under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing information is true and correct.

By:   /s/ Steven Rosenwasser
Steven Rosenwasser

Dated: July 19, 2024