# EXHIBIT 2



Steven J. Rosenwasser
Tel 678.553.7388
Steven.Rosenwasser@gtlaw.com

October 31, 2023

**<u>Via Electronic Mail</u>**
Romeo S. Quinto Jr.
Romeo.Quinto@hklaw.com

    Re:    *American Proteins, Inc. Subpoena to Darling Ingredients, Inc.*

Dear Romeo:

I am in receipt of and responding to your October 19, 2023, letter (the "Letter"), which addresses issues we discussed during our conferral call roughly six weeks earlier. I will address each of the issues in the order in which they are raised in your Letter.

## <u>API Continues to Refuse to Protect</u><br><u>Darling's Highly Confidential and Trade Secret Information</u>

In its August 4, 2023, Objections and Responses to Plaintiffs' Subpoena (the "Objections"), Darling Ingredients, Inc. ("Darling") objected to American Proteins, Inc.'s ("API") subpoena (the "Subpoena") because it purported to require Darling to produce highly confidential, proprietary, and trade secret information (together, "Highly Confidential/Trade Secret Information") to API, Tyson, and potentially other competitors. Notably, in both my August 30, 2023, email and during our September 6, 2023, conferral call, while I acknowledged that a Protective Order has been entered in the underlying litigation, I explained, in detail, why it was insufficient to protect Darling's Highly Confidential/Trade Secret Information. For example, in my August 30, 2023, email, I wrote:

> Contrary to your letter, that section **permits** Darling's competitors to view its Trade Secrets. For example, Paragraph 6(a) expressly allows not only "in-house legal counsel" for Darling's competitors to review its Trade Secrets, but also all "paralegals, secretaries, clerical, regular and temporary employees" who work with Darling's competitors in-house counsel. That is troubling for a number of reasons. As just one example, corporate counsel is often involved in reviewing, discussing, and advising on business, growth, and pricing strategies. Thus, if Darling produced the information you are seeking, Darling would be forced to produce Trade Secret information that could be used by its competitors in creating their business, growth, and pricing plans. And, while the Protective Order states that the information cannot be used outside of the litigation, we do not see how a lawyer (or her employees) can simply erase from her memory what she learned from Darling's Trade Secrets.

Greenberg Traurig, LLP | Attorneys at Law
Terminus 200 Building | 3333 Piedmont Road NE, Suite 2500 | Atlanta, Georgia 30305 | T +1 678.553.2100 | F +1 678.553.2212

ACTIVE 691017592v2

www.gtlaw.com

Further, Paragraph 6(c) allows Darling's competitors to view its Trade Secrets so long as the persons to whom the information is being provided is a witness or deponent. Given the nature of your clients' claims, the "witnesses and deponents" likely include the very people Darling would never want to view its Trade Secrets, including officers, directors, and managers responsible for sales, marketing, and/or pricing. Moreover, as written, the employees can see the documents outside the deposition/trial context so long as the attorney purportedly believes that reviewing the documents are reasonably necessary to "prepare." Further, we do not know what a "witness" means in this context since it is clearly someone other than a deponent. This creates further risk. Again, while we understand that the Protective Order purportedly limits the use of the information, Darling cannot assume or take the risk that its competitors forget what they learn from Darling's Trade Secrets.

During our September 6, 2023, conferral call, I emphasized the importance of amending the Protective Order to address these and other concerns. To that end, I asked API to draft proposed modifications for the Protective Order for our review.[1] Notably, to the extent API is purportedly concerned about how the modifications would impact other parties or third parties, I informed API that it could limit the amendments so that they applied only to the documents and information Darling produced, such that it did not impact any other parties or third parties (an approach I have used in the past).

Darling's request that API modify the Protective Order to ensure that Darling's Highly Confidential/Trade Secret Information was not provided to Darling's competitors was reasonable. Unfortunately, API continues to refuse to affirmatively make any modifications to the Protective Order. Instead, API demands that – unless Darling files its own motion for a protective order – Darling must produce its Highly Confidential/Trade Secret Information to its competitors and hope that they do not contrive a basis to show the information to persons who can use it to their advantage under the guise that they are being "prepare[d]" to testify. API also maintains its position that, even if Darling's Highly Confidential/Trade Secret Information is shown to a competitor's employee involved in sales, marketing, or pricing strategies or decisions, that person can only use the information for the underlying litigation and will not use Darling's information moving forward, *i.e.*, that somehow the person is going to erase Darling's Highly Confidential/Trade Secret Information from his/her mind when devising marketing and/or pricing strategies to compete **against Darling**.

