# EXHIBIT 3



Steven J. Rosenwasser
Tel. (678) 553-7388
rosenwassers@gtlaw.com

December 1, 2023

**Via Electronic Mail Only**
Romeo S. Quinto Jr.
Holland & Knight
150 North Riverside Plaza, Suite 2700
Chicago, IL 60606
Romeo.quinto@hklaw.com

**Re:     American Proteins, Inc.'s Subpoena to Darling Ingredients Inc.**

Dear Romeo:

I am in receipt of and responding to your November 13, 2023, letter relating to the subpoena American Proteins, Inc. ("API") served on Darling Ingredients Inc. ("Darling") (hereafter, the "Subpoena"). I will address the issues in your letter in the order in which you raised them.

### The History of the Parties Conferral

Your letter, at best, mischaracterizes the history of the Subpoena conferral process. Before addressing that, it is worth pointing out the irony in your letter. You begin by claiming that your "primary interest is reaching compromise." Yet, in that very same paragraph, you resort to making inaccurate claims about Darling's efforts to resolve the parties' disputes, including claiming that Darling "refuses to budge," "baits [API] to try [its] claims as though Darling is the arbiter of [its] underlying dispute with Tyson," and "unilaterally shut down the meet-and-confer process." And, later in your letter, you refer to Darling's positions as "nonsensical" and "absurd" and accuse Darling of not "taking this meet-and-confer process seriously." Those statements (and others) are demonstrably false. They are also a far cry from your purported desire to work cooperatively. If you truly want to reach an agreement, we ask that you please tone down the rhetoric and focus on the substantive disputes and how we can try to resolve them.

As for your claim that Darling has "refused to budge" in the conferral process, the record unequivocally demonstrates to the contrary. It is API, not Darling, who has been the obstacle to resolution. Among other things:

\*      While Darling has timely engaged in the conferral process, API has repeatedly caused delay. As just one example, during the parties September 6, 2023, conferral call, API promised to review the Subpoena requests (the "Requests") and thereafter send narrowed Requests that are tailored to the claims and defenses at issue in API's litigation with Tyson (the "Litigation"). API did not follow up with Darling on that issue until October 19, 2023, *i.e.*, more than six weeks later. And, when API finally responded, it failed to narrow the Requests at all.

**Greenberg Traurig, LLP | Attorneys at Law**

Terminus 200 Building  |  3333 Piedmont Road NE, Suite 2500  |  Atlanta, Georgia 30305  |  T +1 678.553.2100  |  F +1 678.553.2212

www.gtlaw.com

\*      For many months, Darling has informed API that the Subpoena Requests, as written, are extremely overly broad, unduly burdensome, and seek information that is not remotely related to any claims or defenses in the Litigation. For example, the Subpoena seeks (i) **"[a]ll communications** between [Darling] and Defendants"** for a nearly ten-year period, regardless of whether the communication has anything to do with the Litigation; (ii) **"[a]] communications** between [Darling] and any entity about Defendants"** for a nearly-ten year period, again without regard to whether the communication has anything to do with the Litigation; and (iii) **"[a]ll documents** relating to any industry trade group or association meeting in which Defendants [one of the largest players in the industry] were discussed,"** which, as we stated, would include such irrelevant items as hotel receipts and plane tickets for the trade show attendees. Darling has repeatedly asked API to narrow the scope of the Requests so they are narrowly-tailored to the issues in the Litigation. Unfortunately, API refuses to do so.

\*      Darling has explained, in detail, why the Protective Order negotiated between API and Defendants is insufficient to protect Darling's highly confidential, proprietary, and trade secret information (the "Highly Confidential/Trade Secret Information"), particularly given that such information will be provided to Darling's competitors. Rather than refuse to produce information given its confidentiality concerns, Darling has simply asked API to make reasonable modifications to the Protective Order. As discussed below, API refuses to do so.

These are just a few examples of how API, and not Darling, has been the obstacle to resolving the Subpoena disputes. If API's "primary interest is reaching compromise" as it claims, we hope it will start to cooperate now.