API claims that the Protective Order does not need to be modified because Darling's Highly Confidential/Trade Secret Information will only be shown to those persons who purportedly have "personal knowledge" of the information contained therein. We have already explained why that limitation is insufficient. For example, Request Number 11 of the Subpoena seeks documents relating to "pricing and output volumes." Thus, as written, the Protective Order would arguably permit API or Tyson to show Darling's Highly Confidential/Trade Secret pricing

---

[1] Defendants would need to agree to any modifications given that they would receive Darling's Highly Confidential/Trade Secret Information.

ACTIVE 691017592v2

models and analysis to any API or Tyson employee who claims to have "personal knowledge" of market pricing, an exception that swallows the rule.

Perhaps acknowledging the flaws in its analysis, API ends its discussion of the Protective Order issue by writing: "In the interest of compromise, however, and without waiving any rights, we think that the appropriate approach would be **for Darling** to move for a protective order, which API would not oppose (subject to review of the motion), that seeks an additional 'Non-Party – Outside Counsel Eyes Only' designation for information that Darling believes in good faith constitutes trade secrets." While Darling appreciates that API acknowledges the need for the protective order to be modified, Darling, as a third party, is not required to incur the time and expense of drafting a protective order for API's lawsuit. The obligation of preparing a proper Protective Order, and having it entered before Darling is required to produce its Highly Confidential/Trade Secret Information, falls on API, *i.e.*, the party who is seeking the documents in this case. Further, we do not believe that modification should only impact "trade secrets," as the definition of that term varies by state, is likely to lead to later disputes, and, regardless, Darling has highly confidential (but perhaps not trade secret) market and pricing information that its competitors should not see and be able to use to their competitive advantage. We reiterate our request that API, the plaintiff and party seeking the documents, send us proposed edits to the Protective Order that address our concerns. Unless and until a proper Protective Order is entered, Darling is not required to, and will not, produce documents responsive to the Subpoena.

## API's Response to Darling's Request to Modify the Scope of the Subpoena

During the September 6, 2023, conferral call, I discussed, in detail, why the Subpoena topics are, among other things, extremely overbroad, unduly burdensome and seek information that is not remotely related to any claim or defense in the underlying litigation. I indicated that, while Darling was certainly within its rights to stand on its objections and to require API to draft and serve a new Subpoena that was narrowly tailored and otherwise resolved these issues, as a sign of good faith and cooperation, Darling would instead be willing to discuss material modifications to the topics to see if the parties could reach an agreement and, if so, Darling would not require the issuance of a new subpoena. To that end, during the September 6, 2023, conferral call, I asked API to send Darling revised requests that were narrowly tailored to the claims and defenses at issue in the underlying litigation and otherwise addressed our concerns. While API promised to do so, your Letter makes no such revisions. Instead, API continues to improperly demand that Darling respond to the overly broad Requests as written.

**Request Nos. 1 through 3**: These Requests seek nearly ten years of detailed transactional data relating to, among other things, the volume and pricing of Darling's raw materials and finished products. As API is aware, Darling does not publish its volume and pricing data, but rather vigorously shields that information from disclosure as its dissemination can cause Darling material competitive harm. For that reason alone, these Requests are improper.

In addition to improperly seeking Highly Confidential/Trade Secret Information, these Requests are improper because the information contained therein is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Among other things, the underlying

litigation is not about any changes to **Darling's** volume or pricing, but rather the impacts, if any, to **API**. For example, assume hypothetically that from 2014 to 2020, Darling's output volume decreased 2% and prices it paid for raw materials increased by 4%. That information is wholly irrelevant if, during that same period, API's output volume increased by 5% and the prices it paid for raw materials decreased by 3%. Likewise, even assuming hypothetically Darling's volume dropped or the prices it paid for materials increased, those changes could be the result of numerous factors including, without limitation, supply chain issues, changes in the labor market, and/or delivery and transport issues. For these and other reasons, the burdens and competitive risks associated with locating, reviewing, and producing this data are far greater than any purported benefit.

Your letter states that "[i]f Darling is going to take the position that these requests are unduly burdensome, please provide the basis for that position and quantify the associated burden." To be clear, Daring is not "going to take the position that these requests are unduly burdensome," it already has taken that position (repeatedly). Darling has also already explained the basis for its position, including doing so in the Objections, during our September 6, 2023, conferral call, and herein. Darling stands by those positions and, if required to do so, will provide the Court with sufficient evidence demonstrating (1) the burdens associated with gathering, reviewing, and producing the requested information (to the extent it even exists in the requested form); (2) why the information is not probative; and (3) how Darling will be competitively harmed through its production.