### API Continues to Refuse to Modify the Protective Order

Your positions on the Protective Order are disingenuous and fail to adequately address our concerns. For one, your letter reads as though Judge Story unilaterally entered the Protective Order without any input or proposals from the parties. Indeed, you repeatedly refer to the Protective Orde as "Judge Story's protective order" and discuss how "Judge Story contemplated" various points. We both know that is not the case. API and Tyson negotiated and drafted the Protective Order and then submitted a proposed Protective Order for Judge Story to sign. While the parties may have drafted and submitted a Protective Order that sufficiently protected *their* interests, it does not adequately protect the interests of third parties like Darling. If we are required to explain to Judge Story why the Protective Order you drafted addressed your concerns but not ours, we will do so. We are confident that Judge Story will listen to and address our concerns.

Turning to the substance of the Protective Order, we have repeatedly explained, both orally and in writing, why the Protective Order does not adequately protect Darling's Highly Confidential/Trade Secret Information. Rather than address those concerns by modifying the Protective Order (at least as to Darling), API continues to discount them using faulty logic.

For example, Darling is highly concerned that the Protective Order permits **in-house** counsel for Tyson and other competitors to receive and review Darling's Highly Confidential/Trade Secret Information. As we previously explained, it is common for a company to seek information and advice from its in-house counsel when making pricing, marketing, and sales decisions as well as during contract negotiations (which involve pricing and supply issues). Thus, the Protective Order currently allows persons actively involving in sales, marketing, and pricing decisions access to Darling's Highly Confidential/Trade Secret Information.

In response to this concern, you state that the Protective Order indicates that information designated as "Highly Confidential Discovery Material shall be used solely for purposes of this Litigation." While that may be the case, you miss the bigger point, *i.e.*, people cannot simply forget information they review. As a hypothetical example, assume that Tyson's in-house counsel reviews a Darling document showing that Darling pays $XX for a certain raw material and, thereafter, that counsel is asked to negotiate a supply contract for that same raw material. It would be impossible for that counsel to simply "forget" his knowledge of what Darling paid for the raw material. Instead, it is inevitable that he will use Darling's Highly Confidential/Trade Secret Information in his contract negotiations. Indeed, that concern is the basis for the "inevitable disclosure" doctrine. *See, e.g., PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."); *Fountain v. Hudson Cush-N-Foam Corp.*, 122 So.2d 232, 234 (Fla. Dist. Ct. App. 1960) (employee's "knowledge of the trade secrets would be so entwined with his employment" that "it would seem logical to assume that his employment by a competitor…would eventually result in a disclosure of this information.") API has refused, and continues to refuse, to address this concern. Yet, it could easily do so by simply modifying the Protective Order to preclude **all** of Defendants' employees, including their in-house counsel, from reviewing or obtaining Darling's Highly Confidential/Trade Secret Information.

API also continues to ignore Darling's concern that the Protective Order permits "witnesses" to review Darling's Highly Confidential/Trade Secret Information. While there are some limitations as to which witnesses can review Highly Confidential/Trade Secret Information, those limitations are insufficient. For example, a witness can review Darling's Highly Confidential/Trade Secret Information if he claims to have "personal knowledge of the information." What if Tyson's head of sales claims that he has personal knowledge of pricing in the rendering industry, does that mean he can now access all of Darling's Highly Confidential/Trade Secret Information relating to pricing?

Regardless, there is no legitimate reason for API's or Defendants' employees to need to review Darling's Highly Confidential/Trade Secret Information "to prepare for depositions or testimony" or to "prepare and submit declarations or affidavits." API's and Defendants' employees should be testified about their personal knowledge of their own company's business. They did not need Darling's **internal** communications on highly sensitive matters to testify.

On this issue, there is also a simple solution. Modify the Protective Order as to Darling so that no party's employees can review or otherwise obtain Darling's Highly Confidential/Trade Secret Information unless the witness had previously reviewed it. That is, the only people who can review such information are outside counsel and experts.