**Request No. 4**: Darling separately addresses Request No. 4, which demands that Darling produce its "internal and public annual, quarterly, and monthly financial statements, summaries, forecasts, business plans, budgets, and analyses concerning Raw Material Supply and Poultry Rendering Outputs, including profit and loss statements and comparisons to budget from January 1, 2014, to the present."

As an initial matter, we have repeatedly asked API to narrow the scope of this (and other) Requests. Yet, API refuses to do so.

This Request exemplifies the fact that API is demanding that Darling produce its Highly Confidential/Trade Secret Information. Among other things, API is claiming that Darling must provide its competitors with its **current** "forecasts, business plans, budgets, and analyses" relating to the most critical parts of its business. This is the type of information that, if provided to a competitor, can cause Darling to suffer millions, if not tens of millions, of dollars of harm. For example, if Darling currently forecasts that customer demand will be stronger in the Northeast, Darling's competitors can use that information to focus their sales and marketing efforts in that area. Similarly, if Darling's business plans reflect an intention to expand in California, Darling's competitors can use that information to try and beat Darling to that market or undercut its pricing therein. These are just two of the many ways in which Darling can suffer material competitive harm through the production of this information.

While the production of the requested information will cause Darling material harm, it provides little, if any, probative information to API. Among other things, while Darling and API were in

the same industry, they are not identical in all material respects. Thus, the fact that Darling may forecast certain sales does not mean that such forecasts would apply to API, which may have focused on different markets or customer types. Likewise, the fact that Darling may budget to spend $X on marketing has no relevance to any claim or defense at issue in the underlying case.

The same is true of Darling's financial records. Whether Darling's profitability increased or decreased during the relevant period says nothing about what happened to API. Further, any changes in Darling's profitability can be attributed to numerous factors that are wholly irrelevant to API's claims, such as changes in contractual terms, the decision to change suppliers for quality or other reasons, changes in the labor market, increases/decreases in utility costs, etc.

Finally, to the extent this Request seeks "public" financial records, it is inappropriate. API is a party to this case. Darling is not. Darling is not required to incur the time, disruption, and expense of gathering publicly available documents that API can obtain itself.

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

**Request No. 5**: This Request seeks "**[a]ll communications**" between Darling and any Defendant. Although Darling has repeatedly made clear that this Request is improper because it makes no effort to tie the responsive documents to any claim or defense in the underlying litigation, API has refused, and continues to refuse, to narrow it. For the reasons set forth in the Objections and in our September 6, 2023, conferral call, this Request is overly broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Therefore, the burdens associated with responding to this Request are disproportionately greater than any purported benefit.

Rather than make any effort to try and narrow this Request to the claims and defenses at issue in the litigation, API instead demands that Darling search its records for any email sent to or received from the @tyson.com domain. In other words, API's proposed compromise is that Darling search for every email ever sent to or received from any person that worked at Tyson. This approach does not remotely resolve the issue. As just one example, if Darling employee John Doe is friends with James Smith who works at Tyson, Darling would have to locate and review every single email those two individuals sent to each other, including emails on such irrelevant topics as them planning to meet for lunch or to go to their children's high school football game together.

API also ignores a threshold issue: this Request seeks communications with Tyson, *i.e.*, **a party to the litigation**. Consequently, API is required to obtain the information from Tyson, not third-party Darling. Indeed, Darling is not required to incur the time, expense, and disruption of searching for documents that API can and should obtain from a party to this case. While we understand that API is purportedly concerned that Tyson may not have all the communications, API has not provided Darling with any proof substantiating that concern. Unless and until API provides Darling with substantial evidence proving that the requested information cannot be obtained from Tyson, Darling has no obligation to, and will not, provide documents responsive to this Request. *See, e.g., Baker v. Yates*, 2015 U.S. Dist. LEXIS 26564, at *2 (E.D. Cal. Mar. 3,

2015) ("the Court will require Plaintiff to demonstrate that he attempted to obtain these documents directly from Defendant S. Moore before seeking them from third party CDCR."); *Petro. Mktg. Grp., Inc. v. Universal Prop. Servs.*, 2023 U.S. Dist. LEXIS 165677, at *7 (D. N.J. Mar. 30, 2023) (denying motion to compel where plaintiff failed to show that the documents at issue could not have been obtained "through party discovery in the first instance before seeking broad third-party discovery."). Indeed, "[c]ourts are particularly reluctant to require a non-party to provide discovery that can be produced by a party. Accordingly, [a] court may prohibit a party from obtaining discovery from a non-party if that same information is available from another party to the litigation." *Spring Pharms, LLC v. Retrophin, Inc.*, 2019 U.S. Dist. LEXIS 133316 (E.D. Pa. Aug. 8, 2019).