At bottom, for months Darling has offered a very simple resolution to the Protective Order issue, *i.e.*, API should modify the Protective Order to address Darling's concerns. Yet, API has refused to do so. Instead, API insists that Darling – a third party – incur the time and expense of modifying API's Protective Order for API's case. That is not how third-party discovery works. API is the one seeking the documents, and thus the burden is on API to make proposed edits to the Protective Order. Darling stands ready, willing, and able to review and respond to any proposed edits API sends.

<u>**API Continues to Ignore the Substantial Cost**</u>
<u>**of ESI Ingestion, Hosting, Searching, and Review**</u>

Before addressing the specific Requests, it is important to reiterate that API has refused, and continues to refuse, to respond to Darling's concerns about the substantial costs associated with responding to the Subpoena, particularly as drafted.

As discussed more below, API has, for the most part, been unwilling to modify the extremely broad nature of the Requests. Instead, API claims that Darling can reduce the burden by conducting keyword searches of relevant custodians' email boxes. That claim ignores two points.

First, as written, the Subpoena would require Darling to search a substantial number of employees' email boxes. Indeed, the Subpoena seeks "**[a]ll documents**" on a variety of broad topics such as (i) purchasing raw materials; (ii) sales price; (iii) forecasting; (iv) budgeting; (v) acquisitions; (vi) financial performance; and (vii) trade shows. In fact, **Request No. 6 seeks "[a]ll communications" that even mention any Defendant**. To fully respond to these Requests would require Darling to search thousands of current and former employees' email boxes over a nearly ten-year period. That is precisely why the Requests need to be narrowed before the custodians are identified.

Second, API simply ignores the cost of ESI review, even if it is limited to conducting keyword searches. For Darling to conduct keyword searches, it will need to, among other things, (i) retain a e-discovery vendor; (ii) gather emails for a nearly ten-year period for all the custodians; (iii) have those emails ingested into the e-discovery vendor's review platform; and (iv) search them. Assuming *arguendo* that Darling identifies ten custodians, and assuming each custodian sends and receives 150 emails per business day, that equates to 39,000 emails per year or 390,000 emails per custodian for the requested ten-year period. Thus, to simply conduct keyword searches of ten custodians, Darling would have to gather and ingest nearly 4 million emails. As I am sure you are aware, that comes with a substantial cost, which could easily exceed $75,000, particularly

once hosting costs are included. And, of course, that does not include any attorney time for gathering or reviewing the emails. We have asked whether API is willing to incur any of these costs and, to date, API has refused to agree to do so.

## The Specific Document Requests

**Request Nos. 1-4**: With respect to Request Numbers 1 through 4, you correctly state that Darling is not required to, and will not, produce its Highly Confidential/Trade Secret Information unless and until the Protective Order is modified to ensure that Darling's competitors do not use that information to their competitive advantage. We ask, again, that API please propose modifications to the Protective Order to address Darling's concerns.

Your letter then states that Darling "now contend[s] that the transaction data is irrelevant because increase or decreases to pricing or supply 'could be the result of numerous factors including…supply chain issues, changes in the labor market, and/or delivery and transport issues.'" As an initial matter, Darling has always asserted this position, it was not a new contention in our October 31 letter.

You claim that API is not required to prove to Darling why changes in **Darling's** prices, volumes or contract terms are relevant to API's causation claims. But we are not asking API to prove causation, but rather explain why Darling's transactional data is somehow relevant to API's claims, *i.e.*, to show why Darling's highly confidential transaction data is discoverable. API refuses to do so.

While API refuses to explain the relevance of Darling's transactional data, Darling has explained why it is irrelevant and why the burden and risks of producing the data are disproportionately greater than any purported benefit. As we previously indicated, this case is not about changes in **Darling's** prices, volumes, or contractual terms. It is about API. And, critically, the fact that Darling's prices and other terms may have changes has no bearing on API as the parties are wholly unrelated. Thus, by way of hypothetical example, if Darling's price for a certain raw material increased by 0.5% in 2018, that provides no relevant information to API because that increase could be due to factors wholly unrelated to API's business, such as increase in fuel costs, Darling's desire to establish a relationship with a new supplier, a higher lease rate for Darling's supplier, or a host of other reasons. Thus, a price increase says nothing about whether Tyson did or did not engage in any wrongdoing. For that reason, the benefit of Darling producing this information is, at best, minimal, while the potential harm of disclosing Darling's Highly Confidential/Trade Secret Information to a competitor is great.