Finally, API's demand that Darling incur the time, disruption, and expense of conducting ESI searches now to determine the specific time and expense associated with searching for every email sent to or from a Tyson employee is without merit. Certainly, API and its counsel know how time consuming and costly it is to capture and host ESI, even if that process is limited to conducting keywords. Among other things, Darling would have to retain and pay an outside vendor, ingest likely hundreds of thousands of emails (if not more), and then pay to host that substantial amount of data. Darling is not required to, and will not, incur those costs when there is no reasoned basis to do so.

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

**Request Nos. 6, 7 and 9**: These Requests are extremely overbroad and not remotely tied to the claims and defenses at issue in the underlying litigation. For example, Request No. 6 seeks "[a]ll communications between [Darling] and any entity about Defendants." As Darling previously explained to API, this Request is so overly broad that it would require Darling to produce emails discussing whether Tyson chicken nuggets taste good. Darling has repeatedly asked API to narrow the scope of these Requests, but it refuses to do so.

Rather than narrow these overly broad Requests, API instead asks Darling to conduct broad keyword searches across an unidentified number of custodians. During our September 6, 2023, conferral call, I expressly rejected this approach. Yet, six weeks later, API's response is simply to make the same demand again. That is not how a good faith conferral process works.

As Darling has already explained, keywords do not resolve the deficiencies in these overly broad Requests. For one, the information API claims it needs is not relevant. For example, API states that it seeks emails where Darling discusses its **opinions** of Tyson's sales and marketing behavior (Darling does not concede such emails exist). But Darling's opinions are just that, opinions. They are neither facts nor evidence. Tyson's sales and marketing behavior speaks for itself, and API is free to make any argument it sees fit relating to that conduct to the court. Darling's opinions, if any, do not constitute admissible or relevant evidence. Any minimal probative value the emails may have is outweighed by the cost and competitive risk associated with producing them.

Further, API's proposed keywords are not narrowly tailored and will result in numerous false positives. Moreover, as stated above, Darling is not required to incur the substantial time, disruption, and expense ingesting at least hundreds of thousands of emails to provide specific data as to the number of "hits" the proposed keywords obtain on an unidentified number of custodians.

Additionally, Request No. 9 seeks communications relating to Darling's contractual negotiations with Defendants. But API is required to seek that information from Defendants, not a third party. Defendants have their contracts with Darling as well as the parties' negotiations thereof (Darling does not concede that such highly confidential information should be produced). To the extent Darling has any internal opinions on those communications, they are not relevant to API's claims because, among other things, they have no market impact. Further, Darling's internal negotiation strategies constitute Highly Confidential/Trade Secret Information.

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

**Request No. 8;** This Request seeks "**[a]ll documents** relating to any industry trade group or association meeting in which Defendants were discussed between January 1, 2017 to present." Darling has already explained (at least twice) why this Request is overly broad and unduly burdensome. It will not do so again. Suffice it to say that a Request seeking all documents in any way relating to a trade group meeting wherein one of the industry's largest competitors was discussed is equivalent to asking for all documents (including travel receipts and marketing materials) relating to every industry trade group or association meeting that has occurred in the last nearly seven years.

Your Letter states that API will withdraw this Request if Darling provides an Affidavit that it "never discussed Tyson at any trade group event or meeting." This is an empty proposal. Tyson is one of the largest competitors in the industry so the notion that no one ever said **anything on any topic** about Tyson at a trade group event or meeting is absurd. It is akin to saying that no person at any automobile trade group meeting ever said anything on any topic about Ford or Honda.

API also ignores the fact that it was likely present at most, if not all, trade group and association meetings. Thus, API should already have in its possession the very documents it now seeks from Darling. Likewise, Tyson attended most, if not all, trade group and association meetings. Thus, API can and should seek these documents from a party to the litigation, not a third party. *See supra* at 5-6 (citing cases). API can also seek the information from the trade group associations themselves.