There are many other reasons why Darling's transactional data is wholly irrelevant to API's claims. While Darling has no stake in this litigation and intends to stay neutral, you should be advised that, if we are forced to litigate this issue, we will have no choice but to explain to the Court why Darling's transactional data and other information is wholly irrelevant to causation and other issues in API's case.

With respect to Request Number 4, your purported narrowing of the Request is akin to no narrowing at all. Among other things, you state that you will "narrow" the Request to "seek forecasts, business plans, budgets and analyses concerning Raw Material Supply and Poultry Rendering Outputs **in anticipation of or in response to, in whole or in part, Tyson's [2018] acquisition of API <u>or operation of the former API assets</u>**." In other words, you seek all forecasts, business plans, budgets and analysis from 2018 to the present. In fact, your letter even states that you are demanding production of documents relating to Darling's 2022 acquisition of Valley Proteins, even though it occurred four years after Tyson's acquisition of API. You also demand that Darling produce documents on acquisition plans and business strategies it "is still developing." It is difficult to think of something more damaging to a business than to produce its current acquisition plans and business strategies to a direct competitor. Simply put, your letter does not narrow Request Number 4 in any meaningful way, if it all.

Finally, you claim that Darling has not provided API with information about the burden of responding to the Requests. Not so. During our conferral call and thereafter, we provided API with detailed information about the process needed to gather, search for, and review responsive documents, and made clear that the cost of that process will easily exceed $150,000. We have asked API whether it will assume that cost. API has made clear it will not do so.

**Request Nos. 5-7, 9-11, 14-15**: Your letter states that these Requests seek "Darling's communications with Tyson and others on various enumerated topics," but fail to identify the "enumerated topics." The reason is obvious: the topics are overly broad and involve issues that have nothing to do with the Litigation. As just two examples:

* Request No. 5 seeks "[a]ll communications between [Darling] and Defendants," regardless of the subject matter of the communication. Thus, by way of example, if a Darling employee invited his friend John Smith, a Tyson employee, to lunch, Darling must incur the time and expense of searching for, reviewing, and producing that email.

* Request No. 6 seeks "[a]ll communications between [Darling] and any entity about Defendants." In other words, as written, this Request purports to require Darling to search the emails of its over 14,000 employees to find every instance in which a Darling employee spoke to any other person regarding anything "about Defendants," regardless of the topic.

Setting aside the Requests are overly broad and seek irrelevant information, you claim that Darling's claim that responding to the Requests would be be cost prohibitive is "mere speculation." It is not. Darling does not need to speculate to know that searching 14,000 employees' emails for "[a]ll communications" that in any way reference Tyson or any other Defendant would be prohibitively time consuming and costly. If you are now claiming that you want something other than that information, then you should have modified the Requests to so indicate. We asked you to do that repeatedly. And you have repeatedly refused.

Your letter then states, again, that Darling can solve the issue by reducing the number of custodians and then running keywords. But, absent some modification to the Requests, how is Darling to reduce the custodians without creating a risk that you will claim Darling did not comply with the Subpoena? For example, your letter states that Darling can identify the persons "most likely to have Raw Material Supply or Poultry Rendering Output discussions with Tyson (**or any other entity implicated by the request**."). But nothing in the Requests limits the communications to persons involved in Raw Material Supply or Poultry Rendering Output discussions. For example, Request No. 6 seeks "[a]ll communications" about Defendants regardless of topic. Your letter contradicts the Subpoena itself.