Darling respectfully rejects your proposal and stands on its objections. As we have previously stated for this and the other Requests, API needs to amend the topics so they are narrowly tailored to the claims and defenses at issue in the underlying litigation.

**Request No. 10:** Once again, API refuses to narrow an overly broad Request, and instead demands that Darling conduct keyword searches of an unidentified number of custodians. That is not how

discovery works. API needs to send proper document Requests, and only then will Darling conduct an appropriate search for documents (assuming the modified Request is proper).

Further, for the reasons we previously stated, this Request is overly broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Among other things, a Darling employee's personal subjective opinion of API's lawsuit has no relevance to this case. What matters is Tyson's actual conduct and the impact, if any, it had on API. Even if a Darling employee's opinion was minimally probative, that probative value is far outweighed by the burdens associated with responding to this Request.

Moreover, the proposed keywords are not remotely tailored and will inevitably "hit" an inordinate number of false positives. For example, a marketing email stating that representatives from Tyson and API will be attending would be "hit" by the proposed keywords. As would any email that has a list of the large players in the rendering industry (regardless of the email's topic).

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

**Request Nos. 11, 14, and 15:** As stated above, API cannot cure deficiencies in its overly broad Requests through keywords. Rather, API must first serve proper Requests, and then the parties can discuss keywords and custodians if warranted.

Darling has informed API, several times, why these Requests are improper. Consider Request No. 11, which seeks "[a]ll internal and external communications regarding pricing and output volumes" for both raw materials and finished rendering products. For one, this Request, like the other Requests, seeks Highly Confidential/Trade Secret Information without providing Darling with adequate protection.

Further, API's lawsuit relates to purported changes in **API's** volume and pricing, not any changes at Darling. As noted above, the fact that Darling might have experienced volume or pricing changes does not mean that API suffered similar changes or, if it did, that such changes were caused by the same factors. Indeed, any volume or pricing changes Darling might have experienced could have been caused by many factors, including, without limitation, changes in contractual terms, changes in suppliers, fluctuations in the labor market, etc. Thus, any purported benefit from this information is materially outweighed by the burden of obtaining it and the competitive risks associated with its production to a competitor.

Likewise, to the extent Darling may have opinions as to the changes in **Darling's** volume or pricing, those opinions are irrelevant to the underlying litigation. API's lawsuit is about Tyson's conduct and API can obtain information about that conduct from Tyson. Once it obtains that information, API is free to make whatever arguments it deems fit about that conduct and how it allegedly affected API.

Even if the information sought by these Requests is narrowly tailored (it is not), the proposed keywords are extraordinarily overbroad. For example, the keywords would "hit" the following emails:

- \* An email saying an employee's kids are "demanding chicken again tonight"

- \* An email saying "I can't believe the price of a McDonald's chicken sandwich"

- \* An email saying "The chicken at Kroger is really underpriced"

- \* An email saying "The chicken dance is trending on Tik Tok"

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

**Request Nos. 12 and 13:** This is yet another instance where API has refused to narrow clearly overly broad requests. It is also another example of where API is required to obtain information from Tyson (a party) and not Darling (a third party). Indeed, Request No. 12 seeks all agreements, contracts, and purchase orders "with Defendants." API is required to obtain that information from the Defendants, not Darling.

Additionally, API fails to even provide proposed keywords for these Requests, other than to say that Darling should search an unidentified number of custodians for any email with the word "contract" or "agreement." That proposal does little to resolve the deficiencies in these Requests.

Darling stands on its objections, including those raised in the Objections, the September 6, 2023, conferral call, and herein.

### API's Claim of Market Harm

Your letter ends by stating that "Darling, as a competitor of Tyson, appears to be the victim of any anticompetitive violations by Tyson in the market." It is API who elected to bring litigation, not Darling. And Darling is not required to incur time, expense, and disruption working on a lawsuit it did not bring. Further, your reliance on market harm rings hollow given API's campaign to try to force Darling and others to produce their Highly Confidential/Trade Secret Information to API, Tyson, and other competitors.

### Closing Points

For the reasons stated in the Objections, the September 6, 2023, conferral call, and herein, Darling objects to the Requests. While Darling worked cooperatively and in good faith with API to narrow the Requests, API has been unwilling to reciprocate. For that reason, if API seeks documents, it must either move to enforce the Subpoena as written or serve a new subpoena and we will evaluate the Requests contained therein.

It is unfortunate that API has refused Darling's reasonable request to narrow the clearly overly broad and improper Requests.

Sincerely,

/s/ Steven Rosenwasser
Steven Rosenwasser