At the top of Page 6 of your letter, you claim that Darling's position on the keywords API proposed is "nonsensical." But, once your rhetoric is set aside, you provide no substantive basis for that position. Far from being nonsensical, Darling's position is correct. For example, Request No. 5 seeks "**[a]ll communications** between [Darling] and Defendants." If Darling employee John Doe emails Tyson employee James Smith about meeting for lunch, isn't that a communication between Darling and Defendant? If Darling employee Jane Harris emails Tyson employee Mark Davis to ask him whether Tyson wants to sponsor a cancer walk with Darling, isn't that also a communication between Darling and Defendant? While API may claim that it is not seeking those emails, that is not what Request No. 5 says.

You then discuss Request No. 8, claiming that Darling has "halt[e]d all reasonable progress" because it refused to provide "some assurance" that it "never discussed Tyson at any trade group event or meeting." But, as we previously indicated, API's request is unreasonable. How can Darling provide assurance that Tyson – one of the largest companies in the rendering industry – was never discussed at a rendering industry trade group event?

You then claim that Darling is not being cooperative because it "offered no alternative." Once again, API, the party to the Litigation and the entity serving the Subpoena, is trying to flip the burden on its head. It is API's responsibility to clearly state what documents it is and is not seeking. It is not for Darling to guess what API wants and then to devise requests or compromises based on that guess.

Finally, you turn to Request Nos. 12 and 13, which you again fail to quote or properly describe. Request No. 12 seeks "[a]ll documents reflecting contracts, agreements, purchase orders, or other arrangements of any kind between You **and Defendants** from January 1, 2014, to the present limited to the Market." On it face, this Request seeks documents sent to one or more Defendants. As such, API is required to obtain the documents from the Defendants, who are parties to the Litigation, and not from third party Darling. We have previously asked API to explain why it contends that it cannot obtain these documents from the Defendants themselves. No response was provided. We ask that you please provide one now.

As for Request No. 13, it seeks "[a]ll documents reflecting contracts, agreements, purchase orders, or other arrangements of any kind between You and any Poultry Processor in the Market

from January 1, 2014, to the present." This information is the epitome of Highly Confidential/Trade Secret Information, and Darling is not required to produce it for that reason alone. That is particularly true here, given that this information has, at best, marginal relevance. Among other things, Darling's pricing has no bearing on API's pricing. They are driven by different factors, considerations, and variables, and are the product of independent negotiations between the parties.

### Communications With Other Third Parties

API's feigned concern about Darling's objection to other third-party subpoenas is easily rejected. Darling is a party to contracts with numerous participants in and related to the rendering industry. Those contracts often contain highly confidential information that, if disclosed to Darling's competitors (like Tyson), will cause Darling competitive harm. To ensure that Darling's competitors do not obtain its highly confidential contractual information, Darling's contracts often contain confidentiality terms, which require a party who receives a subpoena seeking the contract or its confidential terms to inform Darling and provide it with an opportunity to object. As I'm sure you are aware, such terms are commonplace.

In any event, in accordance with their contractual obligations, one or more third parties have informed Darling when they received a subpoena seeking their contract with Darling or its terms. Our November 10, 2023, email was based on that contact. Thus, you have no basis for allegedly being "very concerned" about Darling's communications relating to API's subpoenas.

### The Process Moving Forward

Darling has been and remains open to working cooperatively with API with the hope that we can reach an amicable resolution to the Subpoena disputes. Unfortunately, to date, API has been unwilling to respond in kind. Indeed, we asked API to send us proposed redlines to the Protective Order. API refused. We asked API to send us revised Requests that are appropriately narrowed to the issues in the Litigation. API refused. We asked API to agree to pay the costs that Darling would have to incur to respond to the Subpoena. API refused. We ask that API please stop its steadfast refusals and instead work with us to find a mutually agreeable solution.

Your letter ends by stating that API has the right to move to compel on Requests that were never served, but instead were purportedly contained within an email or letter or as modified for the first time in the motion. We respectfully disagree. The operative discovery is the Subpoena. That is what we are responding to. If API wants Darling to consider Requests other than those in the Subpoena, please serve a new Subpoena with new Requests (as we have repeatedly asked API to do).

We look forward to your response.

Sincerely,

*/s/ Steven Rosenwasser*
Steven Rosenwasser

ACTIVE 691573026v